**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| ATLAS COPCO CONSTRUCTION MINING TECHNIQUE USA LLC, a Delaware Limited Liability Company, and ATLAS COPCO CUSTOMER FINANCE USA LLC, a New Jersey Limited Liability Company | ) ) ) ) ) ) ) | No. 08CV2363 EDA JUDGE DER-YEGHIAYAN MAGISTRATE JUDGE BROWN |
| v. | ) ) ) | |
| INDIE ENERGY SERVICES COMPANY, LLC, an Illinois Limited Liability Company, and DANIEL CHEIFETZ, an individual. | ) ) ) ) ) | |

**DEFENDANTS' ANSWER TO VERIFIED COMPLAINT,**
**AFFIRMATIVE DEFENSES AND COUNTERCLAIMS**

Defendants Indie Energy Systems Company, LLC ("Indie Energy"), incorrectly named as Indie Energy Services Company, LLC, and Daniel Cheifetz, (collectively, "Defendants") through their attorneys, Schiff Hardin LLP, hereby answer Plaintiffs' Verified Complaint, as follows:

**NATURE OF ACTION**

1.      This is an action to recover property, amounts due on Indie Energy's accounts with Plaintiff, and fees, costs, and expenses, based on Indie Energy's failure to make payments to Plaintiff and Cheifetz's personal guarantee of those payments.

**ANSWER:** This paragraph makes no allegations against Defendants and they therefore make no answer thereto.

## PARTIES

2.      Plaintiff CMT is a Delaware Limited Liability Company with its principal place of business in Commerce City, Colorado.  Its sole member is Atlas Copco North America LLC, a Delaware Limited Liability Company with its principal place of business in New Jersey.  Atlas Copco North America LLC has two members: Atlas Copco USA Holdings Inc., a Delaware Corporation with its principal place of business in New Jersey, and Atlas Copco Finance S.a.r.l., a Luxembourg corporation.

**ANSWER:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 2 and therefore demand strict proof thereof from Plaintiffs.


3.      Plaintiff ACF is a Delaware Limited Liability Company with its principal place of business in New Jersey.   Its membership is identical to that of CMT. Specifically, its sole member is Atlas Copco North America LLC, a Delaware Limited Liability Company with its principal place of business in New Jersey.  Atlas Copco North America LLC has two members: Atlas Copco USA Holdings Inc., a Delaware Corporation with its principal place of business in New Jersey, and Atlas Copco Finance S.a.r.l., a Luxembourg corporation.

**ANSWER:**  Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 3 and therefore demand strict proof thereof from Plaintiffs.


4.      Defendant Cheifetz is a citizen of Illinois, residing at 1000 Michigan Avenue, Wilmette, Illinois 60091.

**ANSWER:** Admitted.

5.    Defendant Indie Energy is an Illinois Limited Liability Company with its principal place of business located at 1020 Church Street, Evanston, Illinois 60201. Its sole member is Defendant Cheifetz, a citizen of Illinois.

**ANSWER:** Admitted.

## JURISDICTION AND VENUE

6.    This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship among the parties and the amount in controversy, without interest and costs, exceeds $75,000.

**ANSWER:** Admitted.

7.    This court has personal jurisdiction over Defendants because of Defendants' presence in, and contacts with, the forum state.

**ANSWER:** Admitted.

8.    Venue is proper in the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1391(a) because both Defendants reside therein, a substantial part of the events or omissions giving rise to the claim occurred therein, and a substantial part of the property that is the subject of the action is situated therein.

**ANSWER:** Admitted.

## FACTS COMMON TO ALL COUNTS

9.    Plaintiffs are, and were at all relevant times, engaged in the business of financing, leasing, and renting, among other things, construction and mining equipment.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 9 and therefore demand strict proof thereof from Plaintiffs.


10.    On or about July 17, 2006, CMT and Indie Energy entered into a Master Capital Equipment Lease ("T2W Agreement") whereby Plaintiff leased to Indie Energy an Atlas Copco drill, model number T2W, serial number 6201, attached to a vehicle, year 1997, make International, model 2000 Series 2674, vehicle ID number 1HTGLATT3VH431381, in exchange for periodic rent payments.  CMT delivered said property to Indie Energy.  A true and correct copy of relevant documents is attached hereto and made a part hereof as **Group Exhibit A**.

**ANSWER:** Defendants admit that Indie Energy entered into a written agreement with Atlas Copco Mining Construction Technique, LLC on July 17, 2006 for the financing of an Atlas Copco model number T2W, serial number 6201, attached to a vehicle, year 1997, make International, model 2000 Series 2674, vehicle ID number 1HTGLATT3VH431381.  Defendants deny that it was a "lease."


11.    On or about July 18, 2006, Defendant Cheifetz executed a Guarantee ("First Guarantee") whereby he personally agreed to assume any and all of Indie Energy's obligations to CMT upon Indie Energy's default or failure to pay on any of its

obligations to CMT.  A true and correct copy of relevant documents is attached hereto and made a part hereof as **Group Exhibit B**.

**ANSWER:** The July 18, 2006 Guarantee speaks for itself.

12.    On or about April 12, 2007, CMT and Indie Energy entered into an Installment Loan & Security Agreement ("Compressor Agreement") whereby CMT loaned $99,450 to Indie Energy to be repaid in installments at an interest rate of 7.95%. In exchange, CMT retained a security interest in the collateral, an Atlas Copco compressor, model number XRVS 976CD, serial number 539285.  The compressor was previously delivered on or about April 4, 2007.  A true and correct copy of relevant documents is attached hereto and made a part hereof as **Group Exhibit C.**

**ANSWER:** Admitted.

13.    On or about April 12, 2007, Defendant Cheifetz executed a Guarantee ("Second Guarantee") whereby he personally agreed to assume any and all of Indie Energy's obligations to CMT upon Indie Energy's default or failure to pay on any of its obligations to CMT.  A true and correct copy of relevant documents is attached hereto and made a part hereof as **Group Exhibit D**.

**ANSWER:** The April 12, 2007 Guarantee speaks for itself.

14.    On or about June 20, 2007, CMT and Indie Energy entered into an Installment Loan & Security Agreement ("TH60 Agreement") whereby CMT loaned $564,588.46 to Indie Energy to be repaid in installments at an interest rate of 7.95%.  In

exchange, CMT retained a security interest in the collateral, an Atlas Copco drill, model number TH60, serial number 21129, mounted on a Peterbilt truck, serial number 1NPAL40X-7-7D661603. The collateral was previously delivered on or about May 23, 2007. A true and correct copy of relevant documents is attached hereto and made a part hereof as **Group Exhibit E.**

**ANSWER:** Admitted.

15. On or about May 24, 2007, Defendant Cheifetz executed a Guarantee ("Third Guarantee") whereby he personally agreed to assume any and all of Indie Energy's obligations to CMT upon Indic Energy's default or failure to pay on any of its obligations to CMT. A true and correct copy of relevant documents is attached hereto and made a part hereof as **Group Exhibit F**.

**ANSWER:** The May 24, 2007 Guarantee speaks for itself.

16. CMT's rights under these agreements were duly assigned to ACF, a related entity.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 16 and therefore demand strict proof thereof from Plaintiffs.

17. On or about March 7, 2008, ACF notified Indie Energy and Cheifetz that the T2W, Compressor, and TH60 accounts were overdue and delinquent. On or about March 24, 2008, Plaintiffs notified Indie Energy that it was in default and demanded

return of the collateral.   A true and correct copy of relevant documents is attached hereto and made a part hereof as **Exhibit G**.

**ANSWER:**  Admitted.


18.    As of the date of this Complaint, Indie Energy owes $187,497.81 on the T2W Agreement, $72.571.79 on the Compressor Agreement, and $529,575.87 on the TH60 Agreement.

**ANSWER:**    Defendants admit only that as of the date of Plaintiffs' Complaint, there were outstanding balances owed on the T2W Agreement, the Compressor Agreement and the TH60 Agreement.


19.    As of the date of this Complaint, Indie Energy has an outstanding consumables balance of $57,078.05.  A true and correct copy of relevant documents is attached hereto and made a part hereof as **Exhibit H**.

**ANSWER:**    Defendants admit only that as of the date of Plaintiffs' Complaint, there were outstanding balances owed on the T2W Agreement, the Compressor Agreement and the TH60 Agreement.


## COUNT I: ACTION FOR REPLEVIN

20.    Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1-19 as though fully set forth herein.

**ANSWER:**  Defendants re-allege and incorporate by reference their answers to the allegations in paragraphs 1 through 19 above as if fully set forth herein.

21.    After executing the above-referenced Agreements, Indie Energy became delinquent in its payments.

**ANSWER:**  Defendants admit only that as a result of Plaintiffs' breaches of contract, breaches of warranties and fraudulent misrepresentations that Indie Energy eventually stopped payments on the Agreements.

22.    On or about March 7, 2008, Plaintiffs notified Indie Energy that the accounts were overdue and delinquent.   Indie Energy refused to make the required payments, and continues to do so.  On or about March 24, 2008, Plaintiffs notified Indie Energy that it was in default and demanded return of the collateral.

**ANSWER:**  Defendants admit that on March 7, 2008, Plaintiffs notified Indie Energy that the accounts were overdue and delinquent and that on March 24, 2008, Plaintiffs notified Indie Energy it was in default and demand return of the collateral. Defendants deny the remaining allegations of Paragraph 22.

23.    Due to Indie Energy's default on the three Agreements, Plaintiffs are entitled to the immediate possession of (1) the T2W drill, serial number 6201; (2) the vehicle, year 1997, make International, model 2000 Series 2674, vehicle ID number 1HTGLATT3VH431381; (3) the compressor, model number XRVS 976CD, serial number 539285; (4) the TH60 drill, serial number 21129; and (5) the Peterbilt truck, serial number 1NPAL40X-7-7D661603.

**ANSWER:**  Denied.

24.    Defendants' refusal to surrender possession of said property is wrongful and in violation of Plaintiff's right to immediate and exclusive possession of this equipment.

**ANSWER:** Denied.


25.    As a proximate result of Defendants' wrongful possession and detention of said property, Plaintiffs have suffered, and continue to suffer, the loss of use of said property, and the depreciation of said property.

**ANSWER:** Denied.


26.    Plaintiffs have incurred, and continue to incur, the cost of possession, including, without limitation, attorney's fees, court costs and litigation expenses, in an attempt to enforce their rights.

**ANSWER:** Denied.


27.    Said property not [sic] been taken for any tax, assessment, or fine levied by virtue of any law of this State, against the property of Plaintiffs, or against him or her individually, nor seized under any lawful process against the goods and chattels of such plaintiff subject to such lawful process, nor held by virtue of any order for replevin against Plaintiffs.

**ANSWER:** Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 27 and therefore demand strict proof thereof from Plaintiffs.

28.     WHEREFORE, Defendants respectfully request that the Court deny all relief sought by Plaintiffs.

## COUNT II: BREACH OF CONTRACT (T2W AGREEMENT)

29.     Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1-28 as though fully set forth herein.

**ANSWER:**  Defendants re-allege and incorporate by reference their answers to the allegations in paragraphs 1 through 28 above as if fully set forth herein.

30.     Indie Energy was notified by e-mail on or about March 7, 2008 that all of its accounts, including the T2W Agreement, were delinquent.

**ANSWER:**  Admitted.

31.     Indie Energy has refused to pay the amounts due on said Agreement.

**ANSWER:**  Defendants admit only that as a result of Plaintiffs' breaches of contract, breaches of warranties and fraudulent misrepresentations that Indie Energy eventually stopped payment on said Agreement.

32.     Pursuant to ¶ 19(A) of said Agreement, Indie Energy is in default due to its continuing failure to pay amounts due under the Agreement.

**ANSWER:**  Paragraph 19(A) of the referenced Agreement speaks for itself.  To the extent a response is necessary, Defendants deny the allegations of this paragraph.

33.    Pursuant to ¶ 19(F) of said Agreement, all sums due and to become due under said agreement are immediately due and payable to Plaintiffs.

**ANSWER:**  Paragraph 19(F) of the referenced Agreement speaks for itself.  To the extent a response is necessary, Defendants deny the allegations of this paragraph.


34.    WHEREFORE, Defendants respectfully request that the Court deny all relief sought by Plaintiffs.


### COUNT III: BREACH OF CONTRACT (COMPRESSOR AGREEMENT)

35.    Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1-34 as though fully set forth herein.

**ANSWER:**  Defendants re-allege and incorporate by reference their answers to the allegations in paragraphs 1 through 34 above as if fully set forth herein.


36.    Indie Energy was notified by e-mail on or about March 7, 2008 that all of its accounts, including the Compressor Agreement, were delinquent.

**ANSWER:**  Admitted.


37.    Indie Energy has refused to pay the amounts due on said Agreement.

**ANSWER:**  Defendants admit only that as a result of Plaintiffs' breaches of contract, breaches of warranties and fraudulent misrepresentations that Indie Energy eventually stopped payment on said Agreement.

38.    Pursuant to Section 4 of said Agreement, Indie Energy is in default due to its continuing failure to pay amounts due under the Agreement.

**ANSWER:**    Section 4 of said Agreement speaks for itself.    To the extent a response is necessary, Defendants deny the allegations of this paragraph.

39.    Pursuant to said Agreement, the outstanding principal balance, with all accrued and unpaid interest thereon, and all other amounts payable to Plaintiff under the terms of said Agreement are immediately due and payable to Plaintiffs.

**ANSWER:**    The referenced Agreement speaks for itself.    To the extent a response is necessary, Defendants deny the allegations of this paragraph.

40.    WHEREFORE, Defendants respectfully request that the Court deny all relief sought by Plaintiffs.

## COUNT IV: BREACH OF CONTRACT (TH60 AGREEMENT)

41.    Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1-40 as though fully set forth herein.

**ANSWER:**    Defendants re-allege and incorporate by reference their answers to the allegations in paragraphs 1 through 40 above as if fully set forth herein.

42.    Indie Energy was notified by e-mail on or about March 7, 2008 that all of its accounts, including the TH60 Agreement, were delinquent.

**ANSWER:**    Admitted.

43.    Indie Energy has refused to pay the amounts due on said Agreement.

**ANSWER:**    Defendants admit only that as a result of Plaintiffs' breaches of contract, breaches of warranties and fraudulent misrepresentations that Indie Energy eventually stopped payment on said Agreement.


44.    Pursuant to Section 4 of said Agreement, Indie Energy is in default due to its continuing failure to pay amounts due under the agreement.

**ANSWER:**    Section 4 of said Agreement speaks for itself.    To the extent a response is necessary, Defendants deny the allegations of this paragraph.


45.    Pursuant to said Agreement, the outstanding principal balance, with all accrued and unpaid interest thereon, and all other amounts payable to Plaintiffs under the terms of said Agreement are immediately due and payable to Plaintiffs.

**ANSWER:**    The referenced Agreement speaks for itself.    To the extent a response is necessary, Defendants deny the allegations of this paragraph.


46.    WHEREFORE, Defendants respectfully request that the Court deny all relief sought by Plaintiffs.

### COUNT V: ACTION TO RECOVER AMOUNTS DUE ON AN ACCOUNT

47.    Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1-46 as though fully set forth herein.

**ANSWER:**    Defendants re-allege and incorporate by reference their answers to the allegations in paragraphs 1 through 46 above as if fully set forth herein.

13

48.     Indie Energy owes CMT $57,078.05 on the consumables account set forth in Exhibit H.

**ANSWER:**   Indie Energy admits only that it has a consumables account with Atlas Copco that as of the date of this Answer has an outstanding balance.

49.     Pursuant to the above-referenced Guarantees executed by Cheifetz, this amount is also due and payable in full by Cheifetz.

**ANSWER:**   The above-referenced Guarantees speak for themselves.   To the extent a response is necessary, Defendants deny the allegations of this paragraph.

50.     WHEREFORE, Defendants respectfully request that the Court deny all relief sought by Plaintiffs.

### COUNT VI: ACTION TO RECOVER AMOUNTS DUE UNDER GUARANTEES

51.     Plaintiffs re-allege and incorporate the allegations contained in paragraphs 1-50 as though fully set forth herein.

**ANSWER:**   Defendants re-allege and incorporate by reference their answers to the allegations in paragraphs 1 through 50 above as if fully set forth herein.

52.     Defendant Cheifetz executed three separate Guarantees, each corresponding to one of the above-referenced Agreements.

**ANSWER:** Defendants admits only that Daniel Cheifetz executed three separate Guarantees.

53.   Each Guarantee requires Cheifetz to promptly pay <u>all</u> of Indie Energy's obligations, indebtedness, and liabilities of any kind, including unrelated and after-acquired debt, due to Plaintiff upon Indie Energy's default on <u>any</u> agreement, in addition to costs and expenses, including attorney fees.

**ANSWER:** The Guarantees referenced in this paragraph speak for themselves.

54.   As a result of Indie Energy's defaults on all three said Agreements, all three accounts are immediately due and payable in full.

**ANSWER:** Denied.

55.   In addition to the amounts due under the three said Agreements, Indie Energy has an outstanding consumables balance of $57,078.05.  This balance is also immediately due and payable under said Guarantees.

**ANSWER:** Indie Energy admits only that it has a consumables account with Atlas Copco that as of the date of this Answer has an outstanding balance.

56.   WHEREFORE, Defendants respectfully request that the Court deny all relief sought by Plaintiffs.

## **AFFIRMATIVE DEFENSES**

1. Plaintiffs' claims are barred, in whole or in part, by Plaintiff' failure to avoid, minimize or mitigate Plaintiffs' damages.

2. Any recovery by Plaintiffs on their claims is barred by the doctrines of set-off and recoupment.

3. Defendants are entitled to a setoff from any amounts claimed by Plaintiffs for all payments made and equity attained in the equipment purchased and/or leased pursuant to the June 17, 2006 Agreement, the April 12, 2007 Agreement and the June 20, 2007 Agreement.

4. Plaintiffs' claims are barred because Indie Energy detrimentally relied on Plaintiffs' representations and warranties regarding the suitability of the subject equipment for Indie Energy's business purposes.

5. Plaintiffs' claims are barred because they have waived and/or are estopped from contending that Indie Energy has defaulted on any of the subject agreements by reason of the parties' course of dealing with respect to partial payments made by Indie Energy.

6. Plaintiffs' claims with respect to the June 20, 2007 Agreement are barred because June 20, 2007 Agreement does not reflect a credit/set-off for equipment traded-in to the Plaintiffs, and therefore does not truly and accurately state the amount owed by Defendants.

## DEFENDANTS INDIE ENERGY SYSTEMS COMPANY, LLC'S
## AND DANIEL CHIEFETZ'S COUNTERCLAIMS

Defendants/Counter-claimants Indie Energy Systems Company LLC ("Indie Energy") and Daniel Cheifetz (collectively, "Counter-Claimants") for their Counterclaims against Atlas Copco Construction Mining Technique USA, LLC ("Atlas Copco CMT") and Atlas Copco Customer Finance USA LLC, (collectively, "Counter-Defendants") state as follows:

### INTRODUCTION

1.      Counter-Claimants bring these counterclaims to recover damages based on Counter-Defendants' breaches of contract, breaches of express warranties, breaches of implied warranties and fraudulent misrepresentations with respect to purchase and loan agreements for drilling equipment.

### THE PARTIES

2.      Counter-claimant, Indie Energy, is an Illinois Limited Liability Company with its principal place of business located at 1020 Church Street, Evanston, Illinois 60201.

3.      Counter-claimant, Daniel Cheifetz, is an individual who resides in Cook County, Illinois.

4.      Counter-defendant, Atlas Copco Construction Mining Technique USA, LLC, is a Delaware Limited Liability Company with its principal place of business in New Jersey.

5.    Counter-defendant, Atlas Copco Customer Finance USA LLC, is a Delaware Limited Liability Company with its principal place of business in New Jersey.

## JURISDICTION AND VENUE

6.    This court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 because there is diversity of citizenship among the parties and the amount in controversy, without interest and costs, exceeds $75,000.  Venue is proper in the United States District Court for the Northern District of Illinois pursuant to 28 U.S.C. § 1391(a) because the Counter-Defendants do business in this district, a substantial part of the events or omissions giving rise to the claim occurred therein, and the property that is the subject of this action is located therein.

## FACTS

7.    At all times relevant to these Counterclaims, Counter-Claimant, Indie Energy, designed and manufactured clean energy systems by using, in part, geothermal drilling techniques.

8.    Counter-Defendants manufacture, sell and finance industrial equipment, including mining and drilling equipment.

9.    Indie Energy has engaged in various written agreements with Counter-Defendants through which Indie Energy has financed and/or purchased equipment and materials necessary for the operation of its business from Counter-Defendants.

10.    Indie Energy specifically and expressly informed Counter-Defendants of the nature of its business - to provide geothermal-based renewal HVAC systems  - at or near the beginning of the business relationship.

11.    Atlas Copco CMT knew of the nature of Indie-Energy's business - to provide geothermal-based renewal HVAC systems – at or near the beginning of the business relationship.

12.    Atlas Copco CMT affirmatively represented, warranted and proposed to the Counter-Claimants that the equipment and materials sold to Indie Energy were suitable for the business purposes for which Indie Energy intended to use them.

13.    Specifically, Atlas Copco CMT represented to the Counter-Claimants that the use of Counter-Defendants' patented system Symmetrix, along with the purchased equipment, would enhance the efficiency and quality of Indie Energy's drilling operations.    Atlas Copco CMT represented, among other things, that the cocentric working principle of Symmetrix guaranteed effective drilling performance in all formations, boulders, sand, gravel etc; that Symmetrix would drill straight holes at any angle from vertical to horizontal equally effectively and that Symmetrix's construction and working principles would ensure substantially lower downtime, consumables and running costs.

14.    On or about July 17, 2006, Indie Energy entered into a lease/purchase agreement with Atlas Copco CMT whereby it financed the purchase of an Atlas Copco drill, model T2W, serial number 6201 and the truck on which the T2W drill is mounted, International model Series 2674, vehicle identification number 1HTGLATT3VH431381

(collectively, the "T2W drill").  See Master Capital Lease Agreement, attached hereto as Exhibit A.

15.    The total of the amount financed for the T2W drill was $315,126.24.

16.    Indie Energy holds title to the T2W drill.  See Certificate of Title of a Vehicle, attached hereto as Exhibit B.

17.    Counter-Defendants are not lien holders with respect to the T2W drill.

18.    On or about April 12, 2007, Indie Energy entered into an Installment Loan & Security Agreement with Counter-Defendants to purchase an Atlas Copco Compressor, Model XRVS 976CD, Serial No. 539285 ("Compressor").  See April 12, 2007 Installment Loan & Security Agreement, attached hereto as Exhibit C.

19.    Pursuant to the Compressor Agreement, Indie Energy was to maintain ownership of the Compressor, subject to a security interest held by Counter-Defendants.

20.    The total of the amount financed for the Compressor was $99,450.00.

21.    On or about June 20, 2007, Indie Energy entered into an Installment and Loan Agreement (the "June 20, 2007 Agreement") with Counter-Defendants to purchase an Atlas Copco drill, model number TH60, serial number 21129.  The TH60 drill was mounted on a Peterbilt truck, vehicle identification number 1NPAL40X-7-7D661603 (collectively, the "TH60 drill").  See June 20, 2007 Installment and Loan Agreement, attached hereto as Exhibit D and the May 30, 2007 UCC Financing Statement, attached hereto as Exhibit E.

22.    Pursuant to the June 20, 2007 Agreement, Indie Energy was to maintain ownership of the TH60 drill, subject to a security interest held by Counter-Defendants.

23.    The total purchase price for the TH60 drill was $604,500.00.

24.    The purchase invoice for the TH60 drill reflects that the balance due for the equipment, after a $280,000 credit was given for equipment traded-in, was $349,281.25.  See TH60 drill Purchase Invoice, attached hereto as Exhibit F.

25.    The June 20, 2007 Agreement states that the total amount financed for the TH60 was $564,588.46.

26.    The agreements entered into between Indie Energy and the Counter-Defendants required Indie Energy to use Atlas Copco replacement parts and service technicians.

27.    The T2W drill, the Compressor and the TH60 drill (collectively, the "Subject Equipment"), as well as the Symmetrix drilling system, all failed to perform as expressly and impliedly represented and warranted by Counter-Defendants.

28.    Counter-Defendants were aware of the failures, deficiencies and insufficiencies of the T2W drill, the Compressor, TH60 drill and the entire Symmetrix drilling system.  See Atlas Copco Symmetrix Drilling Presentation to Indie Energy, attached hereto as Exhibit G.

29.    Counter-Defendants were aware that the failures, deficiencies and insufficiencies of the T2W drill, the Compressor, the TH60 drill and the entire Symmetrix drilling system were due to their unsuitability for Indie Energy's business purposes.

30.    Atlas Copco CMT performed repairs and replacements of parts and accessories for the Symmetrix drilling system and applied the costs of such repairs and replacements to a "Consumables" account.

31.    Atlas Copco CMT's repairs and replacements of parts and accessories for the Symmetrix drilling system were unsatisfactory, defective and did not result in the adequate operation of any of the subject equipment.

32.    In contravention of Indie Energy's and Counter-Defendants' course of dealing, Counter-Defendants refused to accept the return of the defective T2W drill and the TH60 drill.

## COUNT I - BREACH OF CONTRACT

33.    Counter-Claimants incorporate by reference and reallege paragraphs 1 through 32, inclusive, as though fully set forth herein.

34.    Indie Energy entered into three agreements with Counter-Defendants, the June 17, 2006 Agreement, the April 12, 2007 Agreement and the June 20, 2007 Agreement, to purchase drilling equipment that, when used with Atlas Copco's Symmetrix drilling system, would facilitate Indie Energy's business purpose of providing clean energy HVAC systems to its customers.

35.    Counter-Defendants materially breached their contracts with Indie Energy by failing:

a.    To provide suitable geothermal drilling equipment as contracted and as appropriate for Indie Energy's business purposes.

b.    To provide truthful and accurate information regarding the suitability, performance characteristics and cost of the Symmetrix drilling system for Indie Energy's business purposes.

c.    To provide drilling equipment free of design and manufacturing defects and flaws.

36.    As a direct result of Counter-Defendants' breaches of contract, Indie Energy has incurred significant expense in repairing and replacing component parts of the Symmetrix system and incurred significant incidental and consequential damages, including lost business opportunities.

WHEREFORE, Counter-Claimants Indie Energy and Daniel Cheifetz, respectfully request that this Court enter judgment against Atlas Copco Construction Mining Technique USA, LLC and Atlas Copco Customer Finance USA LLC and in favor of Counter-Claimants for a sum in excess of $75,000 (in an amount to be determined at trial), plus interest, costs and attorneys' fees and any other relief this Court deems just and appropriate.

## COUNT II – BREACH OF EXPRESS WARRANTIES - UCC

37.    Counter-Claimants incorporate by reference and reallege paragraphs 1 through 36, inclusive, as though fully set forth herein.

38.    At all relevant times, there was in force and effect in Illinois, the Uniform Commercial Code, Sales, 810 ILCS 5/2-101, *et seq.*, which governs the contracts at issue.

39.    Counter-Defendants' preceding affirmations, representations and promises regarding the cost, appropriateness and performance of Atlas Copco's Symmetrix drilling system and the Subject Equipment created an express warranty that

the drilling system and the Subject Equipment would conform to the affirmations, representations and promises made by the Counter-Defendants, in accordance with 810 ILCS 5/2-313 "Express Warranties."

40.    Atlas Copco CMT advertised, marketed, showed and displayed depictions of its Symmetrix system, its T2W drill, its TH60 drill and its Compressor to representatives of Indie Energy.  Such action by Counter-Defendants created an express warranty that the Symmetrix system and the Subject Equipment would conform to Indie Energy's expectations, in accordance with 810 ILCS 5/2-313 "Express Warranties."

41.    As a direct result of Counter-Defendants breaches of their express warranties with respect to the sale of the Symmetrix system, the T2W drill, the TH60 drill and the Compressor, Indie Energy has incurred significant expense in repairing and replacing component parts of the Symmetrix system and incurred significant incidental and consequential damages, including lost business opportunities.

WHEREFORE, Counter-Claimants Indie Energy and Daniel Cheifetz, respectfully request that this Court enter judgment against Atlas Copco Construction Mining Technique USA, LLC and Atlas Copco Customer Finance USA LLC and in favor of Counter-Claimants for a sum in excess of $75,000 (in an amount to be determined at trial), plus interest, costs and attorneys' fees and any other relief this Court deems just and appropriate.

## COUNT III - BREACH OF IMPLIED WARRANTIES
## (MERCHANTABILITY) – UCC

42.    Counter-Claimants incorporate by reference and reallege paragraphs 1 through 41, inclusive, as though fully set forth herein.

24

43.    At all relevant times, there was in force and effect in Illinois, the Uniform Commercial Code, Sales, 810 ILCS 5/2-101, *et seq.*, which governs the contracts at issue.

44.    Counter-Defendants' foregoing affirmations, representations and promises regarding the cost, appropriateness and performance of its Symmetrix drilling system and the subject equipment created an implied warranty that the drilling system and the Subject Equipment would be merchantable and fit for the ordinary purposes for which such equipment is used, *inter alia*, fit for Indie Energy's geothermal drilling work, in accordance with 810 ILCS 5/2-314 "Implied Warranty – Merchantability – Usage of Trade."

45.    Atlas Copco CMT advertised, marketed, showed and displayed depictions of its Symmetrix system, its T2W drill, its TH60 drill and its Compressor to representatives of Indie Energy.  Such action by Counter-Defendants created an implied warranty that the Symmetrix system and the subject equipment would be merchantable and fit for the ordinary purposes for which such equipment is used, *inter alia*, fit for Indie Energy's geothermal drilling work,, in accordance with 810 ILCS 5/2-314 "Implied Warranty – Merchantability – Usage of Trade."

46.    As a direct result of Counter-Defendants' breaches of their implied warranties with respect to the merchantability and fitness ordinary purposes of the Symmetrix system, the T2W drill, the TH60 drill and the Compressor, Indie Energy incurred significant additional expense in repairing and replacing component parts of the Symmetrix system and incurred significant incidental and consequential damages, including lost business opportunities.

WHEREFORE, Counter-Claimants Indie Energy and Daniel Cheifetz, respectfully request that this Court enter judgment against Atlas Copco Construction Mining Technique USA, LLC and Atlas Copco Customer Finance USA LLC and in favor of Counter-Claimants for a sum in excess of $75,000 (in an amount to be determined at trial), plus interest, costs and attorneys' fees and any other relief this Court deems just and appropriate.

## COUNT IV - BREACH OF IMPLIED WARRANTIES
## (FITNESS FOR A PARTICULAR PURPOSE) – UCC

47.    Counter-Claimants incorporate by reference and reallege paragraphs 1 through 46, inclusive, as though fully set forth herein.

48.    At all relevant times, there was in force and effect in Illinois, the Uniform Commercial Code, Sales, 810 ILCS 5/2-101, *et seq.*, which governs the contracts at issue.

49.    Counter-Defendants knew, or had reason to know, at the time that the Agreements were executed that the Subject Equipment was required for a particular purpose, specifically, for Indie Energy's geothermal drilling operations in urban areas.

50.    Counter-Defendants' knowledge created an implied warranty that the drilling system and its component drills and compressor would be fit for a particular purpose, *inter alia*, fit for Indie Energy's geothermal drilling work, in accordance with 810 ILCS 5/2-315 "Implied Warranty – Fitness for Particular Purpose."

51.    Indie Energy relied on Atlas Copco CMT's skill and judgment to select and furnish suitable equipment.

52.     As a direct result of Counter-Defendants breaches of their implied warranties with respect to the fitness for a particular purposes of the Symmetrix system, the T2W drill, the TH60 drill and the Compressor, Indie Energy incurred significant additional expense in repairing and replacing component parts of the Symmetrix system and incurred significant incidental and consequential damages, including lost business opportunities.

WHEREFORE, Counter-Claimants Indie Energy and Daniel Cheifetz, respectfully request that this Court enter judgment against Atlas Copco Construction Mining Technique USA, LLC and Atlas Copco Customer Finance USA LLC and in favor of Counter-Claimants for a sum in excess of $75,000 (in an amount to be determined at trial), plus interest, costs and attorneys' fees and any other relief this Court deems just and appropriate.

## COUNT V - BREACH OF IMPLIED WARRANTIES
## (MERCHANTABILITY) – UCC

53.     Counter-Claimants incorporate by reference and reallege paragraphs 1 through 52, inclusive, as though fully set forth herein.

54.     At all relevant times, there was in force and effect in Illinois, the Uniform Commercial Code, Sales, 810 ILCS 5/2-101, *et seq.*, which governs the contracts at issue.

55.     Counter-Defendants' foregoing affirmations, representations and promises regarding the cost, appropriateness and performance of its Symmetrix drilling system and the subject equipment created an implied warranty that the drilling system and its

component drills and compressor would be merchantable and fit for the ordinary purposes for which such equipment is used, *inter alia*, fit for Indie Energy's geothermal drilling work, in accordance with 810 ILCS 5/2-314 "Implied Warranty – Merchantability – Usage of Trade."

56.    Atlas Copco CMT advertised, marketed, showed and displayed depictions of its Symmetrix system, its T2W drill, its TH60 drill and its Compressor to representatives of Indie Energy.  Such action by Counter-Defendants created an implied warranty that the Symmetrix system and the subject equipment would be merchantable and fit for the ordinary purposes for which such equipment is used, *inter alia*, fit for Indie Energy's geothermal drilling work,, in accordance with 810 ILCS 5/2-314 "Implied Warranty – Merchantability – Usage of Trade."

57.    As a direct result of Counter-Defendants' breaches of their implied warranties with respect to the merchantability and fitness ordinary purposes, their Symmetrix system, their T2W drill, their TH60 drill and their Compressor, Indie Energy incurred significant additional expense in repairing and replacing component parts of the Symmetrix system and incurred significant incidental and consequential damages, including lost business opportunities.

WHEREFORE, Counter-Claimants Indie Energy and Daniel Cheifetz, respectfully request that this Court enter judgment against Atlas Copco Construction Mining Technique USA, LLC and Atlas Copco Customer Finance USA LLC and in favor of Counter-Claimants for a sum in excess of $75,000, plus interest, costs and attorneys' fees and any other relief this Court deems just and appropriate.

## COUNT VI – FRAUDULENT MISREPRESENTATION

58.    Counter-Claimants incorporate by reference and reallege paragraphs 1 through 57, inclusive, as though fully set forth herein.

59.    Counter-Defendants knowingly made false statements and representations regarding the suitability, fitness, appropriateness and cost of the Symmetrix drilling system, the T2W drill, the TH60 drill and the Compressor for Indie Energy's business purpose of providing geothermal energy solutions to its customers.

60.    Counter-Defendants made such false statements and representations in order to induce Indie Energy to enter into leasing and purchase contracts for the Symmetrix system and the Subject Equipment and to repeatedly purchase repair and replacement parts for such equipment.

61.    Indie Energy, in justifiable reliance on the statements, warranties and representations made by Counter-Defendants, entered into leasing and purchasing agreements with the Counter-Defendants for the Subject Equipment.

62.    As a direct result of Counter-Defendants' fraudulent misrepresentations with respect to the suitability, fitness appropriateness and cost of the Symmetrix drilling system, the T2W drill, the TH60 drill and the Compressor Indie Energy has incurred significant expense in repairing and replacing component parts of the Symmetrix system and incurred significant incidental and consequential damages, including lost business opportunities.

WHEREFORE, Counter-Claimants Indie Energy and Daniel Cheifetz, respectfully request that this Court enter judgment against Atlas Copco Construction Mining Technique USA, LLC and Atlas Copco Customer Finance USA LLC and in favor of

Counter-Claimants for a sum in excess of $75,000 (in an amount to be determined at trial), plus interest, costs and attorneys' fees and any other relief this Court deems just and appropriate.

Respectfully submitted,

SCHIFF HARDIN LLP

By: _Tracy Campbell_

Counsel for Indie Energy Systems Company, LLC and Daniel Cheifetz

Tracy A. Campbell
SCHIFF HARDIN LLP
6600 Sears Tower
Chicago, IL  60606
Tel:  (312) 258-5500
Fax:  (312) 258-5600

## **CERTIFICATE OF SERVICE**

The undersigned, an attorney, hereby certifies that she caused a copy of the foregoing Defendants' Answer to Verified Complaint, Affirmative Defenses and Counterclaims be served upon the following counsel of record via electronic filing, on May 20, 2008:

      Joseph R. Marconi
      Victor J. Pioli
      Johnson & Bell, Ltd.
      33 W. Monroe Street
      Suite 2700
      Chicago, IL  60606

      Tracy A. Campbell

07/18/2008 09:07 FAX  847 570 8100          THE HOMESTEAD                    ☒010/018

## Master Capital Equipment Lease

This Master Capital Equipment Lease (this "Lease") is entered into and between the Atlas Copco Construction Mining Technique USA Inc., a Delaware corporation with an address at 3700 E. 68th Avenue, P.O. Box 1159, Commerce City, Colorado 80022 ("Lessor"), and Indie Energy Services Company, LLC. with an address at 1202 Church St. Evanston, IL. 60201 ("Lessee", and together with Lessor, the "Parties") and the parties hereto agree as follows:

1. **Equipment Leased.** Lessor hereby leases to Lessee, and Lessee hereby hires and takes from Lessor the personal property identified on **Exhibit/s A** (with all attachments, replacement parts, substitutions, additions, repairs and accessories incorporated therein and/or affixed thereto, and proceeds thereof, the "Equipment").

2. **Term.** The term of this Lease (the "Term") shall begin on the Effective Date and shall end on the date set forth on **Exhibit/s A**.

3. **Payments.** During the Term Lessee shall pay to Lessor base rent ("Base Rent") as set forth on **Exhibit/s A**. Lessee shall begin paying Base Rent on the first day of the first calendar month following the Effective Date and shall make payments of Base Rent on the first day of every calendar month thereafter until the expiration of the Term. In addition to Base Rent, Lessee shall pay directly or reimburse Lessor the full amount of all other taxes, fees or other costs associated with or connected to the Equipment or the delivery of the Equipment to Lessee if, as and when due and all such amounts, together with all of Lessee's other payment obligations and all costs incurred by Lessor on account of any default by Lessee, shall be payable by Lessee as "Additional Rent" upon demand by Lessor. If Lessee remains in possession of the Equipment after the expiration of the Term and Lessee has not purchased the Equipment as provided in this Lease, then, in addition to all other rights and remedies available to Lessor, Lessee shall make monthly payments to Lessor equal to two (2) times the Base Rent set forth herein. The Base Rent is based on Lessee's agreement to purchase the Equipment upon the expiration of the Term as provided in this Lease. If Lessee (i) fails to purchase the Equipment upon the expiration of the Term as provided in this Lease and (ii) uses the Equipment in excess of the usage hours set forth on **Exhibit/s A** (the "Maximum Usage Hours"), then, in addition to all other amounts payable by Lessee to Lessor pursuant to this Lease, Lessee shall pay to Lessor the Excess Usage Fee set forth on **Exhibit/s A** for each hour Lessee uses the Equipment in excess of the Maximum Usage Hours. Lessor shall not be liable to Lessee for any hindrance in the use of the Equipment whether caused by Lessee's inability to obtain service or spare parts or to proceed with any planned project(s) or for any other reason whatsoever. Lessee's payment obligations are absolute and are not subject to any contingency, credit, set-off or deduction of any kind.

4. **Purchase Obligation.** Lessee shall purchase the Equipment from Lessor at the expiration of the Term. The purchase price for the Equipment (the "Purchase Price") at that time shall be the Residual Value of the Equipment set forth on **Exhibit/s A** plus the amount of any value added taxes and any other taxes or charges occasioned by the transfer title to the Equipment from Lessor to Lessee. Lessee shall pay the Purchase Price for the Equipment to Lessor on the day that the last payment of Base Rent is due.

5. **Use, Nature and Location of Equipment.** Lessee warrants and agrees that the Equipment will be used primarily for the purpose indicated on **Exhibit/s A**. Lessee and Lessor agree that regardless of the manner of affixation, the Equipment shall remain personal property and not become part of any real estate. Lessee agrees to keep the Equipment at the location and in the state (the "State") set forth on **Exhibit/s A**. Upon prior written notice to Lessor, Lessee may change the location of the Equipment provided that: (i) Lessee is not in default at the time of such notice or at the time the location of the Equipment is changed and (ii) Lessee does not permit the Equipment to be located outside of the State. Lessee will not remove the Equipment from the State without the prior written consent of Lessor unless the Equipment is located in the State of Pennsylvania.

6. **Delivery Acceptance:** Immediately upon delivery to and acceptance by Lessee of an item of Equipment, Lessee shall execute and deliver Exhibit/s A relating to such item of Equipment, identifying same and acknowledging receipt thereof, with the information required on said Exhibit/s A fully completed. Execution of such Exhibit/s A shall constitute Lessee's acknowledgement that (i) the Equipment is satisfactory and acceptable to Lessee and that Lessee has examined the Equipment to the extent and in the manner it deems necessary or appropriate; (ii) the Equipment is in good operating order, repair, condition and appearance; (iii) is of the design and capacity selected by Lessee; (iv) and is suitable for the purposes for which it was leased. The execution of such Exhibit/s A by Lessee shall also constitute Lessee's waiver of any right of revocation with respect to the Equipment.

7. **Repairs.** Lessor shall not be obligated to install, erect, test, adjust, service or make any repairs or replacements to the Equipment or otherwise. Lessee shall not incur for Lessor's account any liability or expense without Lessor's prior written consent. Lessee shall inspect the Equipment within 48 hours after its receipt. If Lessor does not notify Lessor within such 48 hour period that the Equipment is defective, Lessee shall be conclusively presumed to have accepted the Equipment in its then condition. Thereafter, Lessee shall effect and bear the expense of all necessary repairs,

07/18/2008 09:07 FAX  847 570 8100          THE HOMESTEAD                          ☑011/016

maintenance, operation and replacements required to be made to maintain the Equipment in good condition, normal wear and tear excepted.  Lessee shall ensure that all adjustments, repairs and other servicing of the Equipment is done only by Atlas Copco authorized dealers and that all replacement parts installed into the Equipment shall be original Atlas Copco parts.  **Exhibit A** indicates whether Lessor requires that Lessees enter into a Service Maintenance Contract with respect to the Equipment.  If Lessor so requires, Lessee shall execute the Service Maintenance Contract attached to this Lease as **Exhibit B**.

8.  **Operating the Equipment.**  Lessee is responsible for the Equipment and any and all damages caused to or by the Equipment.  Without limiting the foregoing, Lessee will use the Equipment only for its intended use and in accordance with its rated capacity, operating instructions and safety guidelines and Lessee shall maintain the Equipment in a commercially reasonable manner.  Lessee shall insure that only such persons as are properly trained, qualified and, if applicable, licensed in its proper and safe use shall operate the Equipment.  Lessee agrees to provide all persons who will use, handle or work in close proximity to the Equipment (i) all health, safety, and product information related to the Equipment that is provided or made available by the manufacturer and (ii) adequate health and safety protection and warnings, including, without limitation, those relating to noise exposure, vibration exposure and exposure to silica dust and other harmful dusts, particles, mists and vapors, if applicable.  Lessee shall ensure compliance with all applicable laws, ordinances, rules and regulations governing the operation of the Equipment.

9.  **Indemnity.**  Lessee shall indemnify and save Lessor harmless from any and all injury to or loss of the Equipment from whatever cause, and from any and all liability arising out of the use, maintenance and/or delivery thereof.  Lessee shall be credited with any amounts received by Lessor from insurance procured by Lessee.  Damages for any loss or damage to the Equipment shall be based on the then fair market value of the Equipment, irrespective of rentals theretofore paid or accrued.

10.  **Insurance.**  All risk of loss, damage to or destruction of the Equipment and all property damage and personal injuries (including death) caused by the Equipment shall at all times be on Lessee.  During the Term, Lessee, at Lessee's expense, shall procure and maintain insurance against all risks of loss or physical damage to the Equipment for the full insurable value thereof.  Lessee shall also procure and maintain breach of warranty insurance and such other insurance in such amounts and against such risks as Lessor may specify, and shall promptly deliver each policy to Lessor with a standard long-form mortgagee endorsement attached thereto showing loss payable to Lessor.  Each insurance policy maintained by Lessee shall be with an insurance carrier satisfactory to Lessor, provide Lessor with not less than 30 days written notice of cancellation and be satisfactory to Lessor in form, terms and amount.  Lessor's acceptance of policies in lesser amounts or covering lesser risks shall not be a waiver of Lessee's obligations under this Lease.  No act or omission of Lessee or any of its officers, agents, employees or representatives shall affect the obligations of the insurer to pay the full amount of any loss.

Lessee hereby assigns to Lessor any monies which may become payable under any such policy of insurance and irrevocably constitutes and appoints Lessor as Lessee's attorney in fact (a) to hold each original insurance policy, (b) to make, settle and adjust claims under each policy of insurance, (c) to make claims for any monies which may become payable under policies, including returned or unearned premiums, and (d) to endorse Lessee's name on any check, draft or other instrument received in payment of claims or returned or unearned premiums under each policy and to apply the funds to the payment of Lessee's indebtedness to Lessor; provided, however, Lessor is under no obligation to do any of the foregoing.

Should Lessee fail to furnish any insurance policy to Lessor, or to maintain such policy in full force, or to pay any premium in whole or in part relating thereto, then Lessor, without waiving or releasing any default or obligation by Lessee, may (but shall be under no obligation to) obtain and maintain insurance and pay the premium therefor on behalf of Lessee and add the premium to Lessee's indebtedness to Lessor under this Lease.  The full amount of any such premium paid by Lessor shall be payable by Lessee upon demand, and failure to pay same shall constitute an event of default under this Lease.

11.  **Taxes.**  Lessee shall comply with all laws, ordinances and regulations relating to the ownership, possession, use or maintenance of the Equipment, and indemnify and save Lessor harmless against actual or asserted violations, and pay all costs and expenses of every character occasioned by or arising out of such ownership, possession, use or maintenance.  Lessee agrees that, during the term of this Lease, in addition to all other amounts provided herein to be paid, it will promptly pay all taxes, assessments and other governmental charges (including penalties and interest, if any, and fees for titling or registration, if required) levied or assessed:

    (a) upon the interest of the Lessee in the Equipment or upon the use or operation thereof or on the earnings arising therefrom; and

    (b) against Lessor on account of its acquisition or ownership of the Equipment or any part thereof, or the use or operation thereof or the leasing thereof to the Lessee, or the rent herein provided for, or the earnings arising therefrom, exclusive, however, of any taxes based on net income of Lessor.

*8-31-04 Revision Not for use in Texas*                    2                    Initial here ___

Lessee agrees to file, on behalf of Lessor, all required tax returns and reports concerning the Equipment with all appropriate governmental agencies, and within not more than 30 days after the due date of such filing, to send Lessor confirmation, in form satisfactory to Lessor, of such filing.

**12. Title.** All Equipment shall remain personal property and title thereto shall remain in Lessor exclusively. Lessee shall keep the Equipment free from any and all liens and claims, and shall not permit Lessor's title or rights in the Equipment to be encumbered or impaired.

**13. Inspection.** Lessee shall, whenever requested, advise Lessor of the exact location and condition of the Equipment and shall give Lessor immediate notice of any attachment or other judicial process affecting the Equipment, and indemnify and save Lessor harmless from any loss or damage caused thereby. Lessor may, for the purpose of inspection, at all reasonable times enter upon any job, building or place where the Equipment is located and may remove the Equipment forthwith, without notice to Lessee, if, in the opinion of Lessor, the Equipment is being used beyond its capacity or Lessee is improperly caring for or abusing the Equipment in any manner.

**14. Non-Waiver.** Time is of the essence. Lessor's failure at any time to require strict performance by Lessee of any of the provisions hereof shall not waive or diminish Lessor's right thereafter to demand strict compliance therewith or with any other provision. Waiver of any default shall not waive any other default. No remedy of Lessor hereunder shall be exclusive of any other remedy available at law, in equity or otherwise provided in this Lease, but each shall be cumulative and in addition to every other remedy.

**15. No Warranty.** Lessor, not being the manufacturer of the Equipment, nor manufacturer's agent, makes no warranty or representation, either express or implied, as to the fitness, quality, design, condition, capacity, suitability, merchantability or performance of the Equipment or of the material or workmanship thereof, it being agreed that the Equipment is leased "as is" and that all such risks, as between the Lessor and the Lessee, are to be borne by the Lessee at its sole risk and expense and Lessee agrees not to assert any claim whatsoever against the Lessor based thereon. Lessee further agrees, regardless of cause, not to assert any claim whatsoever against the Lessor for loss of anticipatory profits or consequential damages. No oral agreement, guaranty, promise, condition, representation or warranty shall be binding on Lessor. All prior conversations, agreements and/or representations related to this Lease and/or to the Equipment are integrated in this Lease.

**16. Possession.** Lessor covenants to Lessee that Lessor is the lawful owner of the Equipment free from all encumbrances and that, conditioned upon Lessee's performing the conditions hereof, Lessee shall peaceably and quietly hold, possess and use the Equipment during the Term without let or hindrance.

**17. Performance of Obligations of Lessee by Lessor.** In the event that the Lessee shall fail duly and promptly to perform any of its obligations hereunder, the Lessor may, at its option, perform them for the account of Lessee without thereby waiving such default, and any amount paid or expense, fee (including reasonable attorneys' and other professionals' fees), penalty or other liability incurred by the Lessor in such performance, together with interest thereon at a rate equal to the lesser of (i) 1 1/2% per month or (ii) the maximum rate of interest permitted by applicable law, shall be payable by the Lessee upon demand as Additional Rent for the Equipment.

**18. Further Assurances.** Lessee shall execute and deliver to Lessor, upon Lessor's request, such instruments and assurances as Lessor deems necessary or advisable for the confirmation or perfection of this Lease and/or Lessor's rights hereunder.

**19. Default.** An Event of Default shall occur if:

   (A) Lessee fails to pay when due any installment of rent and such failure continues for a period of 10 days;

   (B) Lessee shall fail to perform or observe any covenant, condition or agreement to be performed or observed by it hereunder and such failure continues uncured for 15 days after written notice thereof to Lessee by Lessor;

   (C) Lessee dies, ceases doing business as a going concern, makes an assignment for the benefit of creditors, admits in writing its inability to pay its debts as they become due, files a voluntary petition in bankruptcy, is adjudicated a bankrupt or an insolvent, files a petition seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar arrangement under any present or future statute, law or regulation, or files an answer admitting the material allegations of a petition filed against it in any such proceeding, consents to or acquiesces in the appointment of a trustee, receiver, or liquidator of it or of all or any substantial part of its assets or properties, or if it or its shareholders shall take any action looking to its dissolution or liquidation;

   (D) within 60 days after the commencement of any proceedings against Lessee seeking reorganization, arrangement, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, such proceedings shall not have been dismissed, or if within 60 days after the appointment without

07/18/2008 09:08 FAX  847 570 8100              THE HOMESTEAD                              ☑013/016

Lessee's consent or acquiescence of any trustee, receiver or liquidator of it or of all or any substantial part of its assets and properties, such appointment shall not be vacated;

(E)  Lessee attempts to remove, sell, transfer, encumber, part with possession or sublet the Equipment or any item thereof or

(F)  a third party takes any action to foreclose on, obtain possession or control of, collect, sell or otherwise dispose of or exercise any rights with respect to any of the Equipment without the express written consent of Lessor.

Upon the occurrence of an Event of Default, Lessor, at its option, may do any or all of the following:

1.   declare all sums due and to become due hereunder immediately due and payable;

2.   proceed by appropriate court action or actions or other proceedings either at law or in equity to enforce performance by the Lessee of any and all covenants of this Lease and to recover damages for the breach thereof;

3.   demand that Lessee deliver the Equipment forthwith to Lessor at Lessee's expense at such place as Lessor may designate; and

4.   Lessor and/or its agents may, without notice or liability or legal process, enter into any premises of or under control or jurisdiction of Lessee or any agent of Lessee where the Equipment may be or by Lessor is believed to be, and repossess all or any item thereof, disconnecting and separating all thereof from any other property and using all force necessary or permitted by applicable law so to do, Lessee hereby expressly waiving all further rights to possession of the Equipment and all claims for injuries suffered through or loss caused by such repossession; Lessor may sell or lease the Equipment at a time and location of its choosing provided that Lessor acts in good faith and in a commercially reasonable manner, but Lessor shall, nevertheless, be entitled to recover immediately as liquidated damages for loss of the bargain and not as a penalty (i) any unpaid Base Rent or Additional Rent that accrued up to the time of Lessor's possession plus (ii) an amount equal to the difference obtained by subtracting (a) proceeds of such sale or the aggregate rental value from such lease (discounted to present value at the then prime rate of interest + 3%) from (b) the aggregate rent reserved hereunder for the unexpired term of this Lease plus the Residual Value of the Equipment, provided, however, that if any statute governing the proceeding in which such damages are to be proved specifies the amount of such claim, Lessor shall be entitled to prove as and for damages for the breach an amount equal to that allowed under such statute.  The provisions of this Section shall be without prejudice to any rights given to the Lessor by such statute to prove for any amounts allowed thereby.  Should any proceedings be instituted by or against Lessor for monies due to Lessor hereunder and/or for possession of any or all of the Equipment or for any other relief, Lessee shall pay a reasonable sum as attorneys' fees.  No remedy referred to herein is intended to be exclusive of any other remedy stated herein or of any other remedy otherwise available to Lessor at law or in equity.

20.  **Assignments.**  Without the prior written consent of Lessor, Lessee shall not assign this Lease or its interests hereunder or enter into any sub-lease with respect to the Equipment, it being agreed that Lessor will not unreasonably withhold its consent to a sub-lease of the Equipment.  The conditions hereof shall bind any permitted successors and assigns of Lessee.  Lessor may assign the rents reserved herein or all or any of Lessor's other rights hereunder.  After such assignment, Lessor shall not be the assignee's agent for any purpose.  Lessee will settle all claims arising out of alleged breach of warranties or otherwise, defenses, set-offs and counterclaims it may have against Lessor directly with Lessor, and not assert any such against Lessor's assignee, Lessor hereby agreeing to remain responsible therefor.  Lessee on receiving notice of any such assignment shall abide thereby and make payment as may therein be directed.  Following such assignment, solely for the purpose of determining assignee's rights hereunder, the term "Lessor" shall be deemed to refer to Lessor's assignee.

21.  **Miscellaneous.**  Lessee will not change or remove any insignia or lettering on the Equipment and shall conspicuously identify each item of the Equipment by suitable lettering thereon to indicate Lessor's ownership.  All transportation charges shall be borne by Lessee.  All notices relating hereto shall be sent certified mail, return receipt requested to Lessor or Lessee at the addresses indicated on **Exhibit A**.  If any part hereof is contrary to, prohibited by or deemed invalid under applicable laws or regulations of any jurisdiction, such provision shall be inapplicable and deemed omitted but shall not invalidate the remaining provisions hereof.  Lessee waives all rights under all exemption laws.  **Lessee acknowledges the receipt of a true copy of this Lease.**  This Lease is irrevocable for the full term hereof and for the aggregate rental herein reserved, and the rent shall not abate by reason of termination of Lessee's right of possession and/or the taking of possession by Lessor or for any other reason.  Any payment not made when due shall, at the option of Lessor, bear late charges thereon calculated at a rate equal to the lesser of  (i) 1 1/2% per month or (ii) the maximum rate of interest permitted by applicable law.  In the event this Lease is deemed to create a security interest, Lessee grants Lessor a security interest in the Equipment as security for all of Lessee's indebtedness and obligations owing under this Lease as well as all other present and future indebtedness and obligations of Lessee

8-5/-04 Revision Not for use in Texas                          4                                Initial here _____

07/18/2008 09:09 FAX  847 570 8100          THE HOMESTEAD                     ☑ 014/018

to Lessor of every kind and nature whatsoever. Lessee shall be responsible for and pay to Lessor a returned check fee, not to exceed the maximum permitted by law, which fee will be equal to the sum of (1) the actual bank charges incurred by Lessor plus (ii) all other actual costs and expenses incurred by Lessor. The returned check fee is payable upon demand as Additional Rent under this Lease. Lessee authorizes Lessor to file a financing statement with respect to the Equipment and ratifies the filing by Lessor of any such financing statement previously filed.

22. <u>Lessee's Organizational Information.</u>  If Lessee is an organization, Lessee (a) is the type of organization, (b) is organized under the laws of the jurisdiction, (c) has its principal place of business, and (d) if it is a "registered organization" as defined in Article 9 of the Uniform Commercial Code (i.e., organized solely under the laws of a single State and as to which the State must maintain a public record showing the organization to have been organized), has the organizational identification number (or, if none, has been assigned no such number by the State of organization), all as set forth on <u>Exhibit/s A</u>.  Lessee's name, as it appears on <u>Exhibit/s A</u> and on the signature line of this Lease, is Lessee's <u>exact and complete legal name</u>.  If Lessee is an individual, Lessee's exact and complete legal name and principal residence are as set forth under Lessee's name on the signature line of this Lease.  Lessee agrees to notify Lessor immediately in the event of a change in any of the foregoing facts or information.

[The remainder of this page is intentionally left blank]



07/18/2006 09:08 FAX  847 570 8100        THE HOMESTEAD                    ☒015/016

This Lease contains the entire agreement between the parties with respect to the Equipment, and may not be altered, modified, terminated or discharged except by a writing signed by the party against whom such alteration, modification, termination or discharge is sought.  Lessee's initials – ___

   IN WITNESS WHEREOF, Lessee and Lessor have duly executed this Lease as of July 17, 2006.

**LESSEE**:

Indie Energy Services Company, LLC.

By _____        Title _Manager_____
   If Lessee is a corporation, have this Lease signed by the President, Vice President or Treasurer and
   indicate the signatory's official title.  If the Lessee is a limited liability company, have this Lease
   signed by the managing member.  If the signatory is an owner, so indicate.

**LESSOR**:

Atlas Copco Construction Mining Technique USA Inc.

By _____        Title VP Finance & Administration
   Jim Levitt

8-5/-04 Revision Not for use in Texas                6

07/18/2006 09:10 FAX  847 570 8100        THE HOMESTEAD                    ☑ 016/016

## Exhibit A to Master Capital Equipment Lease
### (Schedule No 1 )

This exhibit is pursuant to and made part of the Master Capital Equipment Lease dated July 17, 2006, (as amended, restated, modified and supplemented, the "Master Capital Equipment Lease") between Atlas Copco Construction Mining Technique USA Inc., as Lessor, and Indie Energy Services Company, LLC. as Lessee.

Intro: The "Effective Date" of this Lease is July 17, 2006.

1.  **Equipment Description, Serial Numbers and Application:** Atlas Copco brand, model T2W. Serial number 6201.

2.  **The "Term" of the Lease** with respect to Equipment: 49 months, commencing on July 17, 2006, and ending on August 1, 2010.

3.  **Base Rent:** The aggregate amount of the Base Rent payable hereunder is $315,126.24 of which Lessee has paid $0 in advance. The balance of the Base Rent payable hereunder shall be paid in monthly installments of $6565.13 until fully paid.

4.  **Residual Value:** Upon the expiration of the Term, the Residual Value of the Equipment shall be $0.

5.  **Acknowledgement of Receipt of Equipment:** Lessee acknowledges that the Equipment above described has been delivered to and received by it, is as represented, and is acceptable and satisfactory to it, and the same has been accepted as Equipment leased by Lessee under said Master Equipment Lease.

6.  **The Equipment shall be used primarily for:**

    ☒ business or commercial purposes (other than agricultural)
    ☐ agricultural purposes (see definition below)
    ☐ both agricultural and business or commercial purposes.

    Agricultural purposes generally means farming, including dairy farming, but it also includes the transportation, harvesting, and processing of farm, dairy or forest products if what is transported, harvested, or processed is farm, dairy, or forest products grown or bred by the user of the Equipment itself. It does not apply, for instance, to a logger who harvests someone else's forest or a contractor who prepares land or harvests products on someone else's farm.

7.  **Location of Equipment:** The location at which the Lessee shall keep the Equipment is Cook County, IL.

8.  **Service and Maintenance Contract:** Lessor ☐ requires ☒ does not require that Lessee enter into a Service Maintenance Contract.

| LESSEE | LESSOR |
|---|---|
| Indie Energy Services Company, LLC: | Atlas Copco Construction Mining Technique USA Inc. |
| By; | By: |
| Title: _Manager_ | Title: VP Finance & Administration |
| Address: _1020 Church Street Blvd_ | Address: 3700 E 68ᵗʰ Ave. Commerce City, CO. 80022 |
| Phone #: _847-900-4850_ | Phone #: 303.217.2804 |

(Address and Phone numbers are inserted for contact purposes only and not for purposes of effecting Notice)

8-5/-04 Revision Not for use in Texas                    7

# CERTIFICATE OF TITLE OF A VEHICLE

| VEHICLE IDENTIFICATION NO. | YEAR | MAKE | MODEL | BODY STYLE | TITLE NO. |
|---|---|---|---|---|---|
| 1HTGLATT3VH431381 | 1997 | INTERNATIONAL | 2000 SERIES 2674 | TANDEM | X6299057050 |

1HTGLATT3VH431381

| DATE ISSUED | ODOMETER | CCM | PURCHASED | | PURCHASE DATE |
|---|---|---|---|---|---|
| 10/26/06 | | | USED | | 07/17/06 |

MOBILE HOME SQ. FT.

TYPE OF TITLE
ORIGINAL

MAILING ADDRESS

INDIE ENERGY SERVICES CO
1020 CHURCH ST
EVANSTON IL 60201-3623

LEGEND(S)

OWNER(S) NAME AND ADDRESS

INDIE ENERGY SERVICES CO
1020 CHURCH ST
EVANSTON IL 60201-3623

MILEAGE NOT REQUIRED

FIRST LIENHOLDER NAME AND ADDRESS

SECOND LIENHOLDER NAME AND ADDRESS

## RELEASE OF LIEN

The holder of Lien on the vehicle described in this Certificate does hereby state that the lien is released and discharged.

Firm Name _____ By _____ Signature of Authorized Agent _____ Date _____

Firm Name _____ By _____ Signature of Authorized Agent _____ Date _____

NEW LIEN ASSIGNMENT: The information below must be on an application for title and presented to the Secretary of State.

Secured Party *Atlas Copco Customer Finance USA LLC* Address *34 Maple Avenue Pine Brook, NJ 07058*

► **Federal and State law** requires that you state the mileage in connection with the transfer of ownership. Failure to complete or providing a false statement may result in fines and/or imprisonment.

## ASSIGNMENT OF TITLE

The undersigned hereby certifies that the vehicle described in this title has been transferred to the following printed name and address:

"I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked:

☐ 1. The mileage stated is in excess of its mechanical limits.
☐ 2. The odometer reading is not the actual mileage."
**WARNING—ODOMETER DISCREPANCY**

"If this vehicle is one of more than 5 commercial vehicles owned by me, I certify also that the vehicle is not damaged in excess of 33 1/3% of its fair market value unless this document is accompanied by a salvage application."

NO TENTHS

► ODOMETER READING

Signature(s) of Seller(s)

Printed Name(s) of Seller(s) _____ DATE OF SALE _____

"I am aware of the above odometer certification made by seller."

Signature(s) of Buyer(s) _____ Printed Name _____

I, Jesse White, Secretary of State of the State of Illinois, do hereby certify that according to the records on file with my Office, the person or entity named herein is the owner of the vehicle described hereon, which is subject to the above named liens and encumbrances, if any. IN WITNESS WHEREOF, I HAVE AFFIXED MY SIGNATURE AND THE GREAT SEAL OF THE STATE OF ILLINOIS, AT SPRINGFIELD.

G01588300
CONTROL NO.

*Jesse White*
JESSE WHITE, Secretary of State

SEAL OF THE STATE OF ILLINOIS
AUG. 26th 1818

DO NOT ACCEPT TITLE SHOWING ANY ERASURES, ALTERATIONS OR MUTILATIONS.



# INSTALLMENT LOAN & SECURITY AGREEMENT

FOR VALUE RECEIVED, the undersigned borrower ("Borrower"), promises to pay to the order of the lender ("Lender"),  the below stated principal sum together with interest on the unpaid principal balance hereof from time to time outstanding at the rate per annum set forth below. The financial obligation of the Borrower to the Lender is herein called the "Loan". The Loan shall accrue interest by reference to the Fixed Rate as set forth below.

Principal payments and interest shall be due and payable as set forth below  If not sooner paid, all outstanding principal and accrued and unpaid interest thereon shall be paid to the Lender on the Last Payment Date set forth below. In the absence of demonstrable error, the books and records of the Lender shall constitute conclusive evidence of the unpaid principal balance hereof from time to time.

The Borrower may, upon at least two business days' prior written notice to the Lender stating the proposed date and aggregate principal amount of the prepayment, prepay the outstanding principal amount in whole, together with accrued interest to the date of such prepayment on the principal amount prepaid and without discount.

All payments hereunder shall be payable in lawful money of the United States.  All payments shall be applied first to any costs, fees and expenses of the Lender due hereunder, then to interest due hereunder, and any balance shall be applied in reduction of principal in the inverse order of maturity.

| FINANCING SCHEDULE | | | | |
|---|---|---|---|---|
| Purchase Price: | $104,000.00 | Less Cash: | $11,050.00 | Financing Term: | 36 months |
| Documentation Fees: | $0 | Less Trade-In: | $ | Interest Rate: | 7.95% |
| Total Price: | $104,350.00 | Down Payment: | $11,050.00 | Principal Financed: | $99,450.00 |
| Number of Payments in Series | Amount of  Payments in Series | Date of First Payment in Series | Date of Last Payment in Series | Total Amount of Payments in Series |
| 36 | $3114.88 | May 4, 2007 | April 4, 2010 | $112,135.68 |

This Loan is secured by certain collateral described below. If any Event of Default shall occur, the Lender may, at its option, declare to be immediately due and payable the then outstanding principal balance, with all accrued and unpaid interest thereon, and all other amounts payable to the Lender hereunder, whereupon all such amounts shall become and be due and payable immediately. In the event that any payment due hereunder shall not be paid when due, the Borrower shall pay a late fee of the greater of $100.00 or five percent (5.00%) of the outstanding principal payment missed.

| COLLATERAL – EQUIPMENT DESCRIPTION & LOCATION | |
|---|---|
| Description (model, serial number) | Purchase Price |
| 1 Atlas Copco Brand Compressor, Model #XRVS 976CD, SERIAL # 539285 | $104,000.00 |
| Sales Tax @6.25% | $6500.00 |
| Equipment Location (if other than billing address below) | Delivery Date |
| As below | April 4, 2007 |

**Section 1   Grant of Security Interest.**

1.1. For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Borrower hereby grants to the Lender a security interest in and first lien on all of the Borrower's rights in the Collateral to secure the Secured Obligations.

1.2. As used herein, the term "Secured Obligations" shall mean the payment and performance of all debts, liabilities, obligations, covenants, agreements and indemnities of the Borrower to the Lender, of every kind, nature and description, due or to become due, now existing or hereafter arising, including, without limitation, all debts, liabilities and obligations under this agreement; all renewals, amendments, modifications, consolidations, replacements, increases and extensions thereof, therefore and thereto (collectively, the "Loan Documents"); and any other form of indebtedness owed by the Borrower to the Lender.

1.3. As used herein, the term "Collateral" shall mean: (a) All the Borrower's right, title and interest in and to the goods, property and equipment (including any software or computer programs embedded therein) set forth and described in this Security Agreement (the "Equipment"); (b) All    the Borrower's right, title and interest in and to all additions, replacements, accessions, substitutions, modifications and improvements to the foregoing; (c) All of the Borrower's rights in, to and under policies and certificates of insurance, including claims or rights to payment and all proceeds, refunds, and premium rebates, including without limitation, proceeds of fire, theft or any other physical damage or loss relating directly or indirectly to the foregoing; (d) All books, records, and information relating to any of the foregoing, and all rights of access to such books, records, and information, and all property in which such books, records, and information are stored, recorded, and maintained, and all computer programs, computer records, computer software, rights of access to computer bureaus and computer data relating to the foregoing; and (e) All proceeds (cash and non-cash) and products of the foregoing, provided that the grant to the Lender of a security interest in proceeds shall not be deemed a consent by Lender to a sale or other disposition of any Collateral.

1.4. As used herein (a) the term "UCC" shall mean the Uniform Commercial Code as adopted and in effect in the State of Illinois; and (b) the term "Guarantor" shall mean a guarantor, if any, of the Secured Obligations.



## Section 2.  Covenants.

The Borrower hereby covenants and agrees for the benefit of the Lender as follows:

2.1. The Borrower will do all things necessary to preserve, renew and keep in full force and effect and in good standing its existence and material qualifications and rights necessary or desirable in the ordinary conduct of its business.

2.2. The Borrower shall retain ownership and possession of the Collateral and keep the Collateral free and clear of all Liens and other property interest of any and every kind whatsoever, except those in favor of the Lender. The Borrower shall promptly notify the Lender of (i) any Lien made or threatened against the Collateral or any part thereof, and (ii) any material change in the Collateral, including without limitation, any material decrease in the value thereof.

2.3. The Borrower shall deliver to the Lender, promptly upon receipt of same, copies of all notices, certificates, documents and instruments received by the Borrower which materially affect the Collateral.

2.4. The Borrower shall pay or cause to be paid promptly when due all taxes, betterments, assessments and other governmental levies, insurance premiums and other charges, to whomever and whenever laid or assessed, whether on this agreement or on any interest therein or on the Secured Obligations, or on the Collateral, which if unpaid might by law become a Lien on the Collateral; provided, however, that any such tax, assessment, charge, levy or claim need not be paid if the validity or amount thereof shall currently be contested in good faith by appropriate proceedings and if the Borrower shall have set aside on its books appropriate reserves with respect thereto in accordance with generally accepted accounting principles; and provided, further, that the Borrower will pay all such taxes, assessments, levies or other governmental charges forthwith upon the commencement of proceedings to foreclose any Lien which may have attached as security therefore.

2.5. The Borrower will keep and maintain each item of Equipment in good operating condition, ordinary wear and tear excepted, and the Borrower will provide all maintenance and service and all repairs necessary for such purpose.

2.6. The Borrower will use the Collateral for lawful purposes only, with all reasonable care and caution in conformity with all applicable laws, rules, regulations and ordinances.

2.7. The Collateral is now and shall remain personal property, and the Borrower will not permit any of the Collateral to become a part of or affixed to real property without written prior consent of the Lender and without first making all arrangements and delivering, or causing to be delivered, to Lender all instruments and documents including, without limitation, waivers and subordination agreements by any party necessary, at the sole discretion of the Lender, to preserve and protect the primary security interest granted herein in the Collateral to the Lender.

2.8. At all times, and at its sole cost and expense, the Borrower shall (i) cooperate with Lender to record and maintain appropriate financing and continuation statements; (ii) pay all recording, filing or other taxes, fees and other charges relating thereto; and (iii) shall comply with all such statutes and regulations, as may be required by law in order to establish, preserve, perfect and protect the first Lien of the Lender in the Collateral (including, without limitation, any interests acquired after the execution hereof) and the rights of the Lender there under. The Lender may record or file as such a financing statement or statements, a carbon, photographic or other reproduction of this agreement. Borrower hereby authorizes the Lender to prepare and file such financing statements (including continuation statements or amendments thereof or supplements thereto) or other instruments as the Lender may from time to time deem necessary or appropriate in order to perfect and maintain the security interest granted hereunder in accordance with the UCC, including without limitation, any financing statement that describes the Collateral.

2.9. If and to the extent from time to time requested by the Lender, the Borrower shall furnish to the Lender written statements, signed and, if so requested, acknowledged, setting forth the amount of the Secured Obligations which the Borrower acknowledges to be due to the Lender, specifying any claims of offset or defense which the Borrower asserts against the Secured Obligations or any obligations to be performed hereunder, the then state of facts relative to the condition of the Collateral, and such other matters as the Lender shall request.

2.10. The Borrower      'l notify the Lender at least thirty (30) days prior to any change in the ...me, structure or identity of the Borrower, or the use by the Borrower of any trade name or trade style not heretofore disclosed to the Lender, or the address of the Borrower's chief executive office or location and the address of any location of Collateral, in each case by an amendment to this Security Agreement.

2.11. The Borrower will promptly notify the Lender (a) of any material adverse change in its financial condition, assets, business or prospects and (b) any litigation, arbitration or administrative proceeding to which the Borrower may hereafter become a party and which may involve any material risk of any judgment or liability which may have a material adverse effect on the Collateral or Borrower's ability to pay and perform the Secured Obligations as and when due.

2.12. The Borrower shall allow the Lender and its representatives access and right of inspection of the Collateral at its location at reasonable times, with reasonable frequency, and in a reasonable manner, and in the event of loss or damage to the Collateral shall send prompt written notice thereof to the Lender.

2.13. The Borrower will maintain with financially sound and reputable companies insurance policies (i) insuring the Equipment against loss by fire, explosion, theft and such other casualties as are usually insured against by companies engaged in the same or similar businesses, and (ii) insuring the Borrower and the Lender against liability for personal injury and property damage relating to the Equipment, such policies to be in such form and in such amounts and coverage as may be reasonably satisfactory to the Lender, with losses payable, in the case of casualty policies, to the Lender as its interests may appear.  All insurance policies with respect to the Equipment shall (i) contain a "Lender's Loss Payable" endorsement which shall provide that in respect of the interests of the Lender in such policy the insurance shall not be invalidated by any action or inaction of the Borrower or any other person and shall insure the interests of the Lender as they appear, regardless of any breach or violation of any warranties, declarations or conditions contained in such policies by the Borrower; (ii) provide that no cancellation, reduction in amount or change in coverage thereof shall be effective until at least thirty (30) days after receipt by the Lender of written notice thereof; (iii) waive any right of subrogation of the insurer against, or any right of set-off, counterclaim or any other deduction in respect of any liability of, the Lender to such insurer; (iv) provide that the Lender shall receive promptly copies of any notices to the Borrower of any default or other act or omission by the Borrower which might invalidate or render unenforceable, in whole or in part, such policy or result in the lapse thereof, in whole or in part; and (v) be otherwise satisfactory in all respects to the Lender.  Each liability policy carried in accordance with this Section shall be primary without right of contribution from any other insurance policy which is carried by the Borrower or the Lender to the extent that such other insurance policy provides the Borrower or the Lender with contingent or excess liability insurance with respect to its interest in the insured property and shall expressly provide that all of the provisions thereof, except the limits on liability, shall operate in the same manner as if there were a separate policy covering each insured.  The Borrower shall, if so requested by the Lender, deliver to the Lender as often as the Lender may reasonably request, a Certificate of Insurance evidencing such coverage.  All such insurance proceeds received by the Lender may be applied by the Lender in its discretion to the satisfaction of the Secured Obligations or to repair or replacement of any property which sustained the casualty, except as otherwise required by applicable law.

2.14. The Borrower shall not permit the Collateral to be relocated to a jurisdiction outside the contiguous United States, and the Borrower shall give the Lender prior written notice if any item of Collateral is to be removed from its current jurisdiction to another within the United States.

2.15. The Borrower will defend the Collateral against the claims and demands of all persons.

## Section 3.  Right of Lender to Perform for Borrower.

3.1. Whether or not an Event of Default exists under this Security Agreement, the Lender shall have the following rights: (a) The Lender is hereby specifically authorized to make, at the Lender's sole option, any or all payments required to be made either hereunder or otherwise in respect of the Collateral by the Borrower.  Such payments may include, but are not limited to, payments for taxes, assessments, betterments

shall have the right, but not the duty, to p    rm any obligations of the Borrower relating to the Collateral, without    iving any other rights or releasing the Borrower from any obligation hereunder (b) The Lender shall have the right, but not the duty, to intervene or otherwise participate in any legal or equitable proceeding which, in the Lender's sole judgment, affects the Collateral or any of the rights created or secured by this Security Agreement. Such rights may be exercised by the Lender at any time, but only after notice to the Borrower, and only to the extent permitted by law and necessary to protect the Lender's rights hereunder and in the Collateral.

3.2. Any sums paid, and any costs or expenses, including reasonable attorneys' fees, incurred by the Lender, pursuant to the Lender's exercise of rights specified or referred to herein, shall: (a) as between the parties hereto and their successors-in-interest, be deemed valid, so that in no event shall the necessity or validity of any such payments, costs or expenses be disputed by the Borrower; and (b) with respect to such sums, costs and expenses, be, until paid, part of the Secured Obligations and, until paid, shall accrue interest at the Default Rate as defined in this Agreement.

**Section 4. Events of Default.**

The occurrence of any one or more of the following events shall constitute an "Event of Default" hereunder (each an "Event of Default"): (a) the Borrower shall fail to make any payment of the Secured Obligations within five (5) days of when due; (b) the Borrower shall fail to perform or observe any other covenant, condition or agreement to be performed or observed by the Borrower under this Agreement within fifteen (15) days after the date of written notice thereof sent by the Lender; (c) any representation or warranty made by the Borrower herein or in any document or certificate furnished to the Lender in connection herewith shall have been incorrect in any material respect when made; (d) the Borrower shall fail to make any payment of any "material indebtedness" (meaning indebtedness equal to or exceeding ten percent (10%) of the original principal amount of the Loan) (other than indebtedness constituting Secured Obligations) for money borrowed or indebtedness under any capitalized lease or other purchase money obligation or shall fail to perform the terms of any agreement relating to such indebtedness and such breach or default continue, without having been duly cured, waived or consented to, beyond the period of grace, if any, therein specified, or any such indebtedness shall be accelerated or declared due and payable prior to the stated maturity thereof; (e) the Borrower or any "affiliate" (meaning, as applied to any person or entity, a person or entity which directly or indirectly controls, is controlled by, or under common control with such person or entity) shall fail to pay, observe or perform any obligation, indebtedness, covenant or agreement to or with the Lender or any of its "affiliates" to be paid, observed or performed on the part of the Borrower or its "affiliates" and such default shall continue without having been duly cured, waived or consented to beyond the period of grace, if any, therein specified; (f) there shall be imposed on the Collateral or any part thereof any Lien other than a Lien in favor of the Lender; (g) there shall occur any loss, theft, fire, substantial damage to or destruction of a material portion of the Collateral, or any seizure of any of the Collateral; (h) there shall occur the entry of any material judgment against the Borrower, which judgment is not satisfied or appealed from (with execution or similar process stayed) within thirty (30) days of its entry; (i) (x) the Borrower shall generally not pay its debts as such debts become due, shall admit in writing its inability to pay its debts generally or shall make a general assignment for the benefit of creditors, (y) any proceeding shall be instituted by or against the Borrower seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts, under any applicable law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a custodian, receiver, trustee or other similar official for it or for any substantial part of its property; provided, however, that in the case of any such proceedings instituted against the Borrower (but not instituted by the Borrower) either such proceedings shall remain undismissed or unstayed for a period of 45 days or more or any action sought in such proceedings shall occur, or (z) the Borrower shall take any corporate action to authorize any action set forth in clauses (x) and (y) above; (j) any provision of this Agreement after delivery thereof shall for any reason fail or cease to be valid and binding on, or enforceable against, the Borrower, or the Borrower shall so state in writing; (k) this Agreement shall for any reason fail or cease to create valid and enforceable Liens on any Collateral purported to be covered hereby or, such Liens shall fail or cease to constitute the first priority Liens or the Borrower shall so state in writing; (l) all, or a controlling interest of, the capital stock of the Borrower shall be sold, assigned, or otherwise transferred or if a security

therein or with resp    thereto; (m) Lender shall determine, in its sole discretion and in g    faith that there has been a material adverse change in the financial condition of the Borrower since the date hereof, or that Borrower's ability to make any payment under this Agreement promptly when due or otherwise comply with the terms of the Loan Documents is impaired; or (n) any one or more of the foregoing events shall occur with respect to the Guarantor as if it were the "Borrower" named herein.

**Section 5.    Remedies.**

If an Event of Default hereunder shall have occurred, then, or at any time thereafter while such Event of Default is continuing, the Lender may lawfully exercise any of the following remedies (and the Borrower hereby authorizes and empowers the Lender with the aids and assistance of any persons): (a) To enter upon such place as the Collateral may be found and take possession of and carry away the Collateral with or without due process of law at any time or times, and to dispose of the Collateral and apply the proceeds thereof to the Secured Obligations ; and to exercise any or all of the rights and powers and pursue any or all of the remedies that are available to a secured party under the UCC or any other applicable law or in equity in respect to the Collateral. Beyond the safe custody of the Collateral, the Lender shall have no duty as to any of the Collateral in its possession or the possession of its nominee or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto

Upon issuance of a notice of default by Lender, all payments received by the Borrower in connection with the use of any of the Collateral shall be held by the Borrower in trust for the Lender, shall be segregated from other funds of the Borrower and shall forthwith upon receipt by the Borrower be turned over to the Lender, in the same form as received by the Borrower (duly endorsed by the Borrower to the Lender, if required). Any and all such payments so received by the Lender (whether from the Borrower or otherwise) shall be held by the Lender as collateral security for, and then or at any time thereafter, may be applied in whole or in part for the benefit of the Lender against, all or any part of the Obligations in such order as the Lender, in its discretion, may determine.

The Borrower will reimburse the Lender for all fees of attorneys or collection agencies and all expenses, costs and charges paid or payable to third persons or suffered or incurred by the Lender in attempting or effecting protection or preservation of its security interest in the Collateral or the enforcement of any provision of this Security Agreement. Costs of collecting the amounts secured hereby shall be added to the principal amount due hereunder and shall be secured by, and payable out of, the Collateral.

Any sale or other disposition of the Collateral may be at public or private sale upon such terms and in such manner as the Lender deems advisable, having due regard to compliance with any statute or regulation which might affect, limit, or apply to the Lender's disposition of the Collateral. Unless the Collateral is perishable or threatens to decline speedily in value, or is of a type customarily sold on a recognized market (in which event the Lender shall provide the Borrower with such notice as may be practicable under the circumstances), the Lender shall give the Borrower at least the greater of the minimum notice required by law or seven (7) days prior written notice of the date, time, and place of any proposed public sale of, and of the date after which any private sale or other disposition, of the Collateral, or any portion thereof, is to be made.

In connection with the Lender's exercise of the Lender's rights under this Section, the Lender may enter upon, occupy, and use any premises owned or occupied by the Borrower, and may exclude the Borrower from such premises or portion thereof as may have been so entered upon, occupied, or used by the Lender. In no event shall the Lender be liable to the Borrower for use or occupancy by the Lender of any premises pursuant to this Section, nor for any charge (such as wages for the Borrower's employees and utilities) incurred in connection with the Lender's exercise of the Lender's rights and remedies.

The Lender may require the Borrower to assemble the Collateral and make it available to the Lender at the Borrower's sole risk and expense at a place or places which are reasonably convenient to both the Lender and the Borrower (including at the Borrower's premises) or the Lender may render any Collateral unusable to the Borrower.

All rights, remedies and options conferred upon the Lender by the terms of this Agreement or by law shall be cumulative and may be exercised

successively or concurrently and are not altern    e or exclusive of any other such rights, remedies or options.  No expre...    or implied waiver by the Lender of any default or event of default hereunder shall in any way be, or be construed to be, a waiver of any future or subsequent Default or Event of Default.  The failure or delay of the Lender in exercising any rights granted hereunder shall not constitute a waiver of any such right in the future and any single or partial exercise of any particular right by the Lender shall not exhaust such rights or constitute a waiver of any other right provided herein.

**Section 6.    Miscellaneous.**

6.1. If the Lender is made a party defendant to any litigation concerning this Agreement, any Loan Document or the Collateral or any part thereof, then the Borrower shall indemnify, defend and hold the Lender harmless from and against all claims, liabilities, judgments, costs and expenses by reason of said litigation, including reasonable attorneys' fees and expenses incurred by the Lender in any such litigation, whether or not any such litigation is prosecuted to judgment.

All amounts due to the Lender pursuant to this Section shall bear interest at the Default Rate from time to time in effect until paid. The "Default Rate" shall mean a per annum rate of the lesser of (i) the interest rate of the Loan plus four percent (4%) per annum or (ii) the maximum rate of interest then permitted by law.

6.2.When all Secured Obligations have been indefeasibly paid and performed in full and no further obligation on the part of the Borrower shall exist, this Security Agreement shall cease and terminate, and, at the Borrower's written request, accompanied by such certificates, opinions and proof as the Lender shall reasonably deem necessary, the Collateral furnished hereunder shall revert to the Borrower and the estate, rights, title, and interest of the Lender therein shall cease, and thereupon on the Borrower's written request and at its cost and expense, the Lender shall execute proper instruments, acknowledging satisfaction of and discharging the Security Interest created by this Agreement, and shall redeliver to the Borrower the Collateral furnished hereunder then in its possession; subject, however, to the terms and provisions contained in Section 6.3 hereof.

6.3. All covenants, agreements, representations and warranties made herein or in the Note and in certificates delivered pursuant hereto or thereto shall be deemed to have been material and relied upon by Lender, notwithstanding any investigation made by Lender or on Lender's behalf, and shall survive the execution and delivery to Lender hereof and thereof. Each such covenant, agreement, representation and warranty is hereby confirmed by the Borrower to be true and correct in all respects with the same force and effect on and as of the date of delivery of any Collateral to Lender as though made as of the date of such delivery.

6.4.Borrower agrees to indemnify, defend and save and hold harmless Lender and its officers, directors, employees, agents and advisors and affiliates (each, an "Indemnified Party") from and against, and shall pay on demand, any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or resulting from this Agreement (including, without limitation, enforcement of this Agreement), except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

6.5.This Security Agreement may not be waived, changed or discharged orally but only by an agreement in writing and signed by the Lender, and any

oral waiver, change    "scharge of any provision of this Agreement shall be without authority s...    of no force and effect.

6.6 (a)All notices, demands, requests, consents and other communications provided for in this Agreement shall be given in writing, (including electronic mail), and addressed to the party to be notified at the address for such party set forth below or at such other address as shall be notified in writing to the other parties. (b)All notices, demands, requests, consents and other communications described in clause (a) above shall be effective (i) if delivered by hand, including any overnight courier service, upon personal delivery, or (ii) if delivered by mail, three business days after deposited in the mails, and (iii) if delivered by electronic mail or any other telecommunications device, when transmitted to an electronic mail address (or by another means of electronic delivery) as provided in clause (a) above.

6.7 The covenants, representations, warranties and agreements herein set forth shall be binding upon the Borrower, its successors and assigns and shall inure to the benefit of the Lender, its successors and assigns. Any purchaser, assignee or transferee of any of the Secured Obligations and the Lender's Lien hereunder shall forthwith become vested with and entitled to exercise all the powers and rights given by this Agreement to the Lender, as if said purchaser, assignee, transferee or pledgee were originally named herein.

6.8.This Security Agreement shall be interpreted in accordance with and governed by the laws of the State of Illinois without regard to choice of law principles. Any action or suit in connection with this Agreement or the transactions contemplated herein or therein may be brought in any court of record in the State of New York, the parties hereby irrevocably submitting and consenting to the non-exclusive jurisdiction of each thereof, and each party irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may have or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and claim that the same has been brought in an inconvenient forum. Service of process may be made on the other party by mailing a copy of the summons to such party, by registered mail, at its address to be used for the giving of notices under this Security Agreement and the Note. IN THE EVENT OF ANY LITIGATION IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN, THE DEBTOR AND THE LENDER KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ALL RIGHTS TO A TRIAL BY JURY.

6.9.   This Agreement, any Schedules or Exhibits hereto and any riders or other attachments, any application submitted by the Borrow to the Lender and any guaranty or subordination agreement delivered together under this Agreement (the "Loan Documents") constitute the entire agreement between the parties with respect to the subject matter hereof. If at any time one or more provisions of this Agreement or the Loan Documents, any amendment or supplement thereto or any related writing is or becomes invalid, illegal or unenforceable in whole or in part in any jurisdiction, the validity, legality and enforceability of such provision in any other jurisdiction or of the remaining provisions shall not in any way be affected or impaired thereby.

6.10.  If more than one Person constitutes the Borrower or the Guarantor, the obligations of such Persons shall be joint and several.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Security Agreement, under seal, on the day and year first below written.

| LENDER | | BORROWER | |
|---|---|---|---|
| **Name** Atlas Copco Construction and Mining USA LLC | **Contact Person** G. Grammerstorf | **Name** Indie Energy Services Company, LLC | **Contact Person** Daniel Cheifetz |
| **Address** 3700 E. 68th Avenue | **Telephone** 1.303.600.2330 | **Address** 1020 Church Street | **Telephone** 847.371.1604 |
| **City / State** Commerce City, CO | **Zip Code** 80022 | **City / State** Evanston, Illinois | **Zip Code** 60201 |
| **Signature (Duly Authorized)** | **Date** 06-15-07 | **Signature (Duly Authorized)** | **Date** 4/6/07 |
| **Name** Jim Levitt | **Title** VP Finance | **Name** Daniel Cheifetz | **Title** CEO |



# INSTALLMENT LOAN & SECURITY AGREEMENT

FOR VALUE RECEIVED, the undersigned borrower ("Borrower"), promises to pay to the order of the lender ("Lender"), the below stated principal sum together with interest on the unpaid principal balance hereof from time to time outstanding at the rate per annum set forth below. The financial obligation of the Borrower to the Lender is herein called the "Loan". The Loan shall accrue interest by reference to the Fixed Rate as set forth below.

Principal payments and interest shall be due and payable as set forth below If not sooner paid, all outstanding principal and accrued and unpaid interest thereon shall be paid to the Lender on the Last Payment Date set forth below. In the absence of demonstrable error, the books and records of the Lender shall constitute conclusive evidence of the unpaid principal balance hereof from time to time.

The Borrower may, upon at least two business days' prior written notice to the Lender stating the proposed date and aggregate principal amount of the prepayment, prepay the outstanding principal amount in whole, together with accrued interest to the date of such prepayment on the principal amount prepaid and without discount.

All payments hereunder shall be payable in lawful money of the United States. All payments shall be applied first to any costs, fees and expenses of the Lender due hereunder, then to interest due hereunder, and any balance shall be applied in reduction of principal in the inverse order of maturity.

## FINANCING SCHEDULE

| Purchase Price: | $604,500.00 | Less Cash: | $ | Financing Term: | 36 months |
| Documentation Fees: | $350.00 | Less Trade-In: | $44,761.54 | Interest Rate: | 7.95% |
| Total Price: | $604,850.00 | Down Payment: | $44,761.54 | Principal Financed: | $564,588.46 |
| Number of Payments in Series | Amount of  Payments in Series | Date of First Payment in Series | | Date of Last Payment in Series | Total Amount of Payments in Series |
| 36 | $10,677.96 | July 1, 2007 | | July 1, 2010 | $671,406.56 |

This Loan is secured by certain collateral described below. If any Event of Default shall occur, the Lender may, at its option, declare to be immediately due and payable the then outstanding principal balance, with all accrued and unpaid interest thereon, and all other amounts payable to the Lender hereunder, whereupon all such amounts shall become and be due and payable immediately. In the event that any payment due hereunder shall not be paid when due, the Borrower shall pay a late fee of the greater of $100.00 or five percent (5.00%) of the outstanding principal payment missed.

## COLLATERAL – EQUIPMENT DESCRIPTION & LOCATION

| Description (model, serial number) | Purchase Price |
|---|---|
| 1 Atlas Copco Brand Drill Model #TH60, Serial #21129 mounted on Peterbilt truck Serial# 1NPAL40X-7-7D661603 | $604,500.00 |
| Freight | $4,500.00 |
| Sales tax to be paid to taxing source directly by Indie Energy | |
| Equipment Location (if other than billing address below) As below | Delivery Date May 23, 2007 |

### Section 1  Grant of Security Interest.

1.1. For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Borrower hereby grants to the Lender a security interest in and first lien on all of the Borrower's rights in the Collateral to secure the Secured Obligations.

1.2. As used herein, the term "Secured Obligations" shall mean the payment and performance of all debts, liabilities, obligations, covenants, agreements and indemnities of the Borrower to the Lender, of every kind, nature and description, due or to become due, now existing or hereafter arising, including, without limitation, all debts, liabilities and obligations under this agreement; all renewals, amendments, modifications, consolidations, replacements, increases and extensions thereof, therefore and thereto (collectively, the "Loan Documents"); and any other form of indebtedness owed by the Borrower to the Lender.

1.3. As used herein, the term "Collateral" shall mean: (a) All the Borrower's right, title and interest in and to the goods, property and equipment (including any software or computer programs embedded therein) set forth and described in this Security Agreement (the "Equipment"); (b) All          the Borrower's right, title and interest in and to all additions, replacements, accessions, substitutions, modifications and improvements to the foregoing; (c) All of the Borrower's rights, in, to and under policies and certificates of insurance, including claims or rights to payment and all proceeds, refunds, and premium rebates, including without limitation, proceeds of fire, theft or any other physical damage or loss relating directly or indirectly to the foregoing; (d) All books, records, and information relating to any of the foregoing, and all rights of access to such books, records, and information and all property in which such books, records, and information are stored, recorded, and maintained, and all computer programs, computer records, computer software, rights of access to computer bureaus and computer data relating to the foregoing; and (e) All proceeds (cash and non-cash) and products of the foregoing, provided that the grant to the Lender of a security interest in proceeds shall not be deemed a consent by Lender to a sale or other disposition of any Collateral.

1.4. As used herein (a) the term "UCC" shall mean the Uniform Commercial Code as adopted and in effect in the State of Illinois; and (b) the term "Guarantor" shall mean a guarantor, if any, of the Secured Obligations.

**Borrowers initials here**

## Section 2.    Covenants.

The Borrower hereby covenants and agrees for the benefit of the Lender as follows:

2.1. The Borrower will do all things necessary to preserve, renew and keep in full force and effect and in good standing its existence and material qualifications and rights necessary or desirable in the ordinary conduct of its business.

2.2. The Borrower shall retain ownership and possession of the Collateral and keep the Collateral free and clear of all Liens and other property interest of any and every kind whatsoever, except those in favor of the Lender. The Borrower shall promptly notify the Lender of (i) any Lien made or threatened against the Collateral or any part thereof, and (ii) any material change in the Collateral, including without limitation, any material decrease in the value thereof.

2.3. The Borrower shall deliver to the Lender, promptly upon receipt of same, copies of all notices, certificates, documents and instruments received by the Borrower which materially affect the Collateral.

2.4. The Borrower shall pay or cause to be paid promptly when due all taxes, betterments, assessments and other governmental levies, insurance premiums and other charges, to whomever and whenever laid or assessed, whether on this agreement or on any interest therein or on the Secured Obligations, or on the Collateral, which if unpaid might by law become a Lien on the Collateral; provided, however, that any such tax, assessment, charge, levy or claim need not be paid if the validity or amount thereof shall currently be contested in good faith by appropriate proceedings and if the Borrower shall have set aside on its books appropriate reserves with respect thereto in accordance with generally accepted accounting principles; and provided, further, that the Borrower will pay all such taxes, assessments, levies or other governmental charges forthwith upon the commencement of proceedings to foreclose any Lien which may have attached as security therefore.

2.5. The Borrower will keep and maintain each item of Equipment in good operating condition, ordinary wear and tear excepted, and the Borrower will provide all maintenance and service and all repairs necessary for such purpose.

2.6. The Borrower will use the Collateral for lawful purposes only, with all reasonable care and caution in conformity with all applicable laws, rules, regulations and ordinances.

2.7. The Collateral is now and shall remain personal property, and the Borrower will not permit any of the Collateral to become a part of or affixed to real property without written prior consent of the Lender and without first making all arrangements and delivering, or causing to be delivered, to Lender all instruments and documents including, without limitation, waivers and subordination agreements by any party necessary, at the sole discretion of the Lender, to preserve and protect the primary security interest granted herein in the Collateral to the Lender.

2.8. At all times, and at its sole cost and expense, the Borrower shall (i) cooperate with Lender to record and maintain appropriate financing and continuation statements; (ii) pay all recording, filing or other taxes, fees and other charges relating thereto; and (iii) shall comply with all such statutes and regulations, as may be required by law in order to establish, preserve, perfect and protect the first Lien of the Lender in the Collateral (including, without limitation, any interests acquired after the execution hereof) and the rights of the Lender there under. The Lender may record or file as such a financing statement or statements, a carbon, photographic or other reproduction of this agreement. Borrower hereby authorizes the Lender to prepare and file such financing statements (including continuation statements or amendments thereof or supplements thereto) or other instruments as the Lender may from time to time deem necessary or appropriate in order to perfect and maintain the security interest granted hereunder in accordance with the UCC, including without limitation, any financing statement that describes the Collateral.

2.9. If and to the extent from time to time requested by the Lender, the Borrower shall furnish to the Lender written statements, signed and, if so requested, acknowledged, setting forth the amount of the Secured Obligations with the Borrower acknowledges to be due to the Lender, specifying any claims of offset or defense which the Borrower asserts against the Secured Obligations or any obligations to be performed hereunder, the then state of facts relative to the condition of the Collateral, and such other matters as the Lender shall request.

2.10. The Borrower shall notify the Lender at least thirty (30) days prior to any change in the name, structure or identity of the Borrower, or the use by the Borrower of any trade name or trade style not heretofore disclosed to the Lender, or the address of the Borrower's chief executive office or location and the address of any location of Collateral; in each case by an amendment to this Security Agreement.

2.11. The Borrower will promptly notify the Lender (a) of any material adverse change in its financial condition, assets, business or prospects and (b) any litigation, arbitration or administrative proceeding to which the Borrower may hereafter become a party and which may involve any material risk of any judgment or liability which may have a material adverse effect on the Collateral or Borrower's ability to pay and perform the Secured Obligations as and when due.

2.12. The Borrower shall allow the Lender and its representatives access and right of inspection of the Collateral at its location at reasonable times, with reasonable frequency, and in a reasonable manner, and in the event of loss or damage to the Collateral shall send prompt written notice thereof to the Lender.

2.13. The Borrower will maintain with financially sound and reputable companies insurance policies (i) insuring the Equipment against loss by fire, explosion, theft and such other casualties as are usually insured against by companies engaged in the same or similar businesses, and (ii) insuring the Borrower and the Lender against liability for personal injury and property damage relating to the Equipment, such policies to be in such form and in such amounts and coverage as may be reasonably satisfactory to the Lender, with losses payable, in the case of casualty policies, to the Lender as its interests may appear. All insurance policies with respect to the Equipment shall (i) contain a "Lender's Loss Payable" endorsement which shall provide that in respect of the interests of the Lender in such policy the insurance shall not be invalidated by any action or inaction of the Borrower or any other person and shall insure the interests of the Lender as they appear, regardless of any breach or violation of any warranties, declarations or conditions contained in such policies by the Borrower; (ii) provide that no cancellation, reduction in amount or change in coverage thereof shall be effective until at least thirty (30) days after receipt by the Lender of written notice thereof; (iii) waive any right of subrogation of the insurer against, or any right of set-off, counterclaim or any other deduction in respect of any liability of, the Lender to such insurer; (iv) provide that the Lender shall receive promptly copies of any notices to the Borrower of any default or other act or omission by the Borrower which might invalidate or render unenforceable, in whole or in part, such policy or result in the lapse thereof, in whole or in part; and (v) be otherwise satisfactory in all respects to the Lender. Each liability policy carried in accordance with this Section shall be primary without right of contribution from any other insurance policy which is carried by the Borrower or the Lender to the extent that such other insurance policy provides the Borrower or the Lender with contingent or excess liability insurance with respect to its interest in the insured property and shall expressly provide that all of the provisions thereof, except the limits on liability, shall operate in the same manner as if there were a separate policy covering each insured. The Borrower shall, if so requested by the Lender, deliver to the Lender as often as the Lender may reasonably request, a Certificate of Insurance evidencing such coverage. All such insurance proceeds received by the Lender may be applied by the Lender in its discretion to the satisfaction of the Secured Obligations or to repair or replacement of any property which sustained the casualty, except as otherwise required by applicable law.

2.14. The Borrower shall not permit the Collateral to be relocated to a jurisdiction outside the contiguous United States, and the Borrower shall give the Lender prior written notice if any item of Collateral is to be removed from its current jurisdiction to another within the United States.

2.15. The Borrower will defend the Collateral against the claims and demands of all persons.

## Section 3.    Right of Lender to Perform for Borrower.

3.1. Whether or not an Event of Default exists under this Security Agreement, the Lender shall have the following rights: (a) The Lender is hereby specifically authorized to make, at the Lender's sole option, any or all payments required to be made either hereunder or otherwise in respect of the Collateral by the Borrower. Such payments may include, but are not limited to, payments for taxes, assessments, betterments and other governmental levies, and insurance premiums. The Lender

**Borrowers initials here**

shall have the right, but not the duty, to perform any obligations of the Borrower relating to the Collateral, without paying any other rights or releasing the Borrower from any obligation hereunder (b) The Lender shall have the right, but not the duty, to intervene or otherwise participate in any legal or equitable proceeding which, in the Lender's sole judgment, affects the Collateral or any of the rights created or secured by this Security Agreement. Such rights may be exercised by the Lender at any time, but only after notice to the Borrower, and only to the extent permitted by law and necessary to protect the Lender's rights hereunder and in the Collateral.

3.2. Any sums paid, and any costs or expenses, including reasonable attorneys' fees, incurred by the Lender, pursuant to the Lender's exercise of rights specified or referred to herein, shall:    (a) as between the parties hereto and their successors-in-interest, be deemed valid, so that in no event shall the necessity or validity of any such payments, costs or expenses be disputed by the Borrower; and (b) with respect to such sums, costs and expenses, be, until paid, part of the Secured Obligations and, until paid, shall accrue interest at the Default Rate as defined in this Agreement.

### Section 4.    Events of Default.

The occurrence of any one or more of the following events shall constitute an Event of Default hereunder (each an "Event of Default"): (a) the Borrower shall fail to make any payment of the Secured Obligations within five (5) days of when due; (b) the Borrower shall fail to perform or observe any other covenant, condition or agreement to be performed or observed by the Borrower under this Agreement within fifteen (15) days after the date of written notice thereof sent by the Lender; (c) any representation or warranty made by the Borrower herein or in any document or certificate furnished to the Lender in connection herewith shall have been incorrect in any material respect when made; (d) the Borrower shall fail to make any payment of any "material indebtedness" (meaning indebtedness equal to or exceeding ten percent (10%) of the original principal amount of the Loan) other than indebtedness constituting Secured Obligations) for money borrowed or indebtedness under any capitalized lease or other purchase money obligation or shall fail to perform the terms of any agreement relating to such indebtedness and such breach or default shall continue, without having been duly cured, waived or consented to, beyond the period of grace, if any, therein specified, or any such indebtedness shall be accelerated or declared due and payable prior to the stated maturity thereof; (e) the Borrower or any "affiliate" (meaning, as applied to any person or entity, a person or entity which directly or indirectly controls, is controlled by, or under common control with such person or entity) shall fail to pay, observe or perform any obligation, indebtedness, covenant or agreement to or with the Lender or any of its "affiliates" to be paid, observed or performed on the part of the Borrower or its "affiliates" and such default shall continue without having been duly cured, waived or consented to beyond the period of grace, if any, therein specified; (f) there shall be imposed on the Collateral or any part thereof any Lien other than a Lien in favor of the Lender; (g) there shall occur any loss, theft, fire, substantial damage to or destruction of a material portion of the Collateral, or any seizure of any of the Collateral; (h) there shall occur the entry of any material judgment against the Borrower, which judgment is not satisfied or appealed from (with execution or similar process stayed) within thirty (30) days of its entry; (i) (x) the Borrower shall generally not pay its debts as such debts become due, shall admit in writing its inability to pay its debts generally or shall make a general assignment for the benefit of creditors, (y) any proceeding shall be instituted by or against the Borrower seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts, under any applicable law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a custodian, receiver, trustee or other similar official for it or for any substantial part of its property; provided, however, that in the case of any such proceedings instituted against the Borrower (but not instituted by the Borrower) either such proceedings shall remain undismissed or unstayed for a period of 45 days or more or any action sought in such proceedings shall occur, or (z) the Borrower shall take any corporate action to authorize any action set forth in clauses (x) and (y) above; (j) any provision of this Agreement after delivery thereof shall for any reason fail or cease to be valid and binding on, or enforceable against, the Borrower, or the Borrower shall so state in writing; (k) this Agreement shall for any reason fail or cease to create valid and enforceable Liens on any Collateral purported to be covered hereby or, such Liens shall fail or cease to constitute the first priority Liens or the Borrower shall so state in writing; (l) all, or a controlling interest of, the capital stock of the Borrower shall be sold, assigned, or otherwise transferred or if a security interest or other encumbrance shall be granted or otherwise acquired

therein or with respect thereto; (m) Lender shall determine, in its sole discretion and in good faith that there has been a material adverse change in the financial condition of the Borrower since the date hereof, or that Borrower's ability to make any payment under this Agreement promptly when due or otherwise comply with the terms of the Loan Documents is impaired; or (n) any one or more of the foregoing events shall occur with respect to the Guarantor as if it were the "Borrower" named herein.

### Section 5.    Remedies.

If an Event of Default hereunder shall have occurred, then, or at any time thereafter while such Event of Default is continuing, the Lender may lawfully exercise any of the following remedies (and the Borrower hereby authorizes and empowers the Lender with the aide and assistance of any persons): (a) To enter upon such place as the Collateral may be found and take possession of and carry away the Collateral with or without due process of law at any time or times, and to dispose of the Collateral and apply the proceeds thereof to the Secured Obligations ; and to exercise any or all of the rights and powers and pursue any or all of the remedies that are available to a secured party under the UCC or any other applicable law or in equity in respect to the Collateral. Beyond the safe custody of the Collateral, the Lender shall have no duty as to any of the Collateral in its possession or the possession of its nominee or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto

Upon issuance of a notice of default by Lender, all payments received by the Borrower in connection with the use of any of the Collateral shall be held by the Borrower in trust for the Lender, shall be segregated from other funds of the Borrower and shall forthwith upon receipt by the Borrower be turned over to the Lender, in the same form as received by the Borrower (duly endorsed by the Borrower to the Lender, if required). Any and all such payments so received by the Lender (whether from the Borrower or otherwise) shall be held by the Lender as collateral security for, and then or at any time thereafter, may be applied in whole or in part for the benefit of the Lender against, all or any part of the Obligations in such order as the Lender, in its discretion, may determine.

The Borrower will reimburse the Lender for all fees of attorneys or collection agencies and all expenses, costs and charges paid or payable to third persons or suffered or incurred by the Lender in attempting to effecting protection or preservation of its security interest in the Collateral or the enforcement of any provision of this Security Agreement. Costs of collecting the amounts secured hereby shall be added to the principal amount due hereunder and shall be secured by, and payable out of, the Collateral.

Any sale or other disposition of the Collateral may be at public or private sale upon such terms and in such manner as the Lender deems advisable, having due regard to compliance with any statute or regulation which might affect, limit, or apply to the Lender's disposition of the Collateral. Unless the Collateral is perishable or threatens to decline speedily in value, or is of a type customarily sold on a recognized market (in which event the Lender shall provide the Borrower with such notice as may be practicable under the circumstances), the Lender shall give the Borrower at least the greater of the minimum notice required by law or seven (7) days prior written notice of the date, time, and place of any proposed public sale of, and of the date after which any private sale or other disposition, of the Collateral, or any portion thereof, is to be made.

In connection with the Lender's exercise of the Lender's rights under this Section, the Lender may enter upon, occupy, and use any premises owned or occupied by the Borrower, and may exclude the Borrower from such premises or portion thereof as may have been so entered upon, occupied, or used by the Lender.  In no event shall the Lender be liable to the Borrower for use or occupancy by the Lender of any premises pursuant to this Section, nor for any charge (such as wages for the Borrower's employees and utilities) incurred in connection with the Lender's exercise of the Lender's rights and remedies.

The Lender may require the Borrower to assemble the Collateral and make it available to the Lender at the Borrower's sole risk and expense at a place or places which are reasonably convenient to both the Lender and the Borrower (including at the Borrower's premises) or the Lender may render any Collateral unusable to the Borrower.

All rights, remedies and options conferred upon the Lender by the terms of this Agreement or by law shall be cumulative and may be exercised

**Borrowers Initials here**

successively or concurrently and are not alterna***** or exclusive of any other such rights, remedies or options. No expre** *r implied waiver by the Lender of any default or event of default hereunder shall in any way be, or be construed to be, a waiver of any future or subsequent Default or Event of Default. The failure or delay of the Lender in exercising any rights granted hereunder shall not constitute a waiver of any such right in the future and any single or partial exercise of any particular right by the Lender shall not exhaust such rights or constitute a waiver of any other right provided herein.

### Section 6.    Miscellaneous.

6.1. If the Lender is made a party defendant to any litigation concerning this Agreement, any Loan Document or the Collateral or any part thereof, then the Borrower shall indemnify, defend and hold the Lender harmless from and against all claims, liabilities, judgments, costs and expenses by reason of said litigation, including reasonable attorneys' fees and expenses incurred by the Lender in any such litigation, whether or not any such litigation is prosecuted to judgment.

All amounts due to the Lender pursuant to this Section shall bear interest at the Default Rate from time to time in effect until paid. The "Default Rate" shall mean a per annum rate of the lesser of (i) the interest rate of the Loan plus four percent (4%) per annum or (ii) the maximum rate of interest then permitted by law.

6.2.When all Secured Obligations have been indefeasibly paid and performed in full and no further obligation on the part of the Borrower shall exist, this Security Agreement shall cease and terminate, and, at the Borrower's written request, accompanied by such certificates, opinions and proof as the Lender shall reasonably deem necessary, the Collateral furnished hereunder shall revert to the Borrower and the estate, rights, title, and interest of the Lender therein shall cease, and thereupon on the Borrower's written request and at its cost and expense, the Lender shall execute proper instruments, acknowledging satisfaction of and discharging the Security Interest created by this Agreement, and shall redeliver to the Borrower the Collateral furnished hereunder then in its possession; subject, however, to the terms and provisions contained in Section 6.3 hereof.

6.3.    All covenants, agreements, representations and warranties made herein or in the Note and in certificates delivered pursuant hereto or thereto shall be deemed to have been material and relied upon by Lender, notwithstanding any investigation made by Lender or on Lender's behalf, and shall survive the execution and delivery to Lender hereof and thereof. Each such covenant, agreement, representation and warranty is hereby confirmed by the Borrower to be true and correct in all respects with the same force and effect on and as of the date of delivery of any Collateral to Lender as though made as of the date of such delivery.

6.4.Borrower agrees to indemnify, defend and save and hold harmless Lender and its officers, directors, employees, agents and advisors and affiliates (each, an "Indemnified Party") from and against, and shall pay on demand, any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or resulting from this Agreement (including, without limitation, enforcement of this Agreement), except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or wilful misconduct.

6.5.This Security Agreement may not be waived, changed or discharged orally but only by an agreement in writing and signed by the Lender, and any

oral waiver, change or **charge of any provision of this Agreement shall be without authority a** *l no force and effect.

6.6 (a)All notices, demands, requests, consents and other communications provided for in this Agreement shall be given in writing, (including electronic mail), and addressed to the party to be notified at the address for such party set forth below or at such other address as shall be notified in writing to the other parties. (b)All notices, demands, requests, consents and other communications described in clause (a) above shall be effective (i) if delivered by hand, including any overnight courier service, upon personal delivery, or (ii) if delivered by mail, three business days after deposited in the mails, and (iii) if delivered by electronic mail or any other telecommunications device, when transmitted to an electronic mail address (or by another means of electronic delivery) as provided in clause (a) above.

6.7 The covenants, representations, warranties and agreements herein set forth shall be binding upon the Borrower, its successors and assigns and shall inure to the benefit of the Lender, its successors and assigns. Any purchaser, assignee or transferee of any of the Secured Obligations and the Lender's Lien hereunder shall forthwith become vested with and entitled to exercise all the powers and rights given by this Agreement to the Lender, as if said purchaser, assignee, transferee or pledgee were originally named herein.

6.8.This Security Agreement shall be interpreted in accordance with and governed by the laws of the State of Illinois without regard to choice of law principles. Any action or suit in connection with this Agreement or the transactions contemplated herein or therein may be brought in any court of record in the State of New York, the parties hereby irrevocably submitting and consenting to the non-exclusive jurisdiction of each thereof, and each party irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may have or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and claim that the same has been brought in an inconvenient forum. Service of process may be made on the other party by mailing a copy of the summons to such party, by registered mail, at its address to be used for the giving of notices under this Security Agreement and the Note.    IN THE EVENT OF ANY LITIGATION IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN, THE DEBTOR AND THE LENDER KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ALL RIGHTS TO A TRIAL BY JURY.

6.9.    This Agreement, any Schedules or Exhibits hereto and any riders or other attachments, any application submitted by the Borrow to the Lender and any guaranty or subordination agreement delivered together under this Agreement (the "Loan Documents") constitute the entire agreement between the parties with respect to the subject matter hereof. If at any time one or more provisions of this Agreement or the Loan Documents, any amendment or supplement thereto or any related writing is or becomes invalid, illegal or unenforceable in whole or in part in any jurisdiction, the validity, legality and enforceability of such provision in any other jurisdiction or of the remaining provisions shall not in any way be affected or impaired thereby.

6.10.  If more than one Person constitutes the Borrower or the Guarantor, the obligations of such Persons shall be joint and several.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Security Agreement, under seal, on the day and year first below written.

| LENDER | | BORROWER | |
|---|---|---|---|
| Name <br> Atlas Copco Construction and Mining USA LLC | Contact Person <br> G. Grammerstorf | Name <br> Indie Energy Services Company LLC | Contact Person <br> Daniel Cheifetz |
| Address <br> 3700 E. 68th Avenue | Telephone <br> 1.303.600.2330 | Address <br> 1020 Church Street | Telephone <br> 647.371.1604 |
| City / State <br> Commerce City, CO | Zip Code <br> 80022 | City / State <br> Evanston, Il | Zip Code <br> 60201 |
| Signature (Duly Authorized) | Date <br> 08-31-07 | Signature (Duly Authorized) | Date <br> 6/10/07 |
| Name <br> Jim Levitt | Title <br> VP Finance | Name <br> Daniel Cheifetz | Title <br> CEO |

302929

**UCC FINANCING STATEMENT**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

RECEIVED
SECRETARY OF STATE
UNIFORM COMM. CODE DIV
2007 MAY 30 PM 4:30

A. NAME & PHONE OF CONTACT AT FILER [optional]
Phone:(800) 331-3282  Fax: (818) 662-4141

B. SEND ACKNOWLEDGEMENT TO: [Name and Address]   11051 ATLAS COPCO CM

UCC Direct Services          11251047
P.O. Box 29071
Glendale, CA 91209-9071      ILIL

UCU105/30/07:02:2931:
20.00 CKD1
S0SIL 13:08  12155352 FS

1. DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (1a or 1b) - do not abbreviate or combine names

1a. ORGANIZATION'S NAME
INDIE ENERGY SERVICES COMPANY LLC

| 1b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1020 CHURCH ST | EVANSTON | IL | 60201 | USA |

| 1d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 1e. TYPE OF ORGANIZATION | 1f. JURISDICTION OF ORGANIZATION | 1g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | LLC | IL | 01901982 | ☐ NONE |

2. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one debtor name (2a or 2b) - do not abbreviate or combine names

2a. ORGANIZATION'S NAME
INDIE ENERGY SERVICES COMPANY LLC

| 2b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 1020 CHURCH ST | EVANSTON | IL | 60201 | USA |

| 2d. SEE INSTRUCTIONS | ADD'L INFO RE ORGANIZATION DEBTOR | 2e. TYPE OF ORGANIZATION | 2f. JURISDICTION OF ORGANIZATION | 2g. ORGANIZATIONAL ID #, if any | |
|---|---|---|---|---|---|
| | | LLC | IL | 019011982 | ☐ NONE |

3. SECURED PARTY'S NAME (or NAME of TOTAL ASSIGNEE of ASSIGNOR S/P) - insert only one secured party name (3a or 3b)

3a. ORGANIZATION'S NAME
ATLAS COPCO CONSTRUCTION MINING TECHNIQUE USA LLC

| 3b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 3700 E. 68TH AVE. | COMMERCE CITY | CO | 80022 | USA |

4. This FINANCING STATEMENT covers the following collateral:

ONE (1) ATLAS COPCO BRAND DRILL, MODEL #TH60, SERIAL #21129, INCLUDING ALL ATTACHMENTS, ACCESSORIES, REPLACEMENTS AND SUBSTITUTIONS THERETO AND ALL PROCEEDS AND PRODUCTS THEREOF, TOGETHER WITH ALL DOCUMENTS, GENERAL INTANGIBLES, CONTRACT RIGHTS, INSTRUMENTS, ACCOUNTS AND CHATTEL PAPER ARISING OUT OF THE LEASING, SALE OR OTHER DISPOSITION THEREOF.

| 5. ALTERNATIVE DESIGNATION [if applicable] | ☐ LESSEE/LESSOR | ☐ CONSIGNEE/CONSIGNOR | ☐ BAILEE/BAILOR | ☐ SELLER/BUYER | ☐ AG. LIEN | ☐ NON-UCC FILING |
|---|---|---|---|---|---|---|
| 6. ☐ This FINANCING STATEMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS.  Attach Addendum [if applicable] | | 7. Check to REQUEST SEARCH REPORT(S) on Debtor(s) [ADDITIONAL FEE] [optional] | | ☐ All Debtors | ☐ Debtor 1 | ☐ Debtor 2 |

8. OPTIONAL FILER REFERENCE DATA
11251047                          George                    Indie Energy (4) - 5/29/07

ACKNOWLEDGMENT COPY - NATIONAL UCC FINANCING STATEMENT (FORM UCC1) (REV. 05/22/02)

Prepared by UCC Direct Services, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

**FINANCING STATEMENT ADDENDUM**
FOLLOW INSTRUCTIONS (front and back) CAREFULLY

9. NAME OF FIRST DEBTOR (1a or 1b) ON RELATED FINANCING STATEMENT

| 9a. ORGANIZATION'S NAME | | |
|---|---|---|
| INDIE ENERGY SERVICES COMPANY LLC | | |
| OR 9b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME,SUFFIX |

10. MISCELLANEOUS

11251047-IL-0

11051 ATLAS COPCO CM

George

Indie Energy (4) - 5/29/07

File with: Illinois

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

11. ADDITIONAL DEBTOR'S EXACT FULL LEGAL NAME - insert only one name (11a or 11b) - do not abbreviate or combine names

| 11a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| OR 11b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 11c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 11d. SEE INSTRUCTION | ADD'L INFO RE ORGANIZATION DEBTOR | 11e. TYPE OF ORGANIZATION | 11f. JURISDICTION OF ORGANIZATION | 11g. ORGANIZATIONAL ID #, if any |
| | | | | ☐ NONE |

12. [X] ☐ ADDITIONAL SECURED PARTY'S or ☐ ASSIGNOR S/P's NAME - insert only one name (12a or 12b)

| 12a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| ATLAS COPCO CUSTOMER FINANCE USA LLC | | | | |
| OR 12b. INDIVIDUAL'S LAST NAME | FIRST NAME | MIDDLE NAME | | SUFFIX |
| 12c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| 34 MAPLE AVE PO BOX 2028 | PINE BROOK | NJ | 07058 | |

13. This FINANCING STATEMENT covers ☐ timber to be cut or ☐ as-extracted collateral or is filed as a ☐ fixture filing.

14. Description of real estate:

16. Additional collateral description:

15. Name and address of a RECORD OWNER of above-described real estate (if Debtor does not have a record interest):

17. Check only if applicable and check only one box.

Debtor is a ☐ Trust or ☐ Trustee acting with respect to property held in trust or ☐ Decedent's Estate

18. Check only if applicable and check only one box.

☐ Debtor is a TRANSMITTING UTILITY

☐ Filed in connection with a Manufactured-Home Transaction — effective 30 years

☐ Filed in connection with a Public-Finance Transaction — effective 30 years

ACKNOWLEDGMENT COPY - NATIONAL UCC FINANCING STATEMENT ADDENDUM (FORM UCC1Ad) (REV. 05/22/02)

Prepared by UCC-Direct Services, Inc., P.O. Box 29071
Glendale, CA 91209-9071 Tel (800) 331-3282

JUN.05.2007 11:15 4147607963                    ATLAS COPCO                    #0340 P.003 /003



**INVOICE**

Remit To:
Atlas Copco CMT USA LLC
4798 Collection Center Drive,
Chicago, IL 60693

**No.** 305555
**Date:** 7/05/31
**Page:** 1

**Sold to:**
INDIE ENERGY SERVICES CO, LLC

1020 CHURCH STREET

EVANSTON
IL  60201

**Ship to:**
INDIE ENERGY SERVICES CO, LLC

1020 CHURCH STREET
EVANSTON
IL  60201

| Customer Number | Purchase Order Number | Purchase Order Date | Terms Days |
|---|---|---|---|
| 801580 | DANIEL CHEIFETZ 7/05/31 | | Net 30 days |

| AC sales order | Shipped on | Weight | Shipping Information |
|---|---|---|---|
| 335771 | | .000 | |

| Description | Article no. | Qty | Unit price | Disc. | Total |
|---|---|---|---|---|---|
| TH-60 / sn 21129 | 9753202221 | 1 | 604500.00 | | 604500.00 |
| T2W / SN 6256 | 9753202477 | 1- | 280000.00 | | 280000.00- |
| Freight Charge From Factory to Milwaukee | | | | | 4500.00 |
| Sales Price        $604,500.00 | | | | | |
| Trade in T2W S/N 6256  $(-280,000.00) | | | | | |
| Freight From Factory  $4,500.00 | | | | | |
| Net invoice           $329,000 | | | | | |
| AC FINANCE | | | | | |
| STATE: IL | | | | | 20281.25 |

All claims must be made within 14 days from receipt of goods.  No returns accepted without prior approval.  All returns are subject to a minimum handling and restocking charge.  Service charge on overdue accounts of 3% per month.

**TOTAL**            349281.25

Atlas Copco Construction and Mining Technique USA LLC        A Company within the Atlas Copco Group
3700 E. 68th Avenue                                          Telephone:    (303) 287-8822
P.O. Box 1159                                                Toll Free     (800) 732-6762
Commerce City, CO 80022                                      - Fax:        (303) 288-8828
www.atlascopco.com

# Indie Energy
# Symmetrix Drilling

This is a discussion on the use of
Symmetrix for Geothermal Applications by
Indie Energy in the Chicago Land Area.

*Atlas Copco*

We are committed to your superior productivity through interaction and innovation

*Atlas Copco*

# Time-Line

**11 June 2007**

- 12:20  Jukka Ahonen and John Hislop Arrive
- Meet to discuss other Projects at Hotel

**12 June 2007**

- 7:30am  Pick-up at Hotel (Comfort Inn – 3001 Mannheim)
- 8:00am  Meet for Breakfast – Evenston (Indie Office 1020 Church St)
  - Discuss Product use and issues
- 10:00am  Drill Site – Observe
- 12:00pm  Lunch
- 1:00pm  Drill Site – Observe
- 4:30pm  Discuss Results and recommendations
- 6:30-7:30pm  Dinner (time to be adjusted if running late)

**13 June 2007**

- 8:00am  Pick-up at Hotel (Comfort Inn – 3001 Mannheim)
- Drive to Milwaukee for meeting
- 2:00pm  Depart Milwaukee for Airport

**We are committed to your superior productivity through interaction and innovation**

*Atlas Copco*

# Attendees

## ATLAS COPCO

Todd Armstrong – Deephole Sales Rep. (Illinois, Indiana, Iowa)

Steve Matic – Deephole Sales Rep. (Wisconsin, Minnesota, North Dakota and South Dakota)

Jukka Ahonen – Atlas Copco Rotex Marketing Manager

John Hislop - Sales & Technical Rep. Foundation & Geotechnical

Sturge Taggart – Store Manager Atlas Copco Milwaukee (possible attendee)

## INDIE ENERGY

Daniel Cheifetz – President

Erik Larson – Vice President

Buck White – Drilling Operations

**We are committed to your superior productivity through interaction and innovation**

*Atlas Copco*

# Format

**Meeting Chaired by: Todd Armstrong**

This meeting is designed to address current issues and find solutions to the problems that exist. The below outline shows a history of what has been done and obstacles encountered. We will have an open discussion to find the best solution. Please remember our focus is to make Indie Energy Successful.

- Set-Up
- Geology
- Initial Casing Failure
- Recommendations to avoid Failure
- Upgrades to Casing and Symmetrix
- Second Failure
- Actions Taken
- Concerns
- Current Situation
- Future Plans with System and Questions

**We are committed to your superior productivity through interaction and innovation**

*Atlas Copco*

# Set-up

## Drilling Requirements

- Geothermal Application w/ multi-holes
- Require retrieving the casing and using it again
- Size of Casing 6 5/8" OD
- Set Casing 80ft – 150ft depending on Geology at site
- Drill Total depth of 300ft – 500ft through bedrock

## Equipment Used

- N131 System
  - Ring Assembly (Both Standard and Horizontal)
  - Pilot Bit (Both Standard and Clay)
- Casing Left Hand Threaded 432 Wall
  - 4140 Heat Treated Ends w/ Oil field tubular middles
- DHD350 Hammer / QL50 Hammer w/ 5 1/8" bit
- T2W Drill Rig w/ Auxiliary Compressor 976/350
- Additional tooling

**We are committed to your superior productivity through interaction and innovation**

*Atlas Copco*

# Geology

## Chicago Land Area

- 10 - 40 ft Sand and Gravel and sometime caverns
- 20 - 80 ft Sticky Sea Clay.  Very sticky and difficult
- 80 - 130 ft Glacial Clay.  More rocky sand partials
- 120 – 500 ft Bedrock. Limestone formation

Other material encountered:  Boulders, shale and possibly building material from construction

**We are committed to your superior productivity through interaction and innovation**

# Initial Casing

**Atlas Copco**





First Casing Attempt – Later found not to Required Spec.
Time Frame (November – January)

We are committed to your superior productivity through interaction and innovation

# Initial Casing




Threads where cut to deep and made the walls very weak. Male ends showed no failure. These Threads where very difficult to make and break

**We are committed to your superior productivity through interaction and innovation**

*Atlas Copco*

*Atlas Copco*

# Recommendations

## Recommendations

- Run Foam – unable to run foam in the city
- Lift the casing up and down – very difficult, but did this.
- Use Backhammer to pull casing from hole – did this when needed
- Use a Polymer to keep casing free in the hole – used Polymer
    – This showed significant improvements

## Issues

- Casing was still seeing failures
- This Casing was made to the N131 Specification and seems to be to thin for threading.

**We are committed to your superior productivity through interaction and innovation**

*Atlas Copco*

# Casing and Symmetrix Upgrade

## Casing

- Changed vendors to well know Casing and Specialty tool manufacture – OCI
- Use 4140 Heat Treated Alloy ends with an upgraded Oil Field Tubular for the center of the pipe.
- Increase Wall Thickness of pipe
  - was .313 wall
  - now .432 wall (max out ID of casing)

## N131 System

- Tried new Clay Pilot Bit – initial test it did not work
- Changed Ring Assembly to N131 Horizontal
  - This allowed you to drill 7 ¼" hole vs. 7" hole
    - Additional 1/8" clearance around casing

**We are committed to your superior productivity through interaction and innovation**

# New Casing





Better Threads – Thread style is Metric Style (European Thread) or also called Multiple Use Thread. Quicker to Make and Break

We are committed to your superior productivity through interaction and innovation

AtlasCopco

# New Ring Assembly

*AtlasCopco*



SYMMETRIX N131 XL

SYMMETRIX N131 XL HORIZON

We are committed to your superior productivity through interaction and innovation

# Second Failure



Second Failure March – Casing is cracking after every 4-6 holes at depth of 110 – 120 ft at first Section top Joint.

We are committed to your superior productivity through interaction and innovation

Atlas Copco

**Atlas Copco**

# Action Taken

- Removed choke from Hammer
- Running hammer at 100 – 150 psi
- Using Polymer since – January
  - with Standard Ring casing is only a little tight (minimal backhammer needed)
- Use larger Ring Assembly
  - Casing is always loose
  - Tight when rock falls into hole – easy to work out
- Casing is easy to pull with 12,000 Lb winch or head
- Lift casing last 20-30 ft as recommended. Helps prevent sticking at end of hole

## Suggestion not able to do
- Kari recommended using more Pulldown.
  - Formation does not allow this. It is sticky clay
- Run Tricone Bit with Symmetrix – not available

We are committed to your superior productivity through interaction and innovation

*Atlas Copco*

# Concerns

## New Joints on Casing
- Wall thickness changed to .520 wall at bottom 3 joints
- Will these joints work?
- How would we rotate the pipe to reduce stress on bottom section?

## Other Questions
- Is anyone in US running the N131 System and retrieving it?
- If you weld joints how do you rotate you pipe?
- Clay Bit Shows Wear after 130ft
- What is footage for Ring and Pilot bits?
- Currently getting 4-6 holes with casing

**Additional Note:** Eklund Drilling (Nevada) is using 254 all tubing welding it for 6" casing and has only seen 2 failures in 3 years where welds broke.

**We are committed to your superior productivity through interaction and innovation**

*Atlas Copco*

# Concerns

**Additional Note:** Eklund Drilling (Nevada) is using 254 all tubing welding it for 6" casing and has only seen 2 failures in 3 years where welds broke.

- Run Hammer with Symmetrix at 350 psi
- Angle Drilling
- up to 350 ft of casing and pulling it back.
- Also run 8.58" OD and 9.58" OD threaded.
  - ¼ Medium and Heavy Duty Pipe

**Buck Contact them.**

We are committed to your superior productivity through interaction and innovation

**Atlas Copco**

# Current Situation

Currently finishing last 8 holes of 28 hole project and preparing for several other jobs. Depth of holes are about the same 130ft of casing and 475ft to complete the hole.

Will be Starting with the new Casing with increased wall thickness at the joints. Still using the polymer and rarely use Backhammer. If back hammer is used it is for a minute and the casing is easily pulled out of the hole.

Still see failure every 4-6 holes. One Pilot Bit and Ring Assembly failed – extensive wear was present.

Tested Clay bit.

We are committed to your superior productivity through interaction and innovation

*Atlas Copco*

# Recent Bit Failure





Recent Warranty Claim on Ring and Pilot that failed. This could be partially caused by directing Indie to run the hammer at very low pressure. Causing the hammer to run loose in the hole.

We are committed to your superior productivity through interaction and innovation



# Clay Bit - Concerns

This bit shows some early fatigue after the first hole. 130ft

**Atlas Copco**

We are committed to your superior productivity through interaction and innovation

# Future Plans & Questions

- Would like to run Symmetrix System with 200 psi on the hammer.
  - How do we do this with out failure?
- 15 to 20 Holes minimum usage with casing if Possible
- Is there a way to change the couplings when they crack or fail? Re-use the rest of the casing.
- How do we Catch Failures before a Complete Failure Occurs?
- Now we are using 520 wall with up from 432 wall with taper threads
- What is the expected footage for Ring and Pilots
  - How do you avoid fatigue and failure when running loose?
  - How do you repair the bits before complete failure?

**Atlas Copco**

We are committed to your superior productivity through interaction and innovation