## IN THE UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| ATLAS COPCO CONSTRUCTION MINING TECHNIQUE USA, LLC, a Delaware Limited Liability Company and ATLAS COPCO CUSTOMER FINANCE USA LLC, a New Jersey Limited Liability Company,<br><br>Plaintiffs,<br><br>v.<br><br>INDIE ENERGY SERVICES COMPANY, LLC, an Illinois limited liability company, and DANIEL CHEIFETZ<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    No. 08 CV 2363<br><br>   Judge Der-Yeghiayan<br><br>   Magistrate Judge Brown |

## MOTION FOR ENTRY OF ORDER OF REPLEVIN UNDER 735 ILCS 5/19-107

Plaintiffs, ATLAS COPCO CUSTOMER FINANCE USA LLC ("ACF") and ATLAS COPCO CONSTRUCTION MINING TECHNIQUE USA LLC ("CMT") (collectively "Atlas Copco"), move pursuant Illinois Code of Civil Procedure 735 ILCS 5/19-101 *et seq.*, and FED. R. CIV. P. 64 for entry of an order of replevin. In support of their motion, Plaintiffs state as follows:

### *I. Introduction*

1.     Atlas Copco seeks to recover possession of three separate pieces of equipment from Indie Energy Services Company, LLC ("Indie Energy"): (1) T2W drill, serial number 6201 that is mounted to a vehicle year 1997, make International, model 2000 Series 2674, vehicle ID number 1HTGLATT3VH431381 (the "T2W"); (2) a compressor, model number XRVS 976CD, serial number 539285 (the "Compressor"); and (3) TH60 drill, serial number 21129 that is mounted to a Peterbilt truck, serial number 1NPAL40X-7-7D661603 (the "TH60").[1]

---

[1] The T2W drill is mounted and affixed to the '97 International truck and the TH60 drill is mounted and affixed to the Peterbilt truck. The drill and truck share the same power source and are considered a singular piece of property.

2.      A hearing was set in this matter on May 20, 2008 regarding Plaintiffs' claim for replevin of the T2W, the Compressor, and the TH60.   Prior to the May 20, 2008 hearing, Defendants did not file an answer to Plaintiffs' complaint or a response to their motion for an order of replevin.   Nor did Defendants ever indicate in any way that they disputed Plaintiffs' right to possession of the T2W, the Compressor, or the TH60 prior to the May 20, 2008 hearing despite several discussions between counsel.   For the first time at the May 20, 2008 hearing, Defendants orally raised "issues" concerning Plaintiffs' right to possess the T2W, the Compressor, and the TH60.

3.      The "issues" raised by Defendants at the May 20, 2008 hearing were two-fold.   *First*, Defendants contended that Atlas Copco's lien on the '97 International truck to which the T2W drill is affixed is not effective because it "has not been perfected."   (See Trans. of 5/20/2008 Hearing, Ex. A, at p. 10).   *Second*, Defendants contended that they were not properly credited for a trade-in of another T2W drill when they purchased the TH60.   (Id., at pp. 13-14, 16).   Defendants did not raise any issue with respect to Atlas Copco's right to possess the Compressor.

4.      Pursuant to the Court's instruction, Atlas Copco investigated the "issues" raised by Defendants and determined that they misrepresented the dealings between the parties and do not serve as a bar to Atlas Copco's right to possession of the T2W, the Compressor, or the TH60. Counsel for Atlas Copco also inquired with counsel for Defendants regarding whether Defendants had any other objections to Atlas Copco's right to possession of the T2W, the Compressor, or the TH60 that were not stated in Court.   (See May 20, 2008 Letter to Tracy Campbell, Ex. B).   No other objections have been stated.

## II. *Plaintiffs Are Entitled To Possession Of The T2W Drill and '97 International Truck*

5.      Indie Energy took possession of the T2W pursuant to the terms of a Master Capital Equipment Lease (the "Lease").  (See Aff. of Gail Rovere, Ex C).  A true and correct copy of the Lease is attached hereto as Ex. D.

6.      Pursuant to ¶ 12 of the Lease, "All Equipment [*i.e.*, the T2W] shall remain personal property and *title thereto shall remain in Lessor exclusively*."  (See Lease, Ex. D, at ¶ 12 (emphasis added)).  In other words, title to the T2W remained at all times with Atlas Copco.

7.      The Lease also provides that an "Event of Default" shall occur if: "Lessee fails to pay when due any installment of rent and such failure continues for a period of 10 days." (See Lease, Ex. D, at ¶ 19).  The Lease further provides that upon the occurrence of an "Event of Default," Lessor is entitled to repossess the T2W.  (Id.).

8.      Although it had made regular monthly payments before, Indie Energy has failed to make the payments that are due to Atlas Copco under the Lease for the months of February 2008, March 2008, April 2008, and May 2008.  (See Aff. of Gail Rovere, Ex. A, at ¶ 4).  The payments for these months are now all more than 10 days past due and Indie Energy is in default under the Lease.[2]  Pursuant to the terms of the Lease, Atlas Copco is entitled to possession of the T2W.  (See Lease, Ex. D., at ¶ 19).

9.      At the May 20, 2008 hearing, Defendants raised an objection concerning the title to the '97 International truck to which the T2W is mounted.  (See Trans. of 5/20/2008 Hearing, Ex. A, at p. 10).  Specifically, Defendants argued that they possess a Certificate of Title to the '97 International truck and that Atlas Copco's lien on the truck (which is clearly written on the face of

---

[2] Indeed, Defendants' recently filed Answer to Atlas Copco's Complaint admits that "...as of the date of Plaintiff's Complaint, there were outstanding balances owed on the T2W Agreement, the Compressor Agreement and the TH60 Agreement." (See Answer, at ¶¶ 18-19).

the Certificate of Title) was not recorded and perfected. (Id.). A copy of the Certificate of Title reflecting Atlas Copco's lien is attached hereto as Ex. E.

10.    Defendants' argument that Plaintiffs' lien is not effective vis-à-vis Defendants because it was not perfected is just plain wrong. Whether or not Plaintiff's lien was recorded and perfected would only matter if Plaintiffs were asserting a claim against a third party. The court in In re: Lortz, 344 B.R. 579 (C.D. Ill. 2006) succinctly summarized the law on this issue as follows:

> It is entirely possible for a creditor to hold a valid security interest that is not perfected. A signed security agreement stands by itself and governs the creditor's rights in collateral with respect to the debtor. *A security agreement is enforceable against a debtor even if the security interest is not perfected. Perfection is only significant, indeed critical, with respect to the creditor's rights vis-a-vis third parties.*

Lortz, 344 B.R. at 583 (emphasis added).[3]

11.    Defendants' argument that Atlas Copco's lien on the '97 International truck is ineffective is completely without merit. Regardless of whether Atlas Copco's lien was perfected, it is still effective against Indie Energy. Whether or not Atlas Copco's lien was perfected would only come into play if Atlas Copco were asserting rights vis-à-vis a third party. See Lortz *supra*.

12.    Further, Indie Energy has expressly recognized the validity of Atlas Copco's lien and interest in the '97 International truck. The Certificate of Title that Indie Energy holds expressly states that Atlas Copco is a lien holder in handwritten notation. (See Certificate of Title, Ex. E). The fact that a new Certificate of Title with Atlas Copco's lien listed in typewritten form from the Secretary of State is entirely a function of Indie Energy's stall tactics. See Aff. of Gail Rovere, Ex. C, at ¶ 5, Ex. 2. Indie Energy gave repeated assurances to Atlas Copco that it would ensure that a new Certificate of Title reflecting Atlas Copco's lien would be issued by the Secretary of State. (Id.). Indie Energy cannot now stand before this Court claiming that Atlas Copco does not have a

---

[3] Atlas Copco previously raised this argument and pointed out this distinction at the May 20, 2008 hearing. (See Trans. of 5/20/2008 Hearing, Ex. A, at p. 13).

valid lien because Indie Energy failed to take the steps necessary to ensure that a new Certificate of Title was issued.

### III. *Plaintiffs Are Entitled To Possession Of The Compressor*

13.    Indie Energy took possession of the Compressor by virtue of an Installment Loan and Security Agreement (the "Compressor Agreement").    A true and correct copy of the Compressor Agreement is attached hereto as Ex. F.

14.    Pursuant to Sec. 1.1 of the Compressor Agreement, Atlas Copco is granted a "security interest and first lien" on the Compressor.  See Compressor Agreement, Ex. F, at § 1.1.

15.    The Compressor Agreement provides that Indie Energy was to provide monthly payments of $3,114.88 to Atlas Copco beginning on May 4, 2007.  (See Aff. of Gail Rovere, Ex. C., at ¶ 6; Compressor Agreement, Ex. F).

16.    Although it had made regular monthly payments before, Indie Energy has failed to make its required payments for the months of April 2008 and May 2008.[4]  (See Aff. of Gail Rovere, Ex. C., at ¶ 6).

17.    Pursuant to Sec. 4 of the Compressor Agreement, an "Event of Default" occurs if "Borrower shall fail to make any payment of the Secured Obligations within five (5) days of when due."  (See Compressor Agreement, Ex. F, at § 4).

18.    Indie Energy's failure to make the required payments for April 2008 and May 2008 constitutes an "Event of Default" under the Compressor Agreement.  (Id.).

19.    Pursuant to Sec. 5 of the Compressor Agreement, Atlas Copco is entitled to possession of the Compressor due to Indie Energy's failure to make the required payments due to Atlas Copco.  (See Compressor Agreement, Ex. F, at § 5).

---

[4] Once again, Defendants have admitted in their Answer that outstanding balances are owed under the Compressor Agreement.  (See Answer, at ¶¶ 18-19)

20.    At the May 20, 2008 hearing, no objection was made to Atlas Copco's right to possess the Compressor Agreement. (See Trans. of 5/20/2008 Hearing, Ex. A, at p. 13).

**IV.  *Plaintiffs Are Entitled To Possession Of The TH60 Drill And the Peterbilt Truck***

21.    Indie Energy took possession of the TH60 pursuant to the terms of an Installment Loan and Security Agreement (the "TH60 Agreement").   A true and correct copy of the TH60 Agreement is attached hereto as Ex. G.

22.    Pursuant to Sec. 1.1 of the TH60 Agreement, Atlas Copco is granted a "security interest and first lien" on the TH60. See TH60 Agreement, Ex. G, at § 1.1.

23.    The TH60 Agreement provides that Indie Energy was to provide monthly payments of $10,667.96 to Atlas Copco beginning on July 1, 2007. (See Aff. of Gail Rovere, Ex. C., at ¶ 9; TH60 Agreement, Ex. G).

24.    Although it had made regular monthly payments before, Indie Energy has failed to make its required payments for the months of February 2008, March 2008, April 2008 and May 2008.[5] (See Aff. of Gail Rovere, Ex. C., at ¶ 9).

25.    Pursuant to Sec. 4 of the TH60 Agreement, an "Event of Default" occurs if "Borrower shall fail to make any payment of the Secured Obligations within five (5) days of when due." (See TH60 Agreement, Ex. G, at § 4).

26.    Indie Energy's failure to make the required payments for February 2008, March 2008, April 2008 and May 2008 constitutes an "Event of Default" under the TH60 Agreement. (Id.).

27.    Pursuant to Sec. 5 of the TH60 Agreement, Atlas Copco is entitled to possession of the TH60 due to Indie Energy's failure to make the required payments due to Atlas Copco. (See TH60 Agreement, Ex. G, at § 5).

---

[5] The fact that outstanding balances are owed under the TH60 Agreement is admitted in Defendants Answer. (See Answer, at ¶¶ 18-19)

28.     At the May 20, 2008 hearing, Defendants argued that they were not properly credited for a trade-in of a T2W drill (not the T2W drill referenced above) when they purchased the TH60. (See Trans. of 5/20/2008 Hearing, Ex. A, at p. 13-14, 16). Defendants claim that they should have been credited the full purchase price of the T2W (*i.e.*, $280,000), but were actually only credited $44,761.54 on the TH60 Agreement. (Id.). Defendants then claimed that if they were credited the full $280,000, there would be no outstanding amounts due under the TH60 Agreement.

29.     The reason Indie Energy was only credited $44,761.54 for the trade-in of the T2W and not the full purchase price of $280,000 is simple – at the time of the trade-in, Indie Energy had only $44,761.54 of equity in the T2W that it traded in. (See Aff. of Gail Rovere, Ex. C., at ¶ 8).

30.     The trade-in T2W was also bought and financed through Atlas Copco pursuant to an Installment Loan & Security Agreement. (Id.). The Installment Loan & Security Agreement for the trade-in T2W reflects that Indie Energy placed a down payment of $30,430.00 and financed the rest of the purchase price agreeing to make monthly payments beginning in January 2007. (Id., at ¶ 8, Ex. 3). At the time of the trade-in (*i.e.*, July 2007), Indie Energy had only made payments giving rise to equity of $44,761.54 for the trade-in T2W.

31.     Indie Energy was properly credited for the traded-in T2W when it purchased the TH60. Indie Energy's argument that it should be credited the full amount of the purchase price for the trade-in T2W (that Indie Energy never paid) is completely untenable.

**V.  *If Defendants Now Contend That There Are Problems With The T2W, the Compressor, or the TH60, It Does Not Entitle Them To Retain Possession Of The Equipment And Stop Paying For It***

32.     Finally, Defendants make a blanket argument that they need not make payments that are due under the Lease Agreement, the Compressor Agreement, or the TH60 Agreement because they are now alleging that the T2W, the Compressor, and the TH60 are somehow defective. (See Trans. of 5/20/2008 Hearing, Ex. A, at p. 3). In fact, no provision of the UCC or any other law

7

permits Defendants to retain possession of goods and then not pay for them because they claim they are defective.

33.    Under Illinois law, "transactions affecting the sale of goods between merchants are treated under article 2 of the Uniform Commercial Code, sections 2-101 through 2-725." Candalaus Chicago, Inc. v. Evans Mill Supply Co., 51 Ill.App.3d 38, 43-44, 366 N.E.2d 319, 324 (1st Dist. 1977).    Under the UCC, a buyer may reject goods that "fail in any respect to conform to the contract." 810 ILCS 5/2-601.    Any such rejection of goods by the buyer must occur "within a reasonable time after their delivery or tender" and "is ineffective unless the buyer seasonably notifies the seller." 810 ILCS 5/2-602.

34.    In the present case, there is no doubt that Indie Energy accepted the T2W, the Compressor, and the TH60. Indeed, Indie Energy took possession of the goods and made payments for several months to Atlas Copco as required by the Lease Agreement, the Compressor Agreement, and the TH60 Agreement.    (See Aff. of Gail Rovere, Ex. C., at ¶¶ 4,6, and 9).

35.    Indie Energy willfully took possession of the T2W, the Compressor, and the TH60, and used them in its operations, and never attempted to return any of them to Atlas Copco. As a result, Indie Energy became obligated to pay for the T2W, the Compressor, and the TH60, and Atlas Copco acquired the right to be compensated for the T2W, the Compressor, and the TH60. See 810 ILCS 5/2-607, comment 1 (noting that "[u]nder subsection (1) [of 810 ILCS 5/2-607], once the buyer accepts a tender the seller acquires a right to its price on the contract terms").

## VI. Conclusion

36.    As demonstrated above, Atlas Copco possesses a right to immediate and exclusive possession of the T2W, the Compressor, and the TH60. Defendants' refusal to surrender possession of the T2W, the Compressor, and the TH60 is wrongful and in violation of Atlas Copco's right to immediate and exclusive possession of this equipment.

37.    As a proximate result of Defendants' wrongful possession and detention of said property, Atlas Copco has suffered, and continues to suffer, the loss of use of the T2W, the Compressor, and the TH60, and the depreciation of said property.  Atlas Copco has also incurred, and continues to incur, the cost of possession, including, without limitation, attorney's fees, court costs and litigation expenses, in an attempt to enforce their rights.

38.    Neither the T2W, the Compressor, nor the TH60 have been taken for any tax, assessment, or fine levied by virtue of any law of this State, against the property of Atlas Copco, or against it individually, nor seized under any lawful process against the goods and chattels of Atlas Copco subject to such lawful process, nor held by virtue of any order for replevin against Atlas Copco.

39.    Atlas Copco seeks a hearing on its action for replevin to return the T2W, the Compressor, and the TH60 pending disposition of any claims for damages in this case.  The approximate value of the property at issue is $750,000.

WHEREFORE, Plaintiffs, ATLAS COPCO CUSTOMER FINANCE USA LLC and ATLAS COPCO CONSTRUCTION MINING TECHNIQUE USA LLC request that this Court schedule a replevin hearing and/or for any further relief requested herein.

Respectfully submitted,

ATLAS COPCO CONSTRUCTION MINING TECHNIQUE USA, LLC and ATLAS COPCO CUSTOMER FINANCE USA LLC

By: _____/s/ Victor J. Pioli_____
One of Their Attorneys

Joseph R. Marconi
Victor J. Pioli
Johnson & Bell, Ltd.
33 W. Monroe Street
Suite 2700
Chicago, IL 60603
(312) 372-0770
(312) 372-9818 (fax)

1              IN THE UNITED STATES DISTRICT COURT
2                 NORTHERN DISTRICT OF ILLINOIS
                        EASTERN DIVISION
3

4   ATLAS COPCO CONSTRUCTION MINING         )   Docket No. 08 C 2363
    TECHNIQUE USA LLC, et al.,              )
5                                           )
                        Plaintiffs,         )
6                                           )
7               vs.                         )
                                            )   Chicago, Illinois
    INDIE ENERGY SERVICES COMPANY, LLC,     )   May 20, 2008
8   et al.,                                 )   10:00 o'clock a.m.
                                            )
9                       Defendants.

10

                    TRANSCRIPT OF PROCEEDINGS
11        BEFORE THE HONORABLE SAMUEL DER-YEGHIAYAN

12

   APPEARANCES:
13

14  For the Plaintiffs:     JOHNSON & BELL, LTD.
                            BY:  MR. VICTOR J. PIOLI
15                          33 West Monroe Street, Suite 2700
                            Chicago, Illinois  60603
16                          (312) 372-0770

17

   For the Defendants:      SCHIFF HARDIN, LLP
18                          BY:  MS. TRACY ANN CAMPBELL
                            6600 Sears Tower
19                          Chicago, Illinois  60606
                            (312) 258-5602

20

21

22

23

   Court Reporter:          MS. CAROLYN R. COX, CSR, RPR, CRR
24                          Official Court Reporter
                            219 S. Dearborn Street, Suite 1854-B
25                          Chicago, Illinois  60604
                            (312) 435-5639


PLAINTIFF'S
EXHIBIT

1    (The following proceedings were had in open court:)

2         THE CLERK:  08 C 2363, Atlas Copco v. Indie Energy

3    Services.

4         MR. PIOLI:  Good morning, Judge; Victor Pioli on

5    behalf of the plaintiffs.

6         THE COURT:  Good morning.

7         MS. CAMPBELL:  Good morning, your Honor; Tracy

8    Campbell on behalf of the defendants.

9         THE COURT:  Good morning.  We're here for a hearing,

10   replevin hearing.  Have the parties discussed this matter?

11        MR. PIOLI:  We have discussed it, your Honor.

12        THE COURT:  Any resolution?

13        MR. PIOLI:  Well, I don't want to mischaracterize Ms.

14   Campbell's position and I don't want to mischaracterize our

15   conversation, but I will take a stab at it.  I think the

16   dispute that we ultimately have is with regard to how much

17   money is owed on these accounts.  I don't think there's a

18   dispute that the accounts are in arrears pursuant to the three

19   agreements, the equipment lease and the two installment loan

20   agreements, and I don't think there is a dispute that we are

21   entitled to possession at this point.  It was just a dispute as

22   to how much ultimately they're going to owe us, because they

23   believe they're entitled to some credits and we are not so sure

24   about that.  I'll let Ms. Campbell talk, but I think that's

25   where we're at.

1          THE COURT:  Okay.

2          MS. CAMPBELL:  Essentially while I do agree that there

3    is a disagreement with respect to how much is owed on the

4    various agreements, number one, we would submit that while

5    there are some past due -- there are some past due obligations

6    on the agreements, we believe that we have just cause for those

7    past due payments with regard to the fact that some of the

8    equipment was defective and it is not working properly.  And

9    with respect to the ownership of the various pieces of

10   equipment, we do have some issues with regard to that.  There

11   are three primary agreements at issue, one which is

12   characterized as a lease, and two which are clearly finance

13   purchase agreements, and we believe that pursuant to, at the

14   very least, the finance purchase agreements, we have ownership

15   rights in those for the equipment that is identified in those

16   particular agreements.  So we certainly have some issues here,

17   but I do think that at its heart it's with regard to the value

18   of the various equipment.

19          There had been some prior negotiations before the

20   lawsuit was filed with regard to possibly trading in some of

21   this equipment that has been defective and has not been working

22   for our purposes, and those negotiations were not fruitful at

23   that point.  You know, we do expect that there will be further,

24   you know, negotiations and discussions with regard to value and

25   hopefully resolution.

4

1    THE COURT:  So if I heard both of you right, there is

2    some equipment that the defendant has?

3    MS. CAMPBELL:  We have all the equipment, your Honor.

4    THE COURT:  Yes.  And some of them are on lease, some

5    of them are based on purchase agreements, is this what you are

6    saying?

7    MS. CAMPBELL:  That is correct.

8    THE COURT:  And the dispute is obviously about the

9    money, and, Defendant, you're saying that some of that dispute

10    is created because some of the equipment that you have is

11    defective or not functioning properly?

12    MS. CAMPBELL:  In part.

13    THE COURT:  Some of it.

14    MS. CAMPBELL:  Right.

15    THE COURT:  So the question for today's purpose is

16    whether plaintiff has established a prima facie case to

17    superior right of possession of the disputed properties.

18    That's why I asked you if there was any resolution relating to

19    that issue because, you know, a lawsuit is filed, and I don't

20    even see on the docket service or any answer yet.

21    MS. CAMPBELL:  My answer is due today I believe, your

22    Honor.

23    THE COURT:  Excuse me?

24    MS. CAMPBELL:  I believe my answer is due today.

25    THE COURT:  Due today?

1          MS. CAMPBELL:  Yes.

2          THE COURT:  That's what I am saying.  So we are a

3  little early relating to those issues.  There's going to be

4  discovery and so on.

5          On the issue of the replevin motion, that's what we're

6  here for, so I thought that maybe you two could have come to

7  some type of resolution about that.

8          MR. PIOLI:  Well, Judge, as I told Ms. Campbell, we

9  can always fight about the money later on.  And with regard to

10  possession, I don't think there's any dispute that we are

11  entitled to possession.  Whether the equipment is defective or

12  not defective, we just want it back, and I think the fact that

13  they haven't paid gives us a right.

14          THE COURT:  You have to establish a prima facie case

15  first.  That's why we scheduled this hearing.  Are you going to

16  do that through documents, through witnesses, through

17  testimony?  How are you going to do that?

18          MR. PIOLI:  Your Honor, we filed a verified complaint

19  which is sworn and attested to by Gail Rogner (phonetic), who

20  is our account manager, and we believe that the allegations of

21  the complaint, along with the exhibits attached thereto,

22  establish our prima facie case.

23          As you know, Judge, we're seeking possession of five

24  pieces of equipment that are in defendant's possession by

25  virtue of three agreements.  The first two pieces of equipment

1    are a T2W drill which is attached to a 1997 vehicle.  Those

2    pieces of equipment were taken by defendant pursuant to an

3    equipment lease which is attached as Exhibit A to our

4    complaint.

5              THE COURT:  So that was a lease, you're saying?

6              MR. PIOLI:  That was a lease, correct, your Honor.

7              THE COURT:  Okay.  What else?

8              MR. PIOLI:  I'm sorry?

9              THE COURT:  What other items?

10             MR. PIOLI:  Okay.  Also, there was a compressor, an

11   Atlas Copco compressor, and that was taken pursuant to an

12   installment loan and security agreement.

13             THE COURT:  So the compressor, that's not a lease;

14   it's a purchase agreement but installment payments?

15             MR. PIOLI:  That is correct, your Honor.

16             THE COURT:  Okay.

17             MR. PIOLI:  And then finally, there were an additional

18   two pieces of equipment, a TH60 drill, which is attached to a

19   Peterbuilt truck, and that was similarly taken pursuant to a

20   purchase agreement, an installment loan and security agreement.

21             THE COURT:  Okay.  And then what else?

22             MR. PIOLI:  That's it.  Those are the five pieces of

23   equipment.

24             THE COURT:  You told me the T2W, the compressor, and

25   TH60.

1          MR. PIOLI:  Yes.

2          THE COURT:  That's three items.

3          MR. PIOLI:  And the T2W drill is attached to a vehicle

4   that is also --

5          THE COURT:  What type of vehicle is that?

6          MR. PIOLI:  It's a 1997 vehicle, and I will give you

7   the vehicle identification number.  It's a model 2000 series

8   2674, vehicle ID No. 1HTGLATT3BH431381.

9          THE COURT:  Okay.  Was that also part of the T2H

10  equipment lease?

11         MR. PIOLI:  Yes, it was, your Honor.

12         THE COURT:  Okay.  And the other vehicle, is there

13  anything else?

14         MR. PIOLI:  Yes.  The other vehicle is what the TH60

15  drill is attached to.

16         THE COURT:  Okay.

17         MR. PIOLI:  And that was also part of that purchase

18  agreement.  And that is a Peterbuilt truck, serial No.

19  1NPAL40X-7-7D661603.

20         THE COURT:  Okay.  Defense Counsel, plaintiff contends

21  that with their exhibits to the verifiable complaint, they have

22  established superior right.  What do you have to say?

23         MS. CAMPBELL:  Your Honor, we say that based on the

24  documents that are attached to the verified complaint that they

25  have not in fact met their prima facie case with respect to the

1   five pieces of equipment.

2           Beginning with the first piece, the T2W, as indicated,

3   that's subject to what is characterized as a master capital

4   equipment lease; but, in fact, your Honor, upon closer

5   inspection of this agreement, it's really nothing more than a

6   finance purchase agreement with a requirement that my client

7   purchase the equipment at the end of the term.

8           THE COURT:  Show me a document that it's a lease that

9   turns into a purchase.

10          MS. CAMPBELL:  Your Honor, page 2 I believe -- I'm

11  sorry -- page 1 of the master capital equipment lease agreement

12  provides that there is a purchase obligation under this

13  agreement, and it attaches as an exhibit to the master capital

14  equipment lease an Exhibit A which identifies the property to

15  be quote-unquote leased.  And in the equipment description, it

16  states serial number and application, and the only thing it

17  states there is the Atlas Copco brand model T2W, serial number

18  6201.  There is no indication there at all that that includes

19  the International truck on which the T2W drill is mounted.

20          With respect to the T2W drill, because it's a

21  non-consumer good, the plaintiffs must perfect their security

22  interest through a UCC financial financing statement.  There

23  was attached to the complaint a UCC financing statement, but it

24  does not appear that it was ever filed with the Illinois

25  Secretary of State; and, therefore, your Honor, we submit that

1    there is no security interest in the T2W drill.

2          MR. PIOLI:  Judge, if I may.  I don't understand what

3    the difference is, if it's a lease with an option to purchase

4    or if it's a lease with a requirement to purchase.  The fact is

5    they took possession of the equipment, they didn't pay, it's an

6    event of default that's ascribed in the document attached as

7    Exhibit A, however you want to characterize it.  And pursuant

8    to paragraph 19, we are entitled to take possession back upon

9    an event of default, namely, not paying.  It specifically

10   provides in the occurrence of default, lessor at its option may

11   do any or all of the following:  One is declare all sums due to

12   become immediately payable, and No. 3 is demand that the lessee

13   deliver the equipment forthwith to lessor at lessee's expense

14   at such place as lessor may designate.  We have done that, they

15   refused to do that, and that's why we are here today.

16          MS. CAMPBELL:  Your Honor, the UCC financing

17   statement, which apparently was -- which actually is further

18   evidence that this was intended to be a purchase contract does

19   not, in fact, identify the International truck as part --

20          THE COURT:  Have you paid for the item?

21          MS. CAMPBELL:  I'm sorry?

22          THE COURT:  Have you purchased it?  Has your client

23   purchased it?

24          MS. CAMPBELL:  We are financing both the International

25   truck and the T2W.

1    THE COURT:  Have you paid people who gave you this
2    item?

3    MS. CAMPBELL:  Have we paid --

4    THE COURT:  Have you paid them?

5    MS. CAMPBELL:  We have been making payments, your
6    Honor.  We stopped making payments in March by virtue of what
7    we said earlier with regard to the breaches of warranty.

8    THE COURT:  There is a dispute obviously, but I think
9    what I am hearing right now is that the property, the disputed
10   property has to belong to somebody.  It cannot belong to two
11   people.  It has to belong to somebody, and thus far I haven't
12   heard that it belongs to you.

13   MS. CAMPBELL:  Well, as a matter of fact, your Honor,
14   we do have title to the International truck.  As a matter of
15   fact, I have the original of the title -- of the certificate of
16   title to the vehicle for the International truck.  There is a
17   handwritten notation that attempts to give a lien to Atlas, but
18   this lien has not been perfected.  We, in fact, still own the
19   International truck.

20   THE COURT:  Okay.  Plaintiff, you gave them the title?

21   MR. PIOLI:  Certainly, Judge, pursuant to and assuming
22   that they abide by their obligations under the agreement, and
23   they haven't done that.  They haven't paid.  So because of the
24   fact that they haven't paid, we are entitled pursuant to the
25   terms of the agreement.  They have taken title pursuant to

1   their obligation under the lease agreement.

2           THE COURT:  I understand there is going to be a

3   dispute about who owes who how much money, but right now I have

4   to determine who has the superior right to possession of the

5   disputed properties.

6           MS. CAMPBELL:  Yes, your Honor.  With respect to the

7   International truck, the only method to perfect the security

8   interest in the International truck would have been for them to

9   have applied for a lien on their certificate of title, and,

10  your Honor, I will represent to you that as of this morning,

11  after having checked, having done a title inquiry on this

12  particular VIN number, there is no indication that there is a

13  lienholder at all on the International truck.

14          THE COURT:  Have you registered as the lienholder?

15          MR. PIOLI:  Judge, the certificate of title expressly

16  gives us a lien.

17          MS. CAMPBELL:  Your Honor, it's handwritten in there.

18          THE COURT:  Handwritten, but does it have to be

19  registered with somebody?

20          MS. CAMPBELL:  Yes, your Honor, it has to be

21  registered with the Secretary of State, and I have a copy here

22  of the title and registration status info we pulled off the

23  Secretary of State website from this morning which indicates

24  that there is no lienholder on this particular vehicle.

25          THE COURT:  Counsel for plaintiff, when you give

1    somebody a document like a title, then that person can sell

2    that item right now if they went and transferred that item to

3    somebody else.   The Secretary of State has to look in their

4    records to see if there is any lien on it, and if there is no

5    lien, they will allow the sale to somebody else.   The title

6    then goes into somebody else's possession.   Why wasn't there

7    some type of lien registered with the Secretary of State?

8          MR. PIOLI:   Well, Judge, I will confess as I stand

9    here right now, I don't know if it was registered or not.

10   Counsel has represented that it hasn't.   I haven't had an

11   opportunity to investigate that.

12         THE COURT:   Well, counsel is an officer of the Court

13   and she is saying that and you don't have any information to

14   rebut that.   I am just pointing out that just from, you know, a

15   practical standpoint where individuals just go buy a car or

16   sell a car, they cannot sell it if there is a lien on it.

17         MR. PIOLI:   Absolutely, Judge, but also whenever this

18   vehicle is sold, if they tried to sell it, they would have to

19   hand over title to the vehicle, and the title to the vehicle

20   expressly lists our lien interest.

21         THE COURT:   She says it's handwritten.   It's not

22   registered with the Secretary of State.

23         MR. PIOLI:   But I don't think they are disputing that

24   we actually hold that lien interest, whether it was recorded or

25   not.

1    THE COURT:  You might have written something there.  I

2  am not ruling on who has superior possession yet, but I am just

3  saying counsel is pointing out some problems with this type of

4  transaction that the parties have engaged in.

5    MR. PIOLI:  Whether it's recorded or not, that deals

6  with rights as to third parties.  It doesn't deal with our

7  possession rights proposed between the two parties before you

8  today.  They didn't go and sell it to some third party.  That's

9  the only time when they're not recorded.

10    THE COURT:  They have a title.  You know what title

11  means?  Title means I own it.

12    MR. PIOLI:  That's correct, Judge.

13    THE COURT:  Unless there is a lien.

14    MR. PIOLI:  That's correct, but they are not disputing

15  that we do have the lien.  Whether it's handwritten in or not,

16  it's there, and they are not disputing that it exists, and they

17  can only take title pursuant to the terms and conditions of the

18  master lease agreement.  That's how they got title to begin

19  with.

20    THE COURT:  Okay.  Next item, Defense Counsel.

21    MS. CAMPBELL:  Your Honor, with respect to the TH60

22  drill, that was purchased pursuant to a loan and security

23  agreement where there are some discrepancies between the loan

24  and security agreement and the purchase contract.  The purchase

25  contract for the TH60 indicates that Indie Energy owes

1    $349,000, yet the loan agreement through which it was financed

2    indicates that Indie Energy owes $564,000.  That approximately

3    $234,000 difference, your Honor, we submit means that there is

4    no default under the TH60 -- I'm sorry -- yes, that there is no

5    default under the TH60 agreement by virtue of the discrepancies

6    between the purchase contract for the TH60 and the loan

7    agreement.

8        THE COURT:  Okay.  Counsel for plaintiff.

9        MR. PIOLI:  Once again, Judge, we are getting to the

10   amounts that are disputed.

11       THE COURT:  Let me tell you this before even we

12   continue.  Plaintiff has to establish a prima facie case to a

13   superior right to possession of the disputed property, and it

14   doesn't stop there.  And you have to establish probably that

15   you will ultimately prevail on the underlying claim for

16   possession.  So you have to give me some probability that there

17   is a default about that purchase agreement that you will

18   probably prevail, and counsel is saying that based on the

19   numbers, there is no default on that agreement.  This is just

20   for the purpose of the replevin.

21       MR. PIOLI:  That's correct, Judge.  We submitted a

22   verified complaint.  We have given you sworn allegations that

23   they have not made any payments that are due under the

24   installment loan agreement.

25       THE COURT:  That's your side.  One side believes that

1    the other party hasn't paid me, and the other party is saying,

2    look, we don't owe any money at this point.

3         MR. PIOLI:  Judge, if I may.  As of today, the only

4    evidence before you is our sworn complaint.

5         THE COURT:  Yours and hers.

6         MR. PIOLI:  They have not submitted an answer, they

7    have not put any witnesses up on the stand.

8         THE COURT:  But this is the hearing, and, Counsel,

9    repeat what you're saying one more time about this TH60.

10         MS. CAMPBELL:  Absolutely, your Honor.  With respect

11    to the verified complaint and the attachments in the complaint,

12    I'm actually referring to two of the attachments, sorry, two of

13    the exhibits in the verified complaint.  I'm referring to the

14    installment loan and security agreement for the TH60 and also

15    the purchase invoice for the TH60.  The purchase invoice

16    indicates that the amount owed is $349,000.

17         THE COURT:  Stop there.  349.  How much?

18         MS. CAMPBELL:  Yes, $349,000.

19         THE COURT:  $349,000.  Plaintiff's counsel, do you

20    agree so far with what defense counsel says?

21         MR. PIOLI:  That was the equipment invoice that we

22    sent you?

23         MS. CAMPBELL:  Yes.

24         MR. PIOLI:  That's correct, Judge.  As of that date,

25    that's the invoice that was sent to them, and that's what they

1    owed.

2              THE COURT:  As of what date?

3              MR. PIOLI:  The date of the invoice which is --

4              THE COURT:  What exhibit are you looking at?

5              MS. CAMPBELL:  It's Group Exhibit C, your Honor.

6              THE COURT:  Okay.

7              MS. CAMPBELL:  Your Honor, in that invoice it

8    indicates that the way the TH60 was being financed which was --

9    I'm sorry -- the way the TH60 was being financed was through a

10   trade-in of another piece of equipment.  It actually turns out

11   to be another T2W, one that's not related to this particular

12   case, but we traded in the T2W, thereby having a balance of

13   $349,281.50, yet the installment and loan agreement with

14   respect to this very same piece of equipment, the TH60, does

15   not reflect that full trade-in, and it further reflects that

16   there is a principal finance of $564,588.46.

17             MR. PIOLI:  Judge, they signed and agreed to the

18   installment and loan agreement agreeing to make the payments

19   that are specified therein.  They failed to do so.

20             THE COURT:  Show me this document.

21             MR. PIOLI:  It's Group Exhibit C, Judge.

22             THE COURT:  What page?

23             MR. PIOLI:  The first page of Group Exhibit C.

24             THE COURT:  The first page, it says what?

25             MS. CAMPBELL:  The first page, your Honor, where it

1  says principal finance, $564,588.46, is in that first table on

2  the right-hand side.  Do you see where it indicates --

3          THE COURT:  Yes.  Are we looking at the same document,

4  Group Exhibit C?

5          MS. CAMPBELL:  Yes, Judge.

6          THE COURT:  Okay.  First page, on the right-hand side,

7  all I see is a purchase price in the top line of 104,000.

8          MS. CAMPBELL:  Is this what you are looking at?  No,

9  it's not.

10          MR. PIOLI:  I am looking at what you are looking at,

11  Judge.

12          THE COURT:  It's identified Group Exhibit.

13          MS. CAMPBELL:  I'm sorry, your Honor.  I'm sorry, the

14  TH60 actually -- because these installment and loan agreements

15  look virtually identical, it's part of another group exhibit.

16  I believe it's Group Exhibit E within your package.

17          THE COURT:  Let me get that group exhibit out.

18          MR. PIOLI:  Judge, can we just deal with this piece of

19  equipment right now?  This is Group Exhibit C.

20          MS. CAMPBELL:  Actually we are dealing with the TH60.

21          THE COURT:  We are dealing with something else.  Let

22  me follow up with what we are addressing first.  That's Group

23  Exhibit D now.  That's a different document.

24          MS. CAMPBELL:  Sorry, your Honor, about that.  So

25  that's -- in the right corner --

1          THE COURT:  It says principal financed, $564,588.46.

2    And we need to slow down because it's being transcribed.

3          MS. CAMPBELL:  And to the left of that, you'll see

4    where there is an indication as to the down payment of 44,761.

5    We submit, your Honor, that that is incorrect.  In fact, the

6    down payment should have been the value of the traded in piece

7    of equipment, which is indicated on a document that's included

8    within that group exhibit.  The purchase contract -- I'm

9    sorry -- the purchase invoice for that indicates that the

10   purchase price, the overall price was 604,500.

11         THE COURT:  Show me the document.

12         MS. CAMPBELL:  It's document -- it's right after the

13   installment and loan agreement, your Honor.

14         THE COURT:  Okay.

15         MS. CAMPBELL:  It's this document here.

16         THE COURT:  Identify it with something.

17         MS. CAMPBELL:  It says page 6 of 11 at the top at the

18   header.

19         THE COURT:  Okay.  On the bottom it says total 34 --

20   239,481.

21         MS. CAMPBELL:  Precisely, your Honor.  And this is the

22   document through which the correct -- the correct setoff was

23   reflected with respect to the trade-in of the equipment done.

24         THE COURT:  Okay.  Time out.  Time out.  The item was

25   -- principal financed was 564,000 and change and with a down

1  Did you go back to the plaintiff and say, look, this is not a

2  correct agreement?  This started July 1, 2007.  Did you pay

3  monthly $10,600 at that time?

4          MS. CAMPBELL:  Yes.  Yes, your Honor, we were making

5  payments on the TH60, and the point that I am trying to make

6  here is with respect to whether or not there is actually a

7  balance owed currently and whether or not a default actually

8  exists in this particular circumstance where it's clear that we

9  traded in a piece of equipment, and, therefore, we had a credit

10 for that that's not reflected in the loan and security

11 agreement.  Therefore, there is technically no default under

12 the TH60, and the TH60 -- I'm sorry -- and the installment loan

13 and security agreement for the TH60 clearly provides on the

14 second page of the document that we shall retain ownership and

15 possession of the collateral.

16         THE COURT:  Okay.  Counsel for plaintiff, the page

17 that we are looking at, 6 of 11, what does that mean to you?

18         MR. PIOLI:  Judge, this precisely proves the point.

19 Whether or not we gave them a credit subsequent to their

20 signing the security agreement, they were still obligated to

21 make the payments.

22         THE COURT:  One second.  One second.  What does this

23 document mean to you?

24         MR. PIOLI:  As I look at it right now, Judge, without

25 having consulted my client about this specific invoice, it

1   looks like we gave them an additional credit, and they still

2   owe us the amount that's due on this invoice which they haven't

3   paid, and that's why we're here today.

4        THE COURT:  Okay.  Somebody has a contract with

5   another person, and under that contract, which is the

6   installment loan agreement, certain amounts are going to be

7   paid every month.  And let's assume it's $10,000 every month.

8   So in one year, that's going to be $120,000.  But then six

9   months later you go give credit for $60,000 or plus amount,

10  then the party has satisfied their payment obligations relating

11  to the remaining balance.  So there is some type of give and

12  take here going on.

13       So I think, you know, you two, instead of sitting down

14  and looking at the facts, you guys run to court and try to have

15  the court possess equipment or property without getting all the

16  facts together.

17       MR. PIOLI:  Judge, this is all news to me today.  I

18  never heard any of this.

19       THE COURT:  That's why I am saying you two should have

20  looked at this.  I am going to strike today's hearing.  I want

21  you to go back, get with your clients, get to the bottom of

22  these documents and see who owes who what; and if there is any

23  right to possession, after reviewing all these agreements and

24  payments and credits, then at that time you can come prepared

25  to argue and present to me what I need to rule on.  I cannot

# JOHNSON & BELL Ltd.
## ———— Attorneys at Law ————

SUITE 2700
33 WEST MONROE STREET
CHICAGO, IL 60603-5404
TELEPHONE: (312) 372-0770
FACSIMILE: (312) 372-9818

1435 E. 85TH AVENUE
MERRILLVILLE, IN 46410
TELEPHONE: (219) 791-1900
FACSIMILE: (219) 791-1901

(312) 984-0276
pioliv@jbltd.com

May 20, 2008

**VIA FACSIMILE & U.S. MAIL**

Ms. Tracy A. Campbell
Schiff Hardin LLP
6600 Sears Tower
Chicago, Illinois 60606

Re:    ***Atlas Copco Constr. ("Atlas Copco") v. Indie Energy Services ("Indie Energy")***
**Northern District of Illinois Case No. 08 C 02363**
**Our File No.: 05181-08002**

Dear Ms. Campbell:

Following the May 6, 2008 court hearing in the above referenced matter, I inquired whether your clients objected to Atlas Copco's right to possession of the property described in the complaint or whether their dispute simply concerned the amounts they owed Atlas Copco. You informed me that their dispute was with the amounts that are owed to Atals Copco, not Atlas Copco's right to possession of the property. You again affirmed that position prior to today's hearing before Judge Der-Yeghiayan.

Despite being given 14 days to do so, you filed no answer to Atlas Copco's complaint and no response to Atlas Copco's motion for an order of replevin. Nor did you raise any objections to Atlas Copco's right to possession of the property during our recent telephone conferences and email exchanges. Then, at today's hearing, you proceeded to raise several "issues" regarding Atlas Copco's right to possession of the property for the first time in an obvious attempt to delay Atlas Copco's recovery of its property. After having the opportunity to consult with my client, I realize the "issues" you raised are meritless. If you have any objections to Atlas Copco's right to possess the property other than those you raised in court today, please advise us of them immediately.

The manner in which this litigation is proceeding is making this case increasingly difficult to settle, is needlessly increasing the attorney's fees being incurred, and is causing irreparable damage to any hope of salvaging a business relationship between our clients. If we are forced to continue addressing these sorts of delay tactics, we will be seeking all damages and fees to which we are entitled.

Very truly yours,

*Victor J. Pioli*

Victor J. Pioli

**PLAINTIFF'S
EXHIBIT
B**

```
************** -COMM. JOURNAL- ************** DATE MAY-20-2008 ****** TIME 17:28 ******
```

```
        MODE = MEMORY TRANSMISSION         START=MAY-20 17:27   END=MAY-20 17:28

        FILE NO.=476

    STN NO.   COMM.   ABBR NO.   STATION NAME/TEL NO.    PAGES   DURATION

    001       OK      ☎          2585600                 002/002 00:00:43


                                              -JOHNSON AND BELL       -

************************************* -3123729818     - ***** -         17089- **********
```

# JOHNSON&BELL Ltd.
### ─Attorneys at Law─

Suite 2700 • 33 West Monroe Street
Chicago, IL  60603-5404
312-372-0770 (Phone) • 312-372-9818 (Facsimile)

## *fax cover* ────────────────────────

Date          May 20, 2008

To           Tracy A. Campbell            Firm Name   Schiff Hardin LLP

Facsimile    (312) 258-5600               Phone

CC

☐ Urgent   ☐ Per Request   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

From         Victor J. Pioli               Phone      (312) 984-0276

Regarding    Atlas Copco Constr. v. Indie Energy Services

Our File No.  05181a-08002


Total Number of Pages   2            (including this page)

Time of Transmittal    4:00          (am/pm)


Message ───────────────────────────────

──────────────────────────────────────

──────────────────────────────────────

──────────────────────────────────────

If you do not receive all pages, please call 312-372-0770 Bridget Jarecki ext. 638.

**Confidentiality Notice**

This facsimile transmission contains confidential information belonging to the sender.  This information is intended only for the use of the individual or entity named above.  If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the contents of this transmission is prohibited.  If you have received this transmission in error, please notify sender by telephone immediately to arrange for return of the documents.

**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ATLAS COPCO CONSTRUCTION )
MINING TECHNIQUE USA, LLC, a )
Delaware Limited Liability Company, )      No. 08 CV 2363
and ATLAS COPCO CUSTOMER )
FINANCE USA LLC, a New Jersey )
Limited Liability Company, )      Judge Der-Yeghiayan
 )
 )      Magistrate Judge Brown
        Plaintiffs, )
 )
    v. )
 )
INDIE ENERGY SERVICES )
COMPANY, LLC, an Illinois limited )
liability company, and DANIEL )
CHEIFETZ )
 )
        Defendants. )

**AFFIDAVIT OF GAIL ROVERE**

I, Gail Rovere, declare under penalty of perjury that the following is true, accurate and within my personal knowledge and I will competently testify to the statements contained herein if called to do so:

1.     I am an account manager for Atlas Copco Customer Finance ("Atlas Copco"). I have served in the role since April 2007. Part of my responsibilities as an account manager are to ensure that Atlas Copco's customer payments are not in arrears, ensure that proper title to Atlas Copco's machinery and vehicles is maintained, and collect monies that are owed to Atlas Copco.

2.     I am the person who is responsible for monitoring Indie Energy Services Co., LLC's ("Indie Energy") account with Atlas Copco.

3.     Indie Energy currently possesses three pieces of Atlas Copco equipment: (1) T2W drill, serial number 6201 that is mounted to a vehicle year 1997, make International, model 2000



PLAINTIFF'S
EXHIBIT
C

Series 2674, vehicle ID number 1HTGLATT3VH431381 (the "T2W"); (2) a compressor, model number XRVS 976CD, serial number 539285 (the "Compressor"); and (3) TH60 drill, serial number 21129 that is mounted to a Peterbilt truck, serial number 1NPAL40X-7-7D661603 (the "TH60").

***The T2W Drill***

4.      Indie Energy took possession of the T2W pursuant to a Master Capital Equipment Lease (the "Lease"). Pursuant to the terms of the Lease, Indie Energy was required to make monthly payments of $6,565.13 beginning on July 17, 2006. Indie Energy proceeded to make 17 monthly payments of $6,565.13 as it was required to under the Lease (representing payments due from September 2006 through January 2008). However, Indie Energy has now failed to make any payments due under the Lease for the months of February 2008, March 2008, April 2008, or May 2008. The spreadsheet attached hereto as Ex. 1 is one that I maintain in the regular course of my business at Atlas Copco and reflects all payments made by Indie Energy pursuant to the Lease. Indie Energy currently owes $188,604.33 in principal and interest under the Lease.

5.      Upon executing the Lease, a Certificate of Title for the vehicle to which the T2W drill is attached (*i.e.*, the 1997 International, model 2000 Series 2674, vehicle ID number 1HTGLATT3VH431381) was issued to Indie Energy. The Certificate of Title reflects that Atlas Copco is a lien holder on the vehicle. On February 27, 2008, Erik Larson, Executive Vice-President of Indie Energy, sent a copy of the Certificate of Title – reflecting Atlas Copco's lien – to Todd Armstrong. See February 27, 2008 Email, Ex. 2. Mr. Armstrong then sent an email to Mr. Larson instructing him to proceed to the DMV to have a new title issued by the Illinois Secretary of State reflecting Atlas Copco's lien. Id. Mr. Larson, Indie Energy's Vice-President, responded that he recalled that this was handled already, but "if not, we'll go back." Id. In other words, Indie Energy gave assurances to Atlas Copco that its lien on the vehicle was – or would

be – properly recorded.  At no time has Indie Energy disputed the validity of Atlas Copco's lien on the vehicle.

***The Compressor***

6.     Indie Energy took possession of the Compressor pursuant to an Installment Loan & Security Agreement (the "Compressor Agreement").  Atlas Copco retained a security interest in the Compressor pursuant to the terms of the Compressor Agreement.  Pursuant to the terms of the Compressor Agreement, Indie Energy is obligated to make monthly payments of $3,114.88 to Atlas Copco beginning in May 2007.  Indie Energy made 11 payments of $3,114.88 each representing its obligations to pay Atlas Copco under the Compressor Agreement for the months of May 2007 through March 2008.  However, Indie Energy has now failed to make its required payments for the months of April 2008 and May 2008 due under the Compressor Agreement.

7.     The spreadsheet attached hereto as Ex. 3 is one that I maintain in the regular course of my business at Atlas Copco and reflects all payments made by Indie Energy pursuant to the Compressor Agreement.  Indie Energy currently owes $73,018.25 in principal and interest under the Compressor Agreement.

***The TH60 Drill***

8.     Indie Energy took possession of the TH60 pursuant to an Installment Loan & Security Agreement (the ""TH60 Agreement").  Atlas Copco retained a security interest in the TH60 (and the Peterbilt truck to which it is attached) pursuant to the terms of the TH60 Agreement.  The TH60 Agreement provides that Indie Energy was given a credit of $44,761.54 as a down payment.  This down payment reflects the value of a T2W drill (not the T2W drill referenced and described above) that Indie Energy had previously bought and financed through Atlas Copco and traded in.  A copy of the Installment Loan & Security Agreement for the T2W that was traded in is attached hereto as Ex. 4.  The full value of the T2W at the time of the trade-

in was $280,000.00. However, Atlas Copco's equity in the traded in T2W was only $44,761.54. That is why the trade-in value credit reflected on the TH60 Agreement is only $44,761.54, not $280,000.00.

9.    Pursuant to the terms of the TH60 Agreement, Indie Energy is obligated to make monthly payments of $10,677.96 to Atlas Copco beginning in July 2007. Indie Energy made 7 payments of $10,677.96 each representing its obligations to pay Atlas Copco under the TH60 Agreement for the months of July 2007 through January 2008. However, Indie Energy has now failed to make its required payments for the months of February 2008, March 2008, April 2008, and May 2008 due under the TH60 Agreement.

10.    The spreadsheet attached hereto as Ex. 5 is one that I maintain in the regular course of my business at Atlas Copco and reflects all payments made by Indie Energy pursuant to the TH60 Agreement. Indie Energy currently owes $532,858.81 in principal and interest under the TH60 Agreement.

11.    Over the last several months, Atlas Copco has made repeated demands that Indie Energy pay the overdue amounts due under the T2W Agreement, the Compressor Agreement, and the TH60 Agreement. Indie Energy has not made any payments in response to any of Atlas Copco's repeated demands. Copies of several of the email requests that Atlas Copco has made upon Indie Energy requesting payment are attached hereto as Ex. 5.

FURTHER AFFIANT SAYETH NAUGHT.

_Gail Rovere_
Gail Rovere

SUBSCRIBED and SWORN TO
Before me this 5th day of
June 2008.

_Gail E. Davis_
Notary Public

**GAIL E. DAVIS**
**NOTARY PUBLIC - New Jersey**
**No. 2292452**
**Commission Expires** 11/15/2012

4

## INDIE PAYMENTS ON T2W

| Date | Amount | Invoice no. |
|------|--------|-------------|
| 2006-09-01 | $6,565.13 | 1011456 |
| 2006-09-30 | $6,565.13 | 1012626 |
| 2006-11-01 | $6,565.13 | 1014084 |
| 2006-12-01 | $6,565.13 | 1015142 |
| 2007-01-02 | $6,565.13 | 1015578 |
| 2007-02-01 | $6,565.13 | 1016782 |
| 2007-03-01 | $6,565.13 | 1018845 |
| 2007-04-05 | $6,565.13 | 1020101 |
| 2007-05-07 | $6,565.13 | 1021637 |
| 2007-06-02 | $6,565.13 | 1022174 |
| 2007-07-11 | $6,565.13 | 1023672 |
| 2007-08-06 | $6,565.13 | 1026260 |
| 2007-09-11 | $6,565.13 | 1027827 |
| 2007-10-01 | $6,565.13 | 1028417 |
| 2007-11-01 | $6,525.13 | 1029928 |
| 2007-12-27 | $6,565.13 | 1031686 |
| 2008-01-09 | $6,565.13 | 1033321 |

TOTAL
PRINCIPAL &
INTEREST    $111,567.21



PLAINTIFF'S
EXHIBIT

tabbies

C1

**Todd Armstrong/SCU/CMT/ATLAS COPCO**

02/28/2008 12:58 PM

To  erik larson <erik@indieenergy.com>

cc  Gail.Rovere@us.atlascopco.com, Janan Asfour <janan@indieenergy.com>, Shawn.McGill@us.atlascopco.com

bcc

Subject  Re: Title

Erik,

We double check with the Illinois and it is not on record correctly. Could you please help by getting a new title w/ lien.

Thanks

Best regards,

Todd Armstrong
Deephole Sales Specialist

**Atlas Copco Construction Mining Technique USA LLC**
24238 S. Northern Illinois Drive
Channahon, IL 60410 USA
Phone: (815) 467-8166; Fax: (815) 467-8169
Cell: (630) 205-4788
E-mail: todd.armstrong@us.atlascopco.com
Visit Atlas Copco at: www.atlascopco.com

**We are committed to your superior productivity through interaction and innovation**

**erik larson <erik@indieenergy.com>**

02/27/2008 11:36 AM

To  <Shawn.McGill@us.atlascopco.com>, <todd.armstrong@us.atlascopco.com>, Janan Asfour <janan@indieenergy.com>

cc  <Gail.Rovere@us.atlascopco.com>

Subject  Re: Title

Todd,

Are you assuming the lien is not recorded by the state because it is handwritten or because you looked it up?  I too recall this being handled a while back.  If not, we'll go back.

Erik

On 2/27/08 11:32 AM, "Shawn.McGill@us.atlascopco.com" <Shawn.McGill@us.atlascopco.com> wrote:

>


PLAINTIFF'S EXHIBIT
C 2
tabbies

> > Thanks Todd. I swear that Tiffany said she personally took care of this
> > with DMV? Oh well, hope we can finally bring closure to this real soon!
> > Regardsn Shawn
> >
> >     ----- Original Message -----
> >
> >     From: Todd Armstrong
> >     Sent: 02/27/2008 10:43 AM CST
> >     To: erik@indieenergy.com; Janan Asfour <janan@indieenergy.com>
> >     Cc: Shawn McGill; Gail Rovere
> >     Subject: Title
> >
> > Erik,
> >
> > Thank you for the copy of the Title it came through very clear and we do
> > not need a copy of the other side.
> >
> > What we where trying to confirm on the first rig is that the Title was
> > properly marked per Illinois State Regulation.
> >         - The Title should have ATLAS COPCO listed as the lien holder, this
> > is NOT recorded.  It is hand written and not recorded on the title by the
> > State.
> >
> > We need a new title w/ the State recorded lien.  That means a simple trip
> > to DMV for a new title w/ lien.  One that is corrected Atlas Copco can get
> > the paper work on the TH60 completed.
> >
> > On the TH60 - Atlas Copco had requested a signed Indemnity Letter.  Janan
> > worked with Shawn on modifying this letter, since Daniel did not agree with
> > some of the wording.  Atlas Copco has agreed to wave the Indemnity Letter
> > on the TH60 and release the MSO to Indie Energy, once a corrected title w/
> > lien for the T2W is on record with the state of Illinois.
> >
> > I hope that explains everything correctly.  If there are any questions
> > please respond to all on this email and if I cannot answer your question
> > Shawn or Gail would be able to help out.
> >
> > Thank you for you time and help with this Erik.
> >
> > Best regards,
> >
> > Todd Armstrong
> > Deephole Sales Specialist
> > Atlas Copco Construction Mining Technique USA LLC
> > 24238 S. Northern Illinois Drive
> > Channahon, IL 60410 USA
> > Phone: (815) 467-8166; Fax: (815) 467-8169
> > Cell: (630) 205-4788
> > E-mail: todd.armstrong@us.atlascopco.com
> > Visit Atlas Copco at: www.atlascopco.com
> > We are committed to your superior productivity through interaction and
> > innovation
> >
> >

Erik Larson
Executive Vice President
Indie Energy Systems
http://www.indieenergy.com
P 847/371.1604

**Todd Armstrong/SCU/CMT/ATLAS COPCO**

03/07/2008 04:22 PM

To   Gail Rovere/USA/GROUP/ATLAS COPCO

cc

bcc

Subject   Title

---

History:       🖉 This message has been replied to.

---

Gail,

See below: Erik is going to try and resolve the title issue next week. (in bold)

Best regards,

Todd Armstrong
Deephole Sales Specialist

**Atlas Copco Construction Mining Technique USA LLC**
24238 S. Northern Illinois Drive
Channahon, IL 60410 USA
Phone: (815) 467-8166; Fax: (815) 467-8169
Cell: (630) 205-4788
E-mail: todd.armstrong@us.atlascopco.com
Visit Atlas Copco at: www.atlascopco.com

**We are committed to your superior productivity through interaction and innovation**
------ Forwarded by Todd Armstrong/SCU/CMT/ATLAS COPCO on 03/07/2008 03:20 PM ------



**erik larson**
**<erik@hdisenergy.com>**

03/07/2008 03:15 PM

To   <todd.armstrong@us.atlascopco.com>

cc

Subject   Re: Local 150

Todd,

Thanks for the heads-up.  We've talked with them before, not sure what they want this time.  Then again, I know exactly what they want.

**ON the title, I got stuck on other things this week. I'll get in there next week.  Sorry for the delay.**

Erik

On 3/7/08 3:12 PM, "todd.armstrong@us.atlascopco.com" <todd.armstrong@us.atlascopco.com> wrote:

> Erik,
>
> I heard a rumor from a drill that asked how you guys where doing today.  He said that he has heard the Local 150 is keeping their eyes on you guys and might start to try and squeeze you some.
> Not sure it that is just what it is a rumor or smoke.  Thought I would share this with you.
>
> Best regards,

Todd Armstrong
Deephole Sales Specialist

**Atlas Copco Construction Mining Technique USA LLC**
24238 S. Northern Illinois Drive
Channahon, IL 60410 USA
Phone: (815) 467-8166; Fax: (815) 467-8169
Cell: (630) 205-4788
E-mail: todd.armstrong@us.atlascopco.com <mailto:todd.armstrong@us.atlascopco.com>
Visit Atlas Copco at: www.atlascopco.com <www.atlascopco.com>

**We are committed to your superior productivity through interaction and innovation**

Erik Larson
Executive Vice President
Indie Energy Systems
http://www.indieenergy.com
P 847/371.1604

## INDIE PAYMENTS ON COMPRESSOR

| Date | Amount | Invoice no. |
|------|--------|-------------|
| 2007-05-04 | $3,114.88 | 1022026 |
| 2007-06-04 | $3,114.88 | 1022176 |
| 2007-07-11 | $3,114.88 | 1023674 |
| 2007-08-06 | $3,114.88 | 1026262 |
| 2007-09-11 | $3,114.88 | 1027829 |
| 2007-10-01 | $3,114.88 | 1028419 |
| 2007-11-01 | $3,114.88 | 1030188 |
| 2007-12-27 | $3,114.88 | 1032945 |
| 2008-01-09 | $3,114.88 | 1033323 |
| 2008-03-11 | $3,114.88 | 1037734 |
| 2008-03-11 | $3,114.88 | 1034908 |

TOTAL
PRINCIPAL &
INTEREST     $34,263.68



PLAINTIFF'S
EXHIBIT
tabbies
C3



# INSTALLMENT LOAN & SECURITY AGREEMENT

FOR VALUE RECEIVED, the undersigned borrower ("Borrower"), promises to pay to the order of the lender ("Lender"), the below stated principal sum together with interest on the unpaid principal balance hereof from time to time outstanding at the rate per annum set forth below. The financial obligation of the Borrower to the Lender is herein called the "Loan". The Loan shall accrue interest by reference to the Fixed Rate as set forth below.

Principal payments and interest shall be due and payable as set forth below. If not sooner paid, all outstanding principal and accrued and unpaid interest thereon shall be paid to the Lender on the Last Payment Date set forth below. In the absence of demonstrable error, the books and records of the Lender shall constitute conclusive evidence of the unpaid principal balance hereof from time to time.

The Borrower may, upon at least two business days' prior written notice to the Lender stating the proposed date and aggregate principal amount of the prepayment, prepay the outstanding principal amount in whole, together with accrued interest to the date of such prepayment on the principal amount prepaid and without discount.

All payments hereunder shall be payable in lawful money of the United States. All payments shall be applied first to any costs, fees and expenses of the Lender due hereunder, then to interest due hereunder, and any balance shall be applied in reduction of principal in the inverse order of maturity.

## FINANCING SCHEDULE

| Purchase Price: | $304,300.00 | Less Cash: | $30,430.00 | Financing Term: | 48 months |
|---|---|---|---|---|---|
| Documentation Fees: | $0 | Less Trade-In: | $0 | Interest Rate: | 8.25% |
| **Total Price:** | **$304,300.00** | **Down Payment:** | **$30,430.00** | **Principal Financed:** | **$273,870.00** |

| Number of Payments in Series | Amount of Payments in Series | Date of First Payment in Series | Date of Last Payment in Series | Total Amount of Payments in Series |
|---|---|---|---|---|
| 6 | $11,335.16 | January 1, 2007 | June 1, 2007 | $68,010.96 |
| 42 | $5971.69 | July 1, 2007 | December 1, 2010 | $250,810.98 |

This Loan is secured by certain collateral described below. If any Event of Default shall occur, the Lender may, at its option, declare to be immediately due and payable the then outstanding principal balance, with all accrued and unpaid interest thereon, and all other amounts payable to the Lender hereunder, whereupon all such amounts shall become and be due and payable immediately. In the event that any payment due hereunder shall not be paid when due, the Borrower shall pay a late fee of the greater of $100.00 or five percent (5.00%) of the outstanding principal payment missed.

## COLLATERAL ~ EQUIPMENT DESCRIPTION & LOCATION

| Description (model, serial number) | Purchase Price |
|---|---|
| 1 Atlas Copco Brand Model T2W 750/300, Serial Number 6256 | $280,000.00 |
| 16 OD 3 ½ Drill Pipe | $6,400.00 |
| Sales Tax | $17,900.00 |

| Equipment Location (if other than billing address below) | Delivery Date |
|---|---|
| As below | November 15, 2006 |

### Section 1    Grant of Security Interest.

1.1. For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Borrower hereby grants to the Lender a security interest in and first lien on all of the Borrower's rights in the Collateral to secure the Secured Obligations.

1.2. As used herein, the term "Secured Obligations" shall mean the payment and performance of all debts, liabilities, obligations, covenants, agreements and indemnities of the Borrower to the Lender, of every kind, nature and description, due or to become due, now existing or hereafter arising, including, without limitation, all debts, liabilities and obligations under this agreement; all renewals, amendments, modifications, consolidations, replacements, increases and extensions thereof, therefore and thereto (collectively, the "Loan Documents"); and any other form of indebtedness owed by the Borrower to the Lender.

1.3. As used herein, the term "Collateral" shall mean: (a) All the Borrower's right, title and interest in and to the goods, property and equipment (including any software or computer programs embedded therein) set forth and described in this Security Agreement (the "Equipment"); (b) All the Borrower's right, title and interest in and to all additions, replacements, accessions, substitutions, modifications and improvements to the foregoing; (c) All of the Borrower's rights in, to and under policies and certificates of insurance, including claims or rights to payment and all proceeds, refunds, and premium rebates, including without limitation, proceeds of fire, theft or any other physical damage or loss relating directly or indirectly to the foregoing; (d) All books, records, and information relating to any of the foregoing, and all rights of access to such books, records, and information, and (e) All proceeds (cash and non-cash) and products of the foregoing, provided that the grant to the Lender of a security interest in proceeds shall not be deemed a consent by Lender to a sale or other disposition of any Collateral.

1.4. As used herein (a) the term "UCC" shall mean the Uniform Commercial Code as adopted and in effect in the State of Illinois; and (b) the term "Guarantor" shall mean a guarantor, if any, of the Secured Obligations.


PLAINTIFF'S EXHIBIT
C 4

## Section 2.    Covenants.

The Borrower hereby covenants and agrees for the benefit of the Lender as follows:

2.1.  The Borrower will do all things necessary to preserve, renew and keep in full force and effect and in good standing its existence and material qualifications and rights necessary or desirable in the ordinary conduct of its business.

2.2.  The Borrower shall retain ownership and possession of the Collateral and keep the Collateral free and clear of all Liens and other property interest of any and every kind whatsoever, except those in favor of the Lender.  The Borrower shall promptly notify the Lender of (i) any Lien made or threatened against the Collateral or any part thereof, and (ii) any material change in the Collateral, including without limitation, any material decrease in the value thereof.

2.3.  The Borrower shall deliver to the Lender, promptly upon receipt of same, copies of all notices, certificates, documents and instruments received by the Borrower which materially affect the Collateral.

2.4.  The Borrower shall pay or cause to be paid promptly when due all taxes, betterments, assessments and other governmental levies, insurance premiums and other charges, to whomever and whenever laid or assessed, whether on this agreement or on any interest therein or on the Secured Obligations, or on the Collateral, which if unpaid might by law become a Lien on the Collateral; provided, however, that any such tax, assessment, charge, levy or claim need not be paid if the validity or amount thereof shall currently be contested in good faith by appropriate proceedings and if the Borrower shall have set aside on its books appropriate reserves with respect thereto in accordance with generally accepted accounting principles; and provided, further, that the Borrower will pay all such taxes, assessments, levies or other governmental charges forthwith upon the commencement of proceedings to foreclose any Lien which may have attached as security therefore.

2.5.  The Borrower will keep and maintain each item of Equipment in good operating condition, ordinary wear and tear excepted, and the Borrower will provide all maintenance and service and all repairs necessary for such purpose.

2.6.  The Borrower will use the Collateral for lawful purposes only, with all reasonable care and caution in conformity with all applicable laws, rules, regulations and ordinances.

2.7.  The Collateral is now and shall remain personal property, and the Borrower will not permit any of the Collateral to become a part of or affixed to real property without written prior consent of the Lender and without first making all arrangements and delivering, or causing to be delivered, to Lender all instruments and documents including, without limitation, waivers and subordination agreements by any party necessary, at the sole discretion of the Lender, to preserve and protect the primary security interest granted herein in the Collateral to the Lender.

2.8.  At all times, and at its sole cost and expense, the Borrower shall (i) cooperate with Lender to record and maintain appropriate financing and continuation statements; (ii) pay all recording, filing or other taxes, fees and other charges relating thereto; and (iii) shall comply with all such statutes and regulations, as may be required by law in order to establish, preserve, perfect and protect the first Lien of the Lender in the Collateral (including, without limitation, any interests acquired after the execution hereof) and the rights of the Lender there under. The Lender may record or file as such a financing statement or statements, a carbon, photographic or other reproduction of this agreement.  Borrower hereby authorizes the Lender to prepare and file such financing statements (including continuation statements or amendments thereof or supplements thereto) or other instruments as the Lender may from time to time deem necessary or appropriate in order to perfect and maintain the security interest granted hereunder in accordance with the UCC, including without limitation, any financing statement that describes the Collateral.

2.9.  If and to the extent from time to time requested by the Lender, the Borrower shall furnish to the Lender written statements, signed and, if so requested, acknowledged, setting forth the amount of the Secured Obligations which the Borrower acknowledges to be due to the Lender, specifying any claims of offset or defense which the Borrower asserts against the Secured Obligations or any obligations to be performed hereunder, the then state of facts relative to the condition of the Collateral, and such other matters as the Lender shall request.

2.10. The Borrower shall notify the Lender at least thirty (30) days prior to any change in the name, structure or identity of the Borrower, or the use by the Borrower of any trade name or trade style not heretofore disclosed to the Lender, or the address of the Borrower's chief executive office or location and the address of any location of this Security Agreement.

2.11. The Borrower will promptly notify the Lender (a) of any material adverse change in its financial condition, assets, business or prospects and (b) any litigation, arbitration or administrative proceeding to which the Borrower may hereafter become a party and which may involve any material risk of any judgment or liability which may have a material adverse effect on the Collateral or Borrower's ability to pay and perform the Secured Obligations as and when due.

2.12. The Borrower shall allow the Lender and its representatives access and right of inspection of the Collateral at its location at reasonable times, with reasonable frequency, and in a reasonable manner, and in the event of loss or damage to the Collateral shall send prompt written notice thereof to the Lender.

2.13. The Borrower will maintain with financially sound and reputable companies insurance policies (i) insuring the Equipment against loss by fire, explosion, theft and such other casualties as are usually insured against by companies engaged in the same or similar businesses, and (ii) insuring the Borrower and the Lender against liability for personal injury and property damage relating to the Equipment, such policies to be in such form and in such amounts and coverage as may be reasonably satisfactory to the Lender, with losses payable, in the case of casualty policies, to the Lender as its interests may appear.    All insurance policies with respect to the Equipment shall (i) contain a "Lender's Loss Payable" endorsement which shall provide that in respect of the interests of the Lender in such policy the insurance shall not be invalidated by any action or inaction of the Borrower or any other person and shall insure the interests of the Lender as they appear, regardless of any breach or violation of any warranties, declarations or conditions contained in such policies by the Borrower; (ii) provide that no cancellation, reduction in amount or change in coverage thereof shall be effective until at least thirty (30) days after receipt by the Lender of written notice thereof; (iii) waive any right of subrogation of the insurer against, or any right of set-off, counterclaim or any other deduction in respect of any liability of, the Lender to such insurer; (iv) provide that the Lender shall receive promptly copies of any notices to the Borrower of any default or other act or omission by the Borrower which might invalidate or render unenforceable, in whole or in part, such policy or result in the lapse thereof, in whole or in part; and (v) be otherwise satisfactory in all respects to the Lender.  Each liability policy carried in accordance with this Section shall be primary without right of contribution from any other insurance policy which is carried by the Borrower or the Lender to the extent that such other insurance policy provides the Borrower or the Lender with contingent or excess liability insurance with respect to its interest in the insured property and shall expressly provide that all of the provisions thereof, except the limits on liability, shall operate in the same manner as if there were a separate policy covering each insured. The Borrower shall, if so requested by the Lender, deliver to the Lender as often as the Lender may reasonably request, a Certificate of Insurance evidencing such coverage.  All such insurance proceeds received by the Lender may be applied by the Lender in its discretion to the satisfaction of the Secured Obligations or to repair or replacement of any property which sustained the casualty, except as otherwise required by applicable law.

2.14. The Borrower shall not permit the Collateral to be relocated to a jurisdiction outside the contiguous United States, and the Borrower shall give the Lender prior written notice if any item of Collateral is to be removed from its current jurisdiction to another within the United States.

2.15. The Borrower will defend the Collateral against the claims and demands of all persons.

## Section 3.    Right of Lender to Perform for Borrower.

3.1. Whether or not an Event of Default exists under this Security Agreement, the Lender shall have the following rights: **(a)** The Lender is hereby specifically authorized to make, at the Lender's sole option, any or all payments required to be made either hereunder or otherwise in respect of the Collateral by the Borrower.  Such payments may include, but are not limited to, payments for taxes, assessments, betterments and other governmental levies, and insurance premiums. The Lender

shall have the right, but not the duty, to p        n any obligations of the Borrower relating to the Collateral, without waiving any other rights or releasing the Borrower from any obligation hereunder **(b)** The Lender shall have the right, but not the duty, to intervene or otherwise participate in any legal or equitable proceeding which, in the Lender's sole judgment, affects the Collateral or any of the rights created or secured by this Security Agreement. Such rights may be exercised by the Lender at any time, but only after notice to the Borrower, and only to the extent permitted by law and necessary to protect the Lender's rights hereunder and in the Collateral.

3.2. Any sums paid, and any costs or expenses, including reasonable attorneys' fees, incurred by the Lender, pursuant to the Lender's exercise of rights specified or referred to herein, shall:   (a) as between the parties hereto and their successors-in-interest, be deemed valid, so that in no event shall the necessity or validity of any such payments, costs or expenses be disputed by the Borrower; and (b) with respect to such sums, costs and expenses, be, until paid, part of the Secured Obligations and, until paid, shall accrue interest at the Default Rate as defined in this Agreement.

## Section 4.   Events of Default.

The occurrence of any one or more of the following events shall constitute an Event of Default hereunder (each an "Event of Default"): **(a)** the Borrower shall fail to make any payment of the Secured Obligations within five (5) days of when due; **(b)** the Borrower shall fail to perform or observe any other covenant, condition or agreement to be performed or observed by the Borrower under this Agreement within fifteen (15) days after the date of written notice thereof sent by the Lender; **(c)** any representation or warranty made by the Borrower herein or in any document or certificate furnished to the Lender in connection herewith shall have been incorrect in any material respect when made; **(d)** the Borrower shall fail to make any payment of any "material indebtedness" (meaning indebtedness equal to or exceeding ten percent (10%) of the original principal amount of the Loan) (other than indebtedness constituting Secured Obligations) for money borrowed or indebtedness under any capitalized lease or other purchase money obligation or shall fail to perform the terms of any agreement relating to such indebtedness and such breach or default shall continue, without having been duly cured, waived or consented to, beyond the period of grace, if any, therein specified, or any such indebtedness shall be accelerated or declared due and payable prior to the stated maturity thereof; **(e)** the Borrower or any "affiliate" (meaning, as applied to any person or entity, a person or entity which directly or indirectly controls, is controlled by, or under common control with such person or entity) shall fail to pay, observe or perform any obligation, indebtedness, covenant or agreement to or with the Lender or any of its "affiliates" to be paid, observed or performed on the part of the Borrower or its "affiliates" and such default shall continue without having been duly cured, waived or consented to beyond the period of grace, if any, therein specified; **(f)** there shall be imposed on the Collateral or any part thereof any Lien other than a Lien in favor of the Lender; **(g)** there shall occur any loss, theft, fire, substantial damage to or destruction of a material portion of the Collateral, or any seizure of any of the Collateral; **(h)** there shall occur the entry of any material judgment against the Borrower, which judgment is not satisfied or appealed from (with execution or similar process stayed) within thirty (30) days of its entry; **(i)** (x) the Borrower shall generally not pay its debts as such debts become due, shall admit in writing its inability to pay its debts generally or shall make a general assignment for the benefit of creditors, (y) any proceeding shall be instituted by or against the Borrower seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts, under any applicable law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a custodian, receiver, trustee or other similar official for it or for any substantial part of its property; provided, however, that in the case of any such proceedings instituted against the Borrower (but not instituted by the Borrower) either such proceedings shall remain undismissed or unstayed for a period of 45 days or more or any action sought in such proceedings shall occur, or (z) the Borrower shall take any corporate action to authorize any action set forth in clauses (x) and (y) above; **(j)** any provision of this Agreement after delivery thereof shall for any reason fail or cease to be valid and binding on, or enforceable against, the Borrower, or the Borrower shall so state in writing; **(k)** this Agreement shall for any reason fail or cease to create valid and enforceable Liens on any Collateral purported to be covered hereby or, such Liens shall fail or cease to constitute the first priority Liens or the Borrower shall so state in writing; **(l)** all, or a controlling interest of, the capital stock of the Borrower shall be sold, assigned, or otherwise transferred or if a security interest or other encumbrance shall be granted or otherwise acquired

therein or with resp    hereto; **(m)** Lender shall determine, in its sole discretion and in good faith that there has been a material adverse change in the financial condition of the Borrower since the date hereof, or that Borrower's ability to make any payment under this Agreement promptly when due or otherwise comply with the terms of the Loan Documents is impaired; or **(n)** any one or more of the foregoing events shall occur with respect to the Guarantor as if it were the "Borrower" named herein.

## Section 5.    Remedies.

If an Event of Default hereunder shall have occurred, then, or at any time thereafter while such Event of Default is continuing, the Lender may lawfully exercise any of the following remedies (and the Borrower hereby authorizes and empowers the Lender with the aide and assistance of any persons): **(a)** To enter upon such place as the Collateral may be found and take possession of and carry away the Collateral with or without due process of law at any time or times, and to dispose of the Collateral and apply the proceeds thereof to the Secured Obligations ; and to exercise any or all of the rights and powers and pursue any or all of the remedies that are available to a secured party under the UCC or any other applicable law or in equity in respect to the Collateral. Beyond the safe custody of the Collateral, the Lender shall have no duty as to any of the Collateral in its possession or the possession of its nominee or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto

Upon issuance of a notice of default by Lender, all payments received by the Borrower in connection with the use of any of the Collateral shall be held by the Borrower in trust for the Lender, shall be segregated from other funds of the Borrower and shall forthwith upon receipt by the Borrower be turned over to the Lender, in the same form as received by the Borrower (duly endorsed by the Borrower to the Lender, if required). Any and all such payments so received by the Lender (whether from the Borrower or otherwise) shall be held by the Lender as collateral security for, and then or at any time thereafter, may be applied in whole or in part for the benefit of the Lender against, all or any part of the Obligations in such order as the Lender, in its discretion, may determine.

The Borrower will reimburse the Lender for all fees of attorneys or collection agencies and all expenses, costs and charges paid or payable to third persons or suffered or incurred by the Lender in attempting or effecting protection or preservation of its security interest in the Collateral or the enforcement of any provision of this Security Agreement. Costs of collecting the amounts secured hereby shall be added to the principal amount due hereunder and shall be secured by, and payable out of, the Collateral.

Any sale or other disposition of the Collateral may be at public or private sale upon such terms and in such manner as the Lender deems advisable, having due regard to compliance with any statute or regulation which might affect, limit, or apply to the Lender's disposition of the Collateral. Unless the Collateral is perishable or threatens to decline speedily in value, or is of a type customarily sold on a recognized market (in which event the Lender shall provide the Borrower with such notice as may be practicable under the circumstances), the Lender shall give the Borrower at least the greater of the minimum notice required by law or seven (7) days prior written notice of the date, time, and place of any proposed public sale of, and of the date after which any private sale or other disposition, of the Collateral, or any portion thereof, is to be made.

In connection with the Lender's exercise of the Lender's rights under this Section, the Lender may enter upon, occupy, and use any premises owned or occupied by the Borrower, and may exclude the Borrower from such premises or portion thereof as may have been so entered upon, occupied, or used by the Lender.  In no event shall the Lender be liable to the Borrower for use or occupancy by the Lender of any premises pursuant to this Section, nor for any charge (such as wages for the Borrower's employees and utilities) incurred in connection with the Lender's exercise of the Lender's rights and remedies.

The Lender may require the Borrower to assemble the Collateral and make it available to the Lender at the Borrower's sole risk and expense at a place or places which are reasonably convenient to both the Lender and the Borrower (including at the Borrower's premises) or the Lender may render any Collateral unusable to the Borrower.

All rights, remedies and options conferred upon the Lender by the terms of this Agreement or by law shall be cumulative and may be exercised

successively or concurrently and are not altern    ) or exclusive of any other such rights, remedies or options. No express or implied waiver by the Lender of any default or event of default hereunder shall in any way be, or be construed to be, a waiver of any future or subsequent Default or Event of Default. The failure or delay of the Lender in exercising any rights granted hereunder shall not constitute a waiver of any such right in the future and any single or partial exercise of any particular right by the Lender shall not exhaust such rights or constitute a waiver of any other right provided herein.

### Section 6.   Miscellaneous.

6.1. If the Lender is made a party defendant to any litigation concerning this Agreement, any Loan Document or the Collateral or any part thereof, then the Borrower shall indemnify, defend and hold the Lender harmless from and against all claims, liabilities, judgments, costs and expenses by reason of said litigation, including reasonable attorneys' fees and expenses incurred by the Lender in any such litigation, whether or not any such litigation is prosecuted to judgment.

All amounts due to the Lender pursuant to this Section shall bear interest at the Default Rate from time to time in effect until paid. The "Default Rate" shall mean a per annum rate of the lesser of (i) the interest rate of the Loan plus four percent (4%) per annum or (ii) the maximum rate of interest then permitted by law.

6.2. When all Secured Obligations have been indefeasibly paid and performed in full and no further obligation on the part of the Borrower shall exist, this Security Agreement shall cease and terminate, and, at the Borrower's written request, accompanied by such certificates, opinions and proof as the Lender shall reasonably deem necessary, the Collateral furnished hereunder shall revert to the Borrower and the estate, rights, title, and interest of the Lender therein shall cease, and thereupon on the Borrower's written request and at its cost and expense, the Lender shall execute proper instruments, acknowledging satisfaction of and discharging the Security Interest created by this Agreement, and shall redeliver to the Borrower the Collateral furnished hereunder then in its possession; subject, however, to the terms and provisions contained in Section 6.3 hereof.

6.3. All covenants, agreements, representations and warranties made herein or in the Note and in certificates delivered pursuant hereto or thereto shall be deemed to have been material and relied upon by Lender, notwithstanding any investigation made by Lender or on Lender's behalf, and shall survive the execution and delivery to Lender hereof and thereof. Each such covenant, agreement, representation and warranty is hereby confirmed by the Borrower to be true and correct in all respects with the same force and effect on and as of the date of delivery of any Collateral to Lender as though made as of the date of such delivery.

6.4. Borrower agrees to indemnify, defend and save and hold harmless Lender and its officers, directors, employees, agents and advisors and affiliates (each, an "Indemnified Party") from and against, and shall pay on demand, any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or resulting from this Agreement (including, without limitation, enforcement of this Agreement), except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

6.5. This Security Agreement may not be waived, changed or discharged orally but only by an agreement in writing and signed by the Lender, and any

oral waiver, change (    scharge of any provision of this Agreement shall be without authority and of no force and effect.

6.6 (a) All notices, demands, requests, consents and other communications provided for in this Agreement shall be given in writing, (including electronic mail), and addressed to the party to be notified at the address for such party set forth below or at such other address as shall be notified in writing to the other parties. (b) All notices, demands, requests, consents and other communications described in clause (a) above shall be effective (i) if delivered by hand, including any overnight courier service, upon personal delivery, or (ii) if delivered by mail, three business days after deposited in the mails, and (iii) if delivered by electronic mail or any other telecommunications device, when transmitted to an electronic mail address (or by another means of electronic delivery) as provided in clause (a) above.

6.7 The covenants, representations, warranties and agreements herein set forth shall be binding upon the Borrower, its successors and assigns and shall inure to the benefit of the Lender, its successors and assigns. Any purchaser, assignee or transferee of any of the Secured Obligations and the Lender's Lien hereunder shall forthwith become vested with and entitled to exercise all the powers and rights given by this Agreement to the Lender, as if said purchaser, assignee, transferee or pledgee were originally named herein.

6.8. This Security Agreement shall be interpreted in accordance with and governed by the laws of the State of Illinois without regard to choice of law principles. Any action or suit in connection with this Agreement or the transactions contemplated herein or therein may be brought in any court of record in the State of New York, the parties hereby irrevocably submitting and consenting to the non-exclusive jurisdiction of each thereof, and each party irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may have or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and claim that the same has been brought in an inconvenient forum. Service of process may be made on the other party by mailing a copy of the summons to such party, by registered mail, at its address to be used for the giving of notices under this Security Agreement and the Note. IN THE EVENT OF ANY LITIGATION IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN, THE DEBTOR AND THE LENDER KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ALL RIGHTS TO A TRIAL BY JURY.

6.9. This Agreement, any Schedules or Exhibits hereto and any riders or other attachments, any application submitted by the Borrow to the Lender and any guaranty or subordination agreement delivered together under this Agreement (the "Loan Documents") constitute the entire agreement between the parties with respect to the subject matter hereof. If at any time one or more provisions of this Agreement or the Loan Documents, any amendment or supplement thereto or any related writing is or becomes invalid, illegal or unenforceable in whole or in part in any jurisdiction, the validity, legality and enforceability of such provision in any other jurisdiction or of the remaining provisions shall not in any way be affected or impaired thereby.

6.10. If more than one Person constitutes the Borrower or the Guarantor, the obligations of such Persons shall be joint and several.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Security Agreement, under seal, on the day and year first below written.

| LENDER | | BORROWER | |
|---|---|---|---|
| **Name** Atlas Copco Construction and Mining USA Inc | **Contact Person** G. Grammerstorf | **Name** Indie Energy Services Company, LLC. | **Contact Person** Daniel Cheifetz |
| **Address** 3700 E. 68th Avenue | **Telephone** 1.303.600.2330 | **Address** 1020 Church Street | **Telephone** 847.910.4850 |
| **City / State** Commerce City, CO | **Zip Code** 80022 | **City / State** Evanston, Illinois | **Zip Code** 60201 |
| **Signature (Duly Authorized)** | **Date** 02-22-07 | **Signature (Duly Authorized)** | **Date** 11/14/06 |
| **Name** Jim Levitt | **Title** VP Finance | **Name** Daniel Cheifetz | **Title** CEO |

## INDIE PAYMENTS ON TH60

| Date | Amount | Invoice no. |
|---|---|---|
| 2007-07-11 | $10,677.96 | 1023673 |
| 2007-08-06 | $10,677.96 | 1026261 |
| 2007-09-27 | $10,677.96 | 1027828 |
| 2007-10-01 | $10,677.96 | 1028418 |
| 2007-11-01 | $10,677.96 | 1029929 |
| 2007-12-27 | $10,677.96 | 1031687 |
| 2008-01-09 | $10,677.96 | 1033322 |

TOTAL
PRINCIPAL &
INTEREST        $74,745.72



PLAINTIFF'S
EXHIBIT
C5

07/18/2006 09:07 FAX  847 570 8100         THE HOMESTEAD                    ☑010/018

## Master Capital Equipment Lease

This Master Capital Equipment Lease (this "Lease") is entered into and between the Atlas Copco Construction Mining Technique USA Inc., a Delaware corporation with an address at 3700 E. 68th Avenue, P.O. Box 1159, Commerce City, Colorado 80022 ("Lessor"), and Indie Energy Services Company, LLC. with an address at 1202 Church St. Evanston, IL. 60201 ("Lessee", and together with Lessor, the "Parties") and the parties hereto agree as follows:

1.  Equipment Leased.  Lessor hereby leases to Lessee, and Lessee hereby hires and takes from Lessor the personal property identified on **Exhibit/s A** (with all attachments, replacement parts, substitutions, additions, repairs and accessories incorporated therein and/or affixed thereto, and proceeds thereof, the "Equipment").

2.  Term.  The term of this Lease (the "Term") shall begin on the Effective Date and shall end on the date set forth on **Exhibit/s A**.

3.  Payments.  During the Term Lessee shall pay to Lessor base rent ("Base Rent") as set forth on **Exhibit/s A**. Lessee shall begin paying Base Rent on the first day of the first calendar month following the Effective Date and shall make payments of Base Rent on the first day of every calendar month thereafter until the expiration of the Term. In addition to Base Rent, Lessee shall pay directly or reimburse Lessor in the full amount of all other taxes, fees or other costs associated with or connected to the Equipment or the delivery of the Equipment to Lessee if, as and when due and all such amounts, together with all of Lessee's other payment obligations and all costs incurred by Lessor on account of any default by Lessee, shall be payable by Lessee as "Additional Rent" upon demand by Lessor. If Lessee remains in possession of the Equipment after the expiration of the Term and Lessee has not purchased the Equipment as provided in this Lease, then, in addition to all other rights and remedies available to Lessor, Lessee shall make monthly payments to Lessor equal to two (2) times the Base Rent set forth herein. The Base Rent is based on Lessee's agreement to purchase the Equipment upon the expiration of the Term as provided in this Lease. If Lessee (i) fails to purchase the Equipment upon the expiration of the Term as provided in this Lease and (ii) uses the Equipment in excess of the usage hours set forth on **Exhibit/s A** (the "Maximum Usage Hours"), then, in addition to all other amounts payable by Lessee to Lessor pursuant to this Lease, Lessee shall pay to Lessor the Excess Usage Fee set forth on **Exhibit/s A** for each hour Lessee uses the Equipment in excess of the Maximum Usage Hours. Lessor shall not be liable to Lessee for any hindrance in the use of the Equipment whether caused by Lessee's inability to obtain service or spare parts or to proceed with any planned project(s) or for any other reason whatsoever. Lessee's payment obligations are absolute and are not subject to any contingency, credit, set-off or deduction of any kind.

4.  Purchase Obligation.  Lessee shall purchase the Equipment from Lessor at the expiration of the Term. The purchase price for the Equipment (the "Purchase Price") at that time shall be the Residual Value of the Equipment set forth on **Exhibit/s A** plus the amount of any value added taxes and any other taxes or charges occasioned by the transfer title to the Equipment from Lessor to Lessee. Lessee shall pay the Purchase Price for the Equipment to Lessor on the day that the last payment of Base Rent is due.

5.  Use, Nature and Location of Equipment.  Lessee warrants and agrees that the Equipment will be used primarily for the purpose indicated on **Exhibit/s A**. Lessee and Lessor agree that regardless of the manner of affixation, the Equipment shall remain personal property and not become part of any real estate. Lessee agrees to keep the Equipment at the location and in the state (the "State") set forth on **Exhibit/s A**. Upon prior written notice to Lessor, Lessee may change the location of the Equipment provided that: (i) Lessee is not in default at the time of such notice or at the time the location of the Equipment is changed and (ii) Lessee does not permit the Equipment to be located outside of the State. Lessee will not remove the Equipment from the State without the prior written consent of Lessor unless the Equipment is located in the State of Pennsylvania.

6.  Delivery Acceptance:  Immediately upon delivery to and acceptance by Lessee of an item of Equipment, Lessee shall execute and deliver Exhibit/s A relating to such item of Equipment, identifying same and acknowledging receipt thereof, with the information required on said Exhibit/s A fully completed. Execution of such Exhibit/s A shall constitute Lessee's acknowledgement that (i) the Equipment is satisfactory and acceptable to Lessee and that Lessee has examined the Equipment to the extent and in the manner it deems necessary or appropriate; (ii) the Equipment is in good operating order, repair, condition and appearance; (iii) is of the design and capacity selected by Lessee; (iv) and is suitable for the purposes for which it was leased. The execution of such Exhibit/s A by Lessee shall also constitute Lessee's waiver of any right of revocation with respect to the Equipment.

7.  Repairs.  Lessor shall not be obligated to install, erect, test, adjust, service or make any repairs or replacements to the Equipment or otherwise. Lessee shall not incur for Lessor's account any liability or expense without Lessor's prior written consent. Lessee shall inspect the Equipment within 48 hours after its receipt. If Lessor does not notify Lessor within such 48 hour period that the Equipment is defective, Lessee shall be conclusively presumed to have accepted the Equipment in its then condition. Thereafter, Lessee shall effect and bear the expense of all necessary repairs,



PLAINTIFF'S EXHIBIT D

Initial here

maintenance, operation and replacements required to be made to maintain the Equipment in good condition, normal wear and tear excepted. Lessee shall ensure that all adjustments, repairs and other servicing of the Equipment is done only by Atlas Copco authorized dealers and that all replacement parts installed into the Equipment shall be original Atlas Copco parts. Exhibit/s A indicates whether Lessor requires that Lessees enter into a Service Maintenance Contract with respect to the Equipment. If Lessor so requires, Lessee shall execute the Service Maintenance Contract attached to this Lease as Exhibit/s B.

8.  Operating the Equipment. Lessee is responsible for the Equipment and any and all damages caused to or by the Equipment. Without limiting the foregoing, Lessee will use the Equipment only for its intended use and in accordance with its rated capacity, operating instructions and safety guidelines and Lessee shall maintain the Equipment in a commercially reasonable manner. Lessee shall insure that only such persons as are properly trained, qualified and, if applicable, licensed in its proper and safe use shall operate the Equipment. Lessee agrees to provide all persons who will use, handle or work in close proximity to the Equipment (i) all health, safety, and product information related to the Equipment that is provided or made available by the manufacturer and (ii) adequate health and safety protection and warnings, including, without limitation, those relating to noise exposure, vibration exposure and exposure to silica dust and other harmful dusts, particles, mists and vapors, if applicable. Lessee shall ensure compliance with all applicable laws, ordinances, rules and regulations governing the operation of the Equipment.

9.  Indemnity. Lessee shall indemnify and save Lessor harmless from any and all injury to or loss of the Equipment from whatever cause, and from any and all liability arising out of the use, maintenance and/or delivery thereof. Lessee shall be credited with any amounts received by Lessor from insurance procured by Lessee. Damages for any loss or damage to the Equipment shall be based on the then fair market value of the Equipment, irrespective of rentals theretofore paid or accrued.

10.  Insurance. All risk of loss, damage to or destruction of the Equipment and all property damage and personal injuries (including death) caused by the Equipment shall at all times be on Lessee. During the Term, Lessee, at Lessee's expense, shall procure and maintain insurance against all risks of loss or physical damage to the Equipment for the full insurable value thereof. Lessee shall also procure and maintain breach of warranty insurance and such other insurance in such amounts and against such risks as Lessor may specify, and shall promptly deliver each policy to Lessor with a standard long-form mortgagee endorsement attached thereto showing loss payable to Lessor. Each insurance policy maintained by Lessee shall be with an insurance carrier satisfactory to Lessor, provide Lessor with not less than 30 days written notice of cancellation and be satisfactory to Lessor in form, terms and amount. Lessor's acceptance of policies in lesser amounts or covering lesser risks shall not be a waiver of Lessee's obligations under this Lease. No act or omission of Lessee or any of its officers, agents, employees or representatives shall affect the obligations of the insurer to pay the full amount of any loss.

Lessee hereby assigns to Lessor any monies which may become payable under any such policy of insurance and irrevocably constitutes and appoints Lessor as Lessee's attorney in fact (a) to hold each original insurance policy, (b) to make, settle and adjust claims under each policy of insurance, (c) to make claims for any monies which may become payable under policies, including returned or unearned premiums, and (d) to endorse Lessee's name on any check, draft or other instrument received in payment of claims or returned or unearned premiums under each policy and to apply the funds to the payment of Lessee's indebtedness to Lessor; provided, however, Lessor is under no obligation to do any of the foregoing.

Should Lessee fail to furnish any insurance policy to Lessor, or to maintain such policy in full force, or to pay any premium in whole or in part relating thereto, then Lessor, without waiving or releasing any default or obligation by Lessee, may (but shall be under no obligation to) obtain and maintain insurance and pay the premium therefor on behalf of Lessee and add the premium to Lessee's indebtedness to Lessor under this Lease. The full amount of any such premium paid by Lessor shall be payable by Lessee upon demand, and failure to pay same shall constitute an event of default under this Lease.

11.  Taxes. Lessee shall comply with all laws, ordinances and regulations relating to the ownership, possession, use or maintenance of the Equipment, and indemnify and save Lessor harmless against actual or asserted violations, and pay all costs and expenses of every character occasioned by or arising out of such ownership, possession, use or maintenance. Lessee agrees that, during the term of this Lease, in addition to all other amounts provided herein to be paid, it will promptly pay all taxes, assessments and other governmental charges (including penalties and interest, if any, and fees for titling or registration, if required) levied or assessed:

(a)  upon the interest of the Lessee in the Equipment or upon the use or operation thereof or on the earnings arising therefrom; and

(b)  against Lessor on account of its acquisition or ownership of the Equipment or any part thereof, or the use or operation thereof or the leasing thereof to the Lessee, or the rent herein provided for, or the earnings arising therefrom, exclusive, however, of any taxes based on net income of Lessor.

Initial here 

Case 1:08-cv-02363    Document 18-10    Filed 06/06/2008    Page 3 of 7
Case 1:08-cv-02363    Document 1-2    Filed 04/25/2008    Page 4 of 11
07/18/2006 09:08 FAX  847 570 8100          THE HOMESTEAD                    ☑012/016

Lessee agrees to file, on behalf of Lessor, all required tax returns and reports concerning the Equipment with all appropriate governmental agencies, and within not more than 30 days after the due date of such filing, to send Lessor confirmation, in form satisfactory to Lessor, of such filing.

12. Title. All Equipment shall remain personal property and title thereto shall remain in Lessor exclusively. Lessee shall keep the Equipment free from any and all liens and claims, and shall not permit Lessor's title or rights in the Equipment to be encumbered or impaired.

13. Inspection. Lessee shall, whenever requested, advise Lessor of the exact location and condition of the Equipment and shall give Lessor immediate notice of any attachment or other judicial process affecting the Equipment, and indemnify and save Lessor harmless from any loss or damage caused thereby. Lessor may, for the purpose of inspection, at all reasonable times enter upon any job, building or place where the Equipment is located and may remove the Equipment forthwith, without notice to Lessee, if, in the opinion of Lessor, the Equipment is being used beyond its capacity or Lessee is improperly caring for or abusing the Equipment in any manner.

14. Non-Waiver. Time is of the essence. Lessor's failure at any time to require strict performance by Lessee of any of the provisions hereof shall not waive or diminish Lessor's right thereafter to demand strict compliance therewith or with any other provision. Waiver of any default shall not waive any other default. No remedy of Lessor hereunder shall be exclusive of any other remedy available at law, in equity or otherwise provided in this Lease, but each shall be cumulative and in addition to every other remedy.

15. No Warranty. Lessor, not being the manufacturer of the Equipment, nor manufacturer's agent, makes no warranty or representation, either express or implied, as to the fitness, quality, design, condition, capacity, suitability, merchantability or performance of the Equipment or of the material or workmanship thereof, it being agreed that the Equipment is leased "as is" and that all such risks, as between the Lessor and the Lessee, are to be borne by the Lessee at its sole risk and expense and Lessee agrees not to assert any claim whatsoever against the Lessor based thereon. Lessee further agrees, regardless of cause, not to assert any claim whatsoever against the Lessor for loss of anticipatory profits or consequential damages. No oral agreement, guaranty, promise, condition, representation or warranty shall be binding on Lessor. All prior conversations, agreements and/or representations related to this Lease and/or to the Equipment are integrated in this Lease.

16. Possession. Lessor covenants to Lessee that Lessor is the lawful owner of the Equipment free from all encumbrances and that, conditioned upon Lessee's performing the conditions hereof, Lessee shall peaceably and quietly hold, possess and use the Equipment during the Term without let or hindrance.

17. Performance of Obligations of Lessee by Lessor. In the event that the Lessee shall fail duly and promptly to perform any of its obligations hereunder, the Lessor may, at its option, perform them for the account of Lessee without thereby waiving such default, and any amount paid or expense, fee (including reasonable attorneys' and other professionals' fees), penalty or other liability incurred by the Lessor in such performance, together with interest thereon at a rate equal to the lesser of (i) 1 1/2% per month or (ii) the maximum rate of interest permitted by applicable law, shall be payable by the Lessee upon demand as Additional Rent for the Equipment.

18. Further Assurances. Lessee shall execute and deliver to Lessor, upon Lessor's request, such instruments and assurances as Lessor deems necessary or advisable for the confirmation or perfection of this Lease and/or Lessor's rights hereunder.

19. Default. An Event of Default shall occur if:

(A) Lessee fails to pay when due any installment of rent and such failure continues for a period of 10 days;

(B) Lessee shall fail to perform or observe any covenant, condition or agreement to be performed or observed by it hereunder and such failure continues uncured for 15 days after written notice thereof to Lessee by Lessor;

(C) Lessee dies, ceases doing business as a going concern, makes an assignment for the benefit of creditors, admits in writing its inability to pay its debts as they become due, files a voluntary petition in bankruptcy, is adjudicated a bankrupt or an insolvent, files a petition seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar arrangement under any present or future statute, law or regulation, or files an answer admitting the material allegations of a petition filed against it in any such proceeding, consents to or acquiesces in the appointment of a trustee, receiver, or liquidator of it or of all or any substantial part of its assets or properties, or if it or its shareholders shall take any action looking to its dissolution or liquidation;

(D) within 60 days after the commencement of any proceedings against Lessee seeking reorganization, arrangement, readjustment, liquidation, dissolution or similar relief under any present or future statute, law or regulation, such proceedings shall not have been dismissed, or if within 60 days after the appointment without

8-5/04 Revision Not for use in Texas                    3                    Initial here

07/18/2006 09:09 FAX  847 570 8100          THE HOMESTEAD                    ☑ 013/016

Lessee's consent or acquiescence of any trustee, receiver or liquidator of it or of all or any substantial part of its assets and properties, such appointment shall not be vacated;

(E) Lessee attempts to remove, sell, transfer, encumber, part with possession or sublet the Equipment or any item thereof or

(F) a third party takes any action to foreclose on, obtain possession or control of, collect, sell or otherwise dispose of or exercise any rights with respect to any of the Equipment without the express written consent of Lessor.

Upon the occurrence of an Event of Default, Lessor, at its option, may do any or all of the following:

1. declare all sums due and to become due hereunder immediately due and payable;

2. proceed by appropriate court action or actions or other proceedings either at law or in equity to enforce performance by the Lessee of any and all covenants of this Lease and to recover damages for the breach thereof;

3. demand that Lessee deliver the Equipment forthwith to Lessor at Lessee's expense at such place as Lessor may designate; and

4. Lessor and/or its agents may, without notice or liability or legal process, enter into any premises of or under control or jurisdiction of Lessee or any agent of Lessee where the Equipment may be or by Lessor is believed to be, and repossess all or any item thereof, disconnecting and separating all thereof from any other property and using all force necessary or permitted by applicable law so to do, Lessee hereby expressly waiving all further rights to possession of the Equipment and all claims for injuries suffered through or loss caused by such repossession; Lessor may sell or lease the Equipment at a time and location of its choosing provided that Lessor acts in good faith and in a commercially reasonable manner, but Lessor shall, nevertheless, be entitled to recover immediately as liquidated damages for loss of the bargain and not as a penalty (i) any unpaid Base Rent or Additional Rent that accrued up to the time of Lessor's possession plus (ii) an amount equal to the difference obtained by subtracting (a) proceeds of such sale or the aggregate rental value from such lease (discounted to present value at the then prime rate of interest + 3%) from (b) the aggregate rent reserved hereunder for the unexpired term of this Lease plus the Residual Value of the Equipment, provided, however, that if any statute governing the proceeding in which such damages are to be proved specifies the amount of such claim, Lessor shall be entitled to prove as and for damages for the breach an amount equal to that allowed under such statute. The provisions of this Section shall be without prejudice to any rights given to the Lessor by such statute to prove for any amounts allowed thereby. Should any proceedings be instituted by or against Lessor for monies due to Lessor hereunder and/or for possession of any or all of the Equipment or for any other relief, Lessee shall pay a reasonable sum as attorneys' fees. No remedy referred to herein is intended to be exclusive of any other remedy stated herein or of any other remedy otherwise available to Lessor at law or in equity.

20. **Assignments.** Without the prior written consent of Lessor, Lessee shall not assign this Lease or its interests hereunder or enter into any sub-lease with respect to the Equipment, it being agreed that Lessor will not unreasonably withhold its consent to a sub-lease of the Equipment. The conditions hereof shall bind any permitted successors and assigns of Lessee. Lessor may assign the rents reserved herein or all or any of Lessor's other rights hereunder. After such assignment, Lessor shall not be the assignee's agent for any purpose. Lessee will settle all claims arising out of alleged breach of warranties or otherwise, defenses, set-offs and counterclaims it may have against Lessor directly with Lessor, and not assert any such against Lessor's assignee, Lessor hereby agreeing to remain responsible therefor. Lessee on receiving notice of any such assignment shall abide thereby and make payment as may therein be directed. Following such assignment, solely for the purpose of determining assignee's rights hereunder, the term "Lessor" shall be deemed to refer to Lessor's assignee.

21. **Miscellaneous.** Lessee will not change or remove any insignia or lettering on the Equipment and shall conspicuously identify each item of the Equipment by suitable lettering thereon to indicate Lessor's ownership. All transportation charges shall be borne by Lessee. All notices relating hereto shall be sent certified mail, return receipt requested to Lessor or Lessee at the addresses indicated on **Exhibit/s A.** If any part hereof is contrary to, prohibited by or deemed invalid under applicable laws or regulations of any jurisdiction, such provision shall be inapplicable and deemed omitted but shall not invalidate the remaining provisions hereof. Lessee waives all rights under all exemption laws. **Lessee acknowledges the receipt of a true copy of this Lease.** This Lease is irrevocable for the full term hereof and for the aggregate rental herein reserved, and the rent shall not abate by reason of termination of Lessee's right of possession and/or the taking of possession by Lessor or for any other reason. Any payment not made when due shall, at the option of Lessor, bear late charges thereon calculated at a rate equal to the lesser of (i) 1 1/2% per month or (ii) the maximum rate of interest permitted by applicable law. In the event this Lease is deemed to create a security interest, Lessee grants Lessor a security interest in the Equipment as security for all of Lessee's indebtedness and obligations owing under this Lease as well as all other present and future indebtedness and obligations of Lessee

8-5/-04 Revision Not for use in Texas                    4                    Initial here

07/18/2006 09:09 FAX  847 570 8100          THE HONESTEAD                              014/018

to Lessor of every kind and nature whatsoever.  Lessee shall be responsible for and pay to Lessor a returned check fee, not to exceed the maximum permitted by law, which fee will be equal to the sum of (1) the actual bank charges incurred by Lessor plus (ii) all other actual costs and expenses incurred by Lessor.  The returned check fee is payable upon demand as Additional Rent under this Lease.  Lessee authorizes Lessor to file a financing statement with respect to the Equipment and ratifies the filing by Lessor of any such financing statement previously filed.

**22. Lessee's Organizational Information.**  If Lessee is an organization, Lessee (a) is the type of organization, (b) is organized under the laws of the jurisdiction, (c) has its principal place of business, and (d) if it is a "registered organization" as defined in Article 9 of the Uniform Commercial Code (i.e., organized solely under the laws of a single State and as to which the State must maintain a public record showing the organization to have been organized), has the organizational identification number (or, if none, has been assigned no such number by the State of organization), all as set forth on **Exhibit/s A**.  Lessee's name, as it appears on **Exhibit/s A** and on the signature line of this Lease, is Lessee's **exact and complete legal name**.  If Lessee is an Individual, Lessee's exact and complete legal name and principal residence are as set forth under Lessee's name on the signature line of this Lease.  Lessee agrees to notify Lessor immediately in the event of a change in any of the foregoing facts or information.

[The remainder of this page is intentionally left blank]



07/18/2006 09:09 FAX  847 570 8100          THE HOMESTEAD                    ☑015/016

This Lease contains the entire agreement between the parties with respect to the Equipment, and may not be altered, modified, terminated or discharged except by a writing signed by the party against whom such alteration, modification, termination or discharge is sought.  **Lessee's initials** - ___

   **IN WITNESS WHEREOF**, Lessee and Lessor have duly executed this Lease as of **July 17, 2006**.

**_LESSEE_:**

**Indie Energy Services Company, LLC.**

By _____          Title _Manager_

   If Lessee is a corporation, have this Lease signed by the President, Vice President or Treasurer and indicate the signatory's official title.  If the Lessee is a limited liability company, have this Lease signed by the managing member.  If the signatory is an owner, so indicate.

**_LESSOR_:**

**Atlas Copco Construction Mining Technique USA Inc.**

By _____          Title VP Finance & Administration
   Jim Levitt

8-5/-04 Revision Not for use in Texas                6

07/18/2006 09:10 FAX  847 570 8100          THE HOMESTEAD                    ☑016/016

## Exhibit A to Master Capital Equipment Lease
### (Schedule No 1 )

This exhibit is pursuant to and made part of the Master Capital Equipment Lease dated July 17, 2006, (as amended, restated, modified and supplemented, the "Master Capital Equipment Lease") between Atlas Copco Construction Mining Technique USA Inc., as Lessor, and Indie Energy Services Company, LLC. as Lessee.

Intro: The "Effective Date" of this Lease is July 17, 2006,

1. **Equipment Description, Serial Numbers and Application:** Atlas Copco brand, model T2W. Serial number 6201.

2. **The "Term" of the Lease** with respect to Equipment: 49 months, commencing on July 17, 2006, and ending on **August 1, 2010.**

3. **Base Rent:** The aggregate amount of the Base Rent payable hereunder is **$315,128.24** of which Lessee has paid $0 in advance. The balance of the Base Rent payable hereunder shall be paid in monthly installments of **$6565.13** until fully paid.

4. **Residual Value:** Upon the expiration of the Term, the Residual Value of the Equipment shall be $0.

5. **Acknowledgement of Receipt of Equipment:** Lessee acknowledges that the Equipment above described has been delivered to and received by it, is as represented, and is acceptable and satisfactory to it, and the same has been accepted as Equipment leased by Lessee under said Master Equipment Lease.

6. **The Equipment shall be used primarily for:**

   ☒ business or commercial purposes (other than agricultural)
   ☐ agricultural purposes (see definition below)
   ☐ both agricultural and business or commercial purposes.

   Agricultural purposes generally means farming, including dairy farming, but it also includes the transportation, harvesting, and processing of farm, dairy or forest products if what is transported, harvested, or processed is farm, dairy, or forest products grown or bred by the user of the Equipment itself.   It does not apply, for instance, to a logger who harvests someone else's forest or a contractor who prepares land or harvests products on someone else's farm.

7. **Location of Equipment:** The location at which the Lessee shall keep the Equipment is Cook County, IL.

8. **Service and Maintenance Contract:** Lessor ☐ requires ☒ does not require that Lessee enter into a Service Maintenance Contract.

**LESSEE**
Indie Energy Services Company, LLC:

By;

Title:  Manager

Address:  1020 Church Street Blvd

Phone #:  847-910-4850

**LESSOR**
Atlas Copco Construction Mining Technique USA Inc.

By:

Title: VP Finance & Administration

Address: 3700 E 68th Ave. Commerce City, CO. 80022

Phone #: 303.217.2804

(Address and Phone numbers are inserted for contact purposes only and not for purposes of effecting Notice)

## STATE OF ILLINOIS

## CERTIFICATE OF TITLE OF A VEHICLE

| VEHICLE IDENTIFICATION NO. | YEAR | MAKE | MODEL | BODY STYLE | TITLE NO. |
|---|---|---|---|---|---|
| 1HTGLATT3VH431381 | 1997 | INTERNATIONAL | 2000 SERIES 2674 | TANDEM | X6299057050 |

| DATE ISSUED | ODOMETER | CCM | PURCHASED | PURCHASE DATE |
|---|---|---|---|---|
| 10/26/06 | | | USED | 07/17/06 |

MOBILE HOME SQ. FT.

TYPE OF TITLE
ORIGINAL

MAILING ADDRESS

INDIE ENERGY SERVICES CO
1020 CHURCH ST
EVANSTON  IL  60201-3623

LEGEND(S)

OWNER(S) NAME AND ADDRESS
INDIE ENERGY SERVICES CO
1020 CHURCH ST
EVANSTON IL 60201-3623

MILEAGE NOT REQUIRED

FIRST LIEN HOLDER NAME AND ADDRESS

SECOND LIEN HOLDER NAME AND ADDRESS

The holder of Lien on the vehicle described in this certificate does hereby state that the lien is released and discharged.

| Print Name | By | Signature of Authorized Agent | Date |
|---|---|---|---|
| Firm Name | | Signature of Authorized Agent | Date |

NEW LIEN ASSIGNMENT: The information below must be an application for title and presented to the Secretary of State

Secured Party: Atlas Copco Customer Finance USA LLC    Address: 34 Maple Avenue    Pine Brook NJ 07058

Federal and State law requires that you state the mileage in connection with the transfer of ownership. Failure to complete or providing a false statement may result in fines and/or imprisonment.

## ASSIGNMENT OF TITLE
The undersigned hereby certifies that the vehicle described in this title has been transferred to the following printed name and address.

I certify to the best of my knowledge that the odometer reading is the actual mileage of the vehicle unless one of the following statements is checked:

□ 1. The mileage stated is in excess of its mechanical limits.
□ 2. The odometer reading is not the actual mileage. WARNING - ODOMETER DISCREPANCY

ODOMETER READING

Signature(s) of Seller(s)
Printed Name(s) of Seller(s)
I am aware of the above odometer certification made by seller.
Signature(s) of Buyer(s)
Printed Name

DATE OF SALE

I, Jesse White, Secretary of State of the State of Illinois, do hereby certify that according to the records on file with my Office, the person or entity named hereon is the owner of the vehicle described hereon, which is subject to the above named liens and encumbrances, if any. IN WITNESS WHEREOF I HAVE AFFIXED MY SIGNATURE AND THE GREAT SEAL OF THE STATE OF ILLINOIS AT SPRINGFIELD.

G01588300
CONTROL NO.

*Jesse White*
JESSE WHITE, Secretary of State

**DO NOT ACCEPT TITLE SHOWING ANY ERASURES, ALTERATIONS OR MUTILATIONS.**

PLAINTIFF'S
EXHIBIT
E



## INSTALLMENT LOAN & SECURITY AGREEMENT

FOR VALUE RECEIVED, the undersigned borrower ("Borrower"), promises to pay to the order of the lender ("Lender"), the below stated principal sum together with interest on the unpaid principal balance hereof from time to time outstanding at the rate per annum set forth below. The financial obligation of the Borrower to the Lender is herein called the "Loan". The Loan shall accrue interest by reference to the Fixed Rate as set forth below.

Principal payments and interest shall be due and payable as set forth below. If not sooner paid, all outstanding principal and accrued and unpaid interest thereon shall be paid to the Lender on the Last Payment Date set forth below. In the absence of demonstrable error, the books and records of the Lender shall constitute conclusive evidence of the unpaid principal balance hereof from time to time.

The Borrower may, upon at least two business days' prior written notice to the Lender stating the proposed date and aggregate principal amount of the prepayment, prepay the outstanding principal amount in whole, together with accrued interest to the date of such prepayment on the principal amount prepaid and without discount.

All payments hereunder shall be payable in lawful money of the United States. All payments shall be applied first to any costs, fees and expenses of the Lender due hereunder, then to interest due hereunder, and any balance shall be applied in reduction of principal in the inverse order of maturity.

| FINANCING SCHEDULE | | | | | |
|---|---|---|---|---|---|
| **Purchase Price:** | $104,000.00 | **Less Cash:** | $11,050.00 | **Financing Term:** | 36 months |
| **Documentation Fees:** | $0 | **Less Trade-In:** | $ | **Interest Rate:** | 7.95% |
| **Total Price:** | $104,350.00 | **Down Payment:** | $11,050.00 | **Principal Financed:** | $99,450.00 |
| **Number of Payments in Series** | **Amount of Payments in Series** | **Date of First Payment in Series** | | **Date of Last Payment in Series** | **Total Amount of Payments in Series** |
| 36 | $3114.88 | May 4, 2007 | | April 4, 2010 | $112,135.68 |

This Loan is secured by certain collateral described below. If any Event of Default shall occur, the Lender may, at its option, declare to be immediately due and payable the then outstanding principal balance, with all accrued and unpaid interest thereon, and all other amounts payable to the Lender hereunder, whereupon all such amounts shall become and be due and payable immediately. In the event that any payment due hereunder shall not be paid when due, the Borrower shall pay a late fee of the greater of $100.00 or five percent (5.00%) of the outstanding principal payment missed.

| COLLATERAL – EQUIPMENT DESCRIPTION & LOCATION | |
|---|---|
| **Description (model, serial number)** | **Purchase Price** |
| 1 Atlas Copco Brand Compressor, Model #XRVS 976CD, SERIAL # 539285 | $104,000.00 |
| Sales Tax @6.25% | $6500.00 |
| **Equipment Location (if other than billing address below)** As below | **Delivery Date** April 4, 2007 |

## Section 1    Grant of Security Interest.

1.1. For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Borrower hereby grants to the Lender a security interest in and first lien on all of the Borrower's rights in the Collateral to secure the Secured Obligations.

1.2. As used herein, the term "Secured Obligations" shall mean the payment and performance of all debts, liabilities, obligations, covenants, agreements and indemnities of the Borrower to the Lender, of every kind, nature and description, due or to become due, now existing or hereafter arising, including, without limitation, all debts, liabilities and obligations under this agreement; all renewals, amendments, modifications, consolidations, replacements, increases and extensions thereof, therefore and thereto (collectively, the "Loan Documents"); and any other form of indebtedness owed by the Borrower to the Lender.

1.3. As used herein, the term "Collateral" shall mean: (a) All the Borrower's right, title and interest in and to the goods, property and equipment (including any software or computer programs embedded therein) set forth and described in this Security Agreement (the "Equipment"); (b) All the Borrower's right, title and interest in and to all additions, replacements, accessions, substitutions, modifications and improvements to the foregoing; (c) All of the Borrower's rights in, to and under policies and certificates of insurance, including claims or rights to payment and all proceeds, refunds, and premium rebates, including without limitation, proceeds of fire, theft or any other physical damage or loss relating directly or indirectly to the foregoing; (d) All books, records, and information relating to any of the foregoing, and all rights of access to such books, records, and information, and all property in which such books, records, and information are stored, recorded, and maintained, and all computer programs, computer records, computer software, rights of access to computer bureaus and computer data relating to the foregoing; and (e) All proceeds (cash and non-cash) and products of the foregoing, provided that the grant to the Lender of a security interest in proceeds shall not be deemed a consent by Lender to a sale or other disposition of any Collateral.

1.4. As used herein (a) the term "UCC" shall mean the Uniform Commercial Code as adopted and in effect in the State of Illinois; and (b) the term "Guarantor" shall mean a guarantor, if any, of the Secured Obligations.



PLAINTIFF'S EXHIBIT

E



**Section 2.  Covenants.**

The Borrower hereby covenants and agrees for the benefit of the Lender as follows:

2.1. The Borrower will do all things necessary to preserve, renew and keep in full force and effect and in good standing its existence and material qualifications and rights necessary or desirable in the ordinary conduct of its business.

2.2. The Borrower shall retain ownership and possession of the Collateral and keep the Collateral free and clear of all Liens and other property interest of any and every kind whatsoever, except those in favor of the Lender. The Borrower shall promptly notify the Lender of (i) any Lien made or threatened against the Collateral or any part thereof, and (ii) any material change in the Collateral, including without limitation, any material decrease in the value thereof.

2.3. The Borrower shall deliver to the Lender, promptly upon receipt of same, copies of all notices, certificates, documents and instruments received by the Borrower which materially affect the Collateral.

2.4. The Borrower shall pay or cause to be paid promptly when due all taxes, betterments, assessments and other governmental levies, insurance premiums and other charges, to whomever and whenever laid or assessed, whether on this agreement or on any interest therein or on the Secured Obligations, or on the Collateral, which if unpaid might by law become a Lien on the Collateral; provided, however, that any such tax, assessment, charge, levy or claim need not be paid if the validity or amount thereof shall currently be contested in good faith by appropriate proceedings and if the Borrower shall have set aside on its books appropriate reserves with respect thereto in accordance with generally accepted accounting principles; and provided, further, that the Borrower will pay all such taxes, assessments, levies or other governmental charges forthwith upon the commencement of proceedings to foreclose any Lien which may have attached as security therefore.

2.5. The Borrower will keep and maintain each item of Equipment in good operating condition, ordinary wear and tear excepted, and the Borrower will provide all maintenance and service and all repairs necessary for such purpose.

2.6. The Borrower will use the Collateral for lawful purposes only, with all reasonable care and caution in conformity with all applicable laws, rules, regulations and ordinances.

2.7. The Collateral is now and shall remain personal property, and the Borrower will not permit any of the Collateral to become a part of or affixed to real property without written prior consent of the Lender and without first making all arrangements and delivering, or causing to be delivered, to Lender all instruments and documents including, without limitation, waivers and subordination agreements by any party necessary, at the sole discretion of the Lender, to preserve and protect the primary security interest granted herein in the Collateral to the Lender.

2.8. At all times, and at its sole cost and expense, the Borrower shall (i) cooperate with Lender to record and maintain appropriate financing and continuation statements; (ii) pay all recording, filing or other taxes, fees and other charges  relating thereto; and (iii) shall comply with all such statutes and regulations, as may be required by law in order to establish, preserve, perfect and protect the first Lien of the Lender in the Collateral (including, without limitation, any interests acquired after the execution hereof) and the rights of the Lender there under. The Lender may record or file as such a financing statement or statements, a carbon, photographic or other reproduction of this agreement.  Borrower hereby authorizes the Lender to prepare and file such financing statements (including continuation statements or amendments thereof or supplements thereto) or other instruments as the Lender may from time to time deem necessary or appropriate in order to perfect and maintain the security interest granted hereunder in accordance with the UCC, including without limitation, any financing statement that describes the Collateral.

2.9. If and to the extent from time to time requested by the Lender, the Borrower shall furnish to the Lender written statements, signed and, if so requested, acknowledged, setting forth the amount of the Secured Obligations which the Borrower acknowledges to be due to the Lender, specifying any claims of offset or defense which the Borrower asserts against the Secured Obligations or any obligations to be performed hereunder, the then state of facts relative to the condition of the Collateral, and such other matters as the Lender shall request.

2.10.The Borrower      'l notify the Lender at least thirty (30) days prior to any change in the ... ame, structure or identity of the Borrower, or the use by the Borrower of any trade name or trade style not heretofore disclosed to the Lender, or the address of the Borrower's chief executive office or location and the address of any location of Collateral; in each case by an amendment to this Security Agreement.

2.11.The Borrower will promptly notify the Lender (a) of any material adverse change in its financial condition, assets, business or prospects and (b) any litigation, arbitration or administrative proceeding to which the Borrower may hereafter become a party and which may involve any material risk of any judgment or liability which may have a material adverse effect on the Collateral or Borrower's ability to pay and perform the Secured Obligations as and when due.

2.12.The Borrower shall allow the Lender and its representatives access and right of inspection of the Collateral at its location at reasonable times, with reasonable frequency, and in a reasonable manner, and in the event of loss or damage to the Collateral shall send prompt written notice thereof to the Lender.

2.13.The Borrower will maintain with financially sound and reputable companies insurance policies (i) insuring the Equipment against loss by fire, explosion, theft and such other casualties as are usually insured against by companies engaged in the same or similar businesses, and (ii) insuring the Borrower and the Lender against liability for personal injury and property damage relating to the Equipment, such policies to be in such form and in such amounts and coverage as may be reasonably satisfactory to the Lender, with losses payable, in the case of casualty policies, to the Lender as its interests may appear.  All insurance policies with respect to the Equipment shall (i) contain a "Lender's Loss Payable" endorsement which shall provide that in respect of the interests of the Lender in such policy the insurance shall not be invalidated by any action or inaction of the Borrower or any other person and shall insure the interests of the Lender as they appear, regardless of any breach or violation of any warranties, declarations or conditions contained in such policies by the Borrower; (ii) provide that no cancellation, reduction in amount or change in coverage thereof shall be effective until at least thirty (30) days after receipt by the Lender of written notice thereof; (iii) waive any right of subrogation of the insurer against, or any right of set-off, counterclaim or any other deduction in respect of any liability of, the Lender to such insurer; (iv) provide that the Lender shall receive promptly copies of any notices to the Borrower of any default or other act or omission by the Borrower which might invalidate or render unenforceable, in whole or in part, such policy or result in the lapse thereof, in whole or in part; and (v) be otherwise satisfactory in all respects to the Lender.  Each liability policy carried in accordance with this Section shall be primary without right of contribution from any other insurance policy which is carried by the Borrower or the Lender to the extent that such other insurance policy provides the Borrower or the Lender with contingent or excess liability insurance with respect to its interest in the insured property and shall expressly provide that all of the provisions thereof, except the limits on liability, shall operate in the same manner as if there were a separate policy covering each insured.  The Borrower shall, if so requested by the Lender, deliver to the Lender as often as the Lender may reasonably request, a Certificate of Insurance evidencing such coverage.  All such insurance proceeds received by the Lender may be applied by the Lender in its discretion to the satisfaction of the Secured Obligations or to repair or replacement of any property which sustained the casualty, except as otherwise required by applicable law.

2.14.The Borrower shall not permit the Collateral to be relocated to a jurisdiction outside the contiguous United States, and the Borrower shall give the Lender prior written notice if any item of Collateral is to be removed from its current jurisdiction to another within the United States.

2.15.The Borrower will defend the Collateral against the claims and demands of all persons.

**Section 3.  Right of Lender to Perform for Borrower.**

3.1.Whether or not an Event of Default exists under this Security Agreement, the Lender shall have the following rights: (a) The Lender is hereby specifically authorized to make, at the Lender's sole option, any or all payments required to be made either hereunder or otherwise in respect of the Collateral by the Borrower.  Such payments may include, but are not limited to, payments for taxes, assessments, betterments

shall have the right, but not the duty, to p ⁓rm any obligations of the Borrower relating to the Collateral, without ᴸiving any other rights or releasing the Borrower from any obligation hereunder (b) The Lender shall have the right, but not the duty, to intervene or otherwise participate in any legal or equitable proceeding which, in the Lender's sole judgment, affects the Collateral or any of the rights created or secured by this Security Agreement. Such rights may be exercised by the Lender at any time, but only after notice to the Borrower, and only to the extent permitted by law and necessary to protect the Lender's rights hereunder and in the Collateral.

3.2. Any sums paid, and any costs or expenses, including reasonable attorneys' fees, incurred by the Lender, pursuant to the Lender's exercise of rights specified or referred to herein, shall:  (a) as between the parties hereto and their successors-in-interest, be deemed valid, so that in no event shall the necessity or validity of any such payments, costs or expenses be disputed by the Borrower; and (b) with respect to such sums, costs and expenses, be, until paid, part of the Secured Obligations and, until paid, shall accrue interest at the Default Rate as defined in this Agreement.

### Section 4.    Events of Default.

The occurrence of any one or more of the following events shall constitute an Event of Default hereunder (each an "Event of Default"): (a) the Borrower shall fail to make any payment of the Secured Obligations within five (5) days of when due; (b) the Borrower shall fail to perform or observe any other covenant, condition or agreement to be performed or observed by the Borrower under this Agreement within fifteen (15) days after the date of written notice thereof sent by the Lender; (c) any representation or warranty made by the Borrower herein or in any document or certificate furnished to the Lender in connection herewith shall have been incorrect in any material respect when made; (d) the Borrower shall fail to make any payment of any "material indebtedness" (meaning indebtedness equal to or exceeding ten percent (10%) of the original principal amount of the Loan (other than indebtedness constituting Secured Obligations) for money borrowed or indebtedness under any capitalized lease or other purchase money obligation or shall fail to perform the terms of any agreement relating to such indebtedness and such breach or default shall continue, without having been duly cured, waived or consented to, beyond the period of grace, if any, therein specified, or any such indebtedness shall be accelerated or declared due and payable prior to the stated maturity thereof; (e) the Borrower or any "affiliate" (meaning, as applied to any person or entity, a person or entity which directly or indirectly controls, is controlled by, or under common control with such person or entity) shall fail to pay, observe or perform any obligation, indebtedness, covenant or agreement to or with the Lender or any of its "affiliates" to be paid, observed or performed on the part of the Borrower or its "affiliates" and such default shall continue without having been duly cured, waived or consented to beyond the period of grace, if any, therein specified; (f) there shall be imposed on the Collateral or any part thereof any Lien other than a Lien in favor of the Lender; (g) there shall occur any loss, theft, fire, substantial damage to or destruction of a material portion of the Collateral, or any seizure of any of the Collateral; (h) there shall occur the entry of any material judgment against the Borrower, which judgment is not satisfied or appealed from (with execution or similar process stayed) within thirty (30) days of its entry; (i) (x) the Borrower shall generally not pay its debts as such debts become due, shall admit in writing its inability to pay its debts generally or shall make a general assignment for the benefit of creditors, (y) any proceeding shall be instituted by or against the Borrower seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts, under any applicable law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a custodian, receiver, trustee or other similar official for it or for any substantial part of its property; provided, however, that in the case of any such proceedings instituted against the Borrower (but not instituted by the Borrower) either such proceedings shall remain undismissed or unstayed for a period of 45 days or more or any action sought in such proceedings shall occur, or (z) the Borrower shall take any corporate action to authorize any action set forth in clauses (x) and (y) above; (j) any provision of this Agreement after delivery thereof shall for any reason fail or cease to be valid and binding on, or enforceable against, the Borrower, or the Borrower shall so state in writing; (k) this Agreement shall for any reason fail or cease to create valid and enforceable Liens on any Collateral purported to be covered hereby or, such Liens shall fail or cease to constitute the first priority Liens or the Borrower shall so state in writing; (l) all, or a controlling interest of, the capital stock of the Borrower shall be sold, assigned, or otherwise transferred or if a security

therein or with resp ⁓ thereto; (m) Lender shall determine, in its sole discretion and in gᴼᴼ., faith that there has been a material adverse change in the financial condition of the Borrower since the date hereof, or that Borrower's ability to make any payment under this Agreement promptly when due or otherwise comply with the terms of the Loan Documents is impaired; or (n) any one or more of the foregoing events shall occur with respect to the Guarantor as if it were the "Borrower" named herein.

### Section 5.    Remedies.

If an Event of Default hereunder shall have occurred, then, or at any time thereafter while such Event of Default is continuing, the Lender may lawfully exercise any of the following remedies (and the Borrower hereby authorizes and empowers the Lender with the aide and assistance of any persons): (a) To enter upon such place as the Collateral may be found and take possession of and carry away the Collateral with or without due process of law at any time or times, and to dispose of the Collateral and apply the proceeds thereof to the Secured Obligations ; and to exercise any or all of the rights and powers and pursue any or all of the remedies that are available to a secured party under the UCC or any other applicable law or in equity in respect to the Collateral. Beyond the safe custody of the Collateral, the Lender shall have no duty as to any of the Collateral in its possession or the possession of its nominee or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto

Upon issuance of a notice of default by Lender, all payments received by the Borrower in connection with the use of any of the Collateral shall be held by the Borrower in trust for the Lender, shall be segregated from other funds of the Borrower and shall forthwith upon receipt by the Borrower be turned over to the Lender, in the same form as received by the Borrower (duly endorsed by the Borrower to the Lender, if required). Any and all such payments so received by the Lender (whether from the Borrower or otherwise) shall be held by the Lender as collateral security for, and then or at any time thereafter, may be applied in whole or in part for the benefit of the Lender against, all or any part of the Obligations in such order as the Lender, in its discretion, may determine.

The Borrower will reimburse the Lender for all fees of attorneys or collection agencies and all expenses, costs and charges paid or payable to third persons or suffered or incurred by the Lender in attempting or effecting protection or preservation of its security interest in the Collateral or the enforcement of any provision of this Security Agreement.   Costs of collecting the amounts secured hereby shall be added to the principal amount due hereunder and shall be secured by, and payable out of, the Collateral.

Any sale or other disposition of the Collateral may be at public or private sale upon such terms and in such manner as the Lender deems advisable, having due regard to compliance with any statute or regulation which might affect, limit, or apply to the Lender's disposition of the Collateral. Unless the Collateral is perishable or threatens to decline speedily in value, or is of a type customarily sold on a recognized market (in which event the Lender should provide the Borrower with such notice as may be practicable under the circumstances), the Lender shall give the Borrower at least the greater of the minimum notice required by law or seven (7) days prior written notice of the date, time, and place of any proposed public sale of, and of the date after which any private sale or other disposition, of the Collateral, or any portion thereof, is to be made.

In connection with the Lender's exercise of the Lender's rights under this Section, the Lender may enter upon, occupy, and use any premises owned or occupied by the Borrower, and may exclude the Borrower from such premises or portion thereof as may have been so entered upon, occupied, or used by the Lender. In no event shall the Lender be liable to the Borrower for use or occupancy by the Lender of any premises pursuant to this Section, nor for any charge (such as wages for the Borrower's employees and utilities) incurred in connection with the Lender's exercise of the Lender's rights and remedies.

The Lender may require the Borrower to assemble the Collateral and make it available to the Lender at the Borrower's sole risk and expense at a place or places which are reasonably convenient to both the Lender and the Borrower (including at the Borrower's premises) or the Lender may render any Collateral unusable to the Borrower.

All rights, remedies and options conferred upon the Lender by the terms of this Agreement or by law shall be cumulative and may be exercised

successively or concurrently and are not alter    e or exclusive of any other such rights, remedies or options. No expr...    or implied waiver by the Lender of any default or event of default hereunder shall in any way be, or be construed to be, a waiver of any future or subsequent Default or Event of Default. The failure or delay of the Lender in exercising any rights granted hereunder shall not constitute a waiver of any such right in the future and any single or partial exercise of any particular right by the Lender shall not exhaust such rights or constitute a waiver of any other right provided herein.

## Section 6.    Miscellaneous.

6.1. If the Lender is made a party defendant to any litigation concerning this Agreement, any Loan Document or the Collateral or any part thereof, then the Borrower shall indemnify, defend and hold the Lender harmless from and against all claims, liabilities, judgments, costs and expenses by reason of said litigation, including reasonable attorneys' fees and expenses incurred by the Lender in any such litigation, whether or not any such litigation is prosecuted to judgment.

All amounts due to the Lender pursuant to this Section shall bear interest at the Default Rate from time to time in effect until paid. The "Default Rate" shall mean a per annum rate of the lesser of (i) the interest rate of the Loan plus four percent (4%) per annum or (ii) the maximum rate of interest then permitted by law.

6.2.When all Secured Obligations have been indefeasibly paid and performed in full and no further obligation on the part of the Borrower shall exist, this Security Agreement shall cease and terminate, and, at the Borrower's written request, accompanied by such certificates, opinions and proof as the Lender shall reasonably deem necessary, the Collateral furnished hereunder shall revert to the Borrower and the estate, rights, title, and interest of the Lender therein shall cease, and thereupon on the Borrower's written request and at its cost and expense, the Lender shall execute proper instruments, acknowledging satisfaction of and discharging the Security Interest created by this Agreement, and shall redeliver to the Borrower the Collateral furnished hereunder then in its possession; subject, however, to the terms and provisions contained in Section 6.3 hereof.

6.3. All covenants, agreements, representations and warranties made herein or in the Note and in certificates delivered pursuant hereto or thereto shall be deemed to have been material and relied upon by Lender, notwithstanding any investigation made by Lender or on Lender's behalf, and shall survive the execution and delivery to Lender hereof and thereof. Each such covenant, agreement, representation and warranty is hereby confirmed by the Borrower to be true and correct in all respects with the same force and effect on and as of the date of delivery of any Collateral to Lender as though made as of the date of such delivery.

6.4.Borrower agrees to indemnify, defend and save and hold harmless Lender and its officers, directors, employees, agents and advisors and affiliates (each, an "Indemnified Party") from and against, and shall pay on demand, any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or resulting from this Agreement (including, without limitation, enforcement of this Agreement), except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

6.5.This Security Agreement may not be waived, changed or discharged orally but only by an agreement in writing and signed by the Lender, and any

oral waiver, change     "scharge of any provision of this Agreement shall be without authority s.._ of no force and effect.

6.6 (a)All notices, demands, requests, consents and other communications provided for in this Agreement shall be given in writing, (including electronic mail), and addressed to the party to be notified at the address for such party set forth below or at such other address as shall be notified in writing to the other parties. (b)All notices, demands, requests, consents and other communications described in clause (a) above shall be effective (i) if delivered by hand, including any overnight courier service, upon personal delivery, or (ii) if delivered by mail, three business days after deposited in the mails, and (iii) if delivered by electronic mail or any other telecommunications device, when transmitted to an electronic mail address (or by another means of electronic delivery) as provided in clause (a) above.

6.7 The covenants, representations, warranties and agreements herein set forth shall be binding upon the Borrower, its successors and assigns and shall inure to the benefit of the Lender, its successors and assigns. Any purchaser, assignee or transferee of any of the Secured Obligations and the Lender's Lien hereunder shall forthwith become vested with and entitled to exercise all the powers and rights given by this Agreement to the Lender, as if said purchaser, assignee, transferee or pledgee were originally named herein.

6.8.This Security Agreement shall be interpreted in accordance with and governed by the laws of the State of Illinois without regard to choice of law principles. Any action or suit in connection with this Agreement or the transactions contemplated herein or therein may be brought in any court of record in the State of New York, the parties hereby irrevocably submitting and consenting to the non-exclusive jurisdiction of each thereof, and each party irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may have or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and claim that the same has been brought in an inconvenient forum. Service of process may be made on the other party by mailing a copy of the summons to such party, by registered mail, at its address to be used for the giving of notices under this Security Agreement and the Note. IN THE EVENT OF ANY LITIGATION IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN, THE DEBTOR AND THE LENDER KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ALL RIGHTS TO A TRIAL BY JURY.

6.9.    This Agreement, any Schedules or Exhibits hereto and any riders or other attachments, any application submitted by the Borrow to the Lender and any guaranty or subordination agreement delivered together under this Agreement (the "Loan Documents") constitute the entire agreement between the parties with respect to the subject matter hereof. If at any time one or more provisions of this Agreement or the Loan Documents, any amendment or supplement thereto or any related writing is or becomes invalid, illegal or unenforceable in whole or in part in any jurisdiction, the validity, legality and enforceability of such provision in any other jurisdiction or of the remaining provisions shall not in any way be affected or impaired thereby.

6.10. If more than one Person constitutes the Borrower or the Guarantor, the obligations of such Persons shall be joint and several.

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Security Agreement, under seal, on the day and year first below written.

| LENDER | | BORROWER | |
|---|---|---|---|
| **Name** Atlas Copco Construction and Mining USA LLC | **Contact Person** G. Grammerstorf | **Name** Indie Energy Services Company, LLC | **Contact Person** Daniel Cheifetz |
| **Address** 3700 E. 68th Avenue | **Telephone** 1.303.600.2330 | **Address** 1020 Church Street | **Telephone** 847.371.1604 |
| **City / State** Commerce City, CO | **Zip Code** 80022 | **City / State** Evanston, Illinois | **Zip Code** 60201 |
| **Signature (Duly Authorized)** | **Date** 06-15-07 | **Signature (Duly Authorized)** | **Date** |
| **Name** Jim Levitt | **Title** VP Finance | **Name** | **Title** CEO |



**Atlas Copco**

## INSTALLMENT LOAN & SECURITY AGREEMENT

FOR VALUE RECEIVED, the undersigned borrower ("Borrower"), promises to pay to the order of the lender ("Lender"), the below stated principal sum together with interest on the unpaid principal balance hereof from time to time outstanding at the rate per annum set forth below. The financial obligation of the Borrower to the Lender is herein called the "Loan". The Loan shall accrue interest by reference to the Fixed Rate as set forth below.

Principal payments and interest shall be due and payable as set forth below. If not sooner paid, all outstanding principal and accrued and unpaid interest thereon shall be paid to the Lender on the Last Payment Date set forth below. In the absence of demonstrable error, the books and records of the Lender shall constitute conclusive evidence of the unpaid principal balance hereof from time to time.

The Borrower may, upon at least two business days' prior written notice to the Lender stating the proposed date and aggregate principal amount of the prepayment, prepay the outstanding principal amount in whole, together with accrued interest to the date of such prepayment on the principal amount prepaid and without discount.

All payments hereunder shall be payable in lawful money of the United States. All payments shall be applied first to any costs, fees and expenses of the Lender due hereunder, then to interest due hereunder, and any balance shall be applied in reduction of principal in the inverse order of maturity.

| FINANCING SCHEDULE | | | | |
|---|---|---|---|---|
| Purchase Price: $604,500.00 | Less Cash: $ | | Financing Term: 36 months | |
| Documentation Fees: $350.00 | Less Trade-In: $44,761.54 | | Interest Rate: 7.95% | |
| Total Price: $604,850.00 | Down Payment: $44,761.54 | | Principal Financed: $564,588.46 | |
| Number of Payments in Series | Amount of Payments in Series | Date of First Payment In Series | Date of Last Payment In Series | Total Amount of Payments in Series |
| 36 | $10,677.96 | July 1, 2007 | July 1, 2010 | $671,406.56 |

This Loan is secured by certain collateral described below. If any Event of Default shall occur, the Lender may, at its option, declare to be immediately due and payable the then outstanding principal balance, with all accrued and unpaid interest thereon, and all other amounts payable to the Lender hereunder, whereupon all such amounts shall become and be due and payable immediately. In the event that any payment due hereunder shall not be paid when due, the Borrower shall pay a late fee of the greater of $100.00 or five percent (5.00%) of the outstanding principal payment missed.

| COLLATERAL – EQUIPMENT DESCRIPTION & LOCATION | |
|---|---|
| Description (model, serial number) | Purchase Price |
| 1 Atlas Copco Brand Drill Model #TH60, Serial #21129 mounted on Peterbilt truck Serial# 1NPAL40X-7-7D661603 | $604,500.00 |
| Freight | $4,500.00 |
| Sales tax to be paid to taxing source directly by Indie Energy | |
| Equipment Location (if other than billing address below) As below | Delivery Date May 23, 2007 |

**Section 1   Grant of Security Interest.**

1.1. For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Borrower hereby grants to the Lender a security interest in and first lien on all of the Borrower's rights in the Collateral to secure the Secured Obligations.

1.2. As used herein, the term "Secured Obligations" shall mean the payment and performance of all debts, liabilities, obligations, covenants, agreements and indemnities of the Borrower to the Lender, of every kind, nature and description, due or to become due, now existing or hereafter arising, including, without limitation, all debts, liabilities and obligations under this agreement; all renewals, amendments, modifications, consolidations, replacements, increases and extensions thereof, therefore and thereto (collectively, the "Loan Documents"); and any other form of indebtedness owed by the Borrower to the Lender.

1.3. As used herein, the term "Collateral" shall mean: (a) All the Borrower's right, title and interest in and to the goods, property and equipment (including any software or computer programs embedded therein) set forth and described in this Security Agreement (the "Equipment"); (b) All the Borrower's right, title and interest in and to all additions, replacements, accessions, substitutions, modifications and improvements to the foregoing; (c) All of the Borrower's rights in, to and under policies and certificates of insurance, including claims or rights to payment and all proceeds, refunds, and premium rebates, including without limitation, proceeds of fire, theft or any other physical damage or loss relating directly or indirectly to the foregoing; (d) All books, records, and information relating to any of the foregoing, and all rights of access to such books, records, and information, and all property in which such books, records, and information are stored, recorded, and maintained, and all computer programs, computer records, computer software, rights of access to computer bureaus and computer data relating to the foregoing; and (e) All proceeds (cash and non-cash) and products of the foregoing, provided that the grant to the Lender of a security interest in proceeds shall not be deemed a consent by Lender to a sale or other disposition of any Collateral.

1.4. As used herein (a) the term "UCC" shall mean the Uniform Commercial Code as adopted and in effect in the State of Illinois; and (b) the term "Guarantor" shall mean a guarantor, if any, of the Secured Obligations.



PLAINTIFF'S
EXHIBIT
G

Borrowers initials here

## Section 2.   Covenants.

The Borrower hereby covenants and agrees for the benefit of the Lender as follows:

2.1. The Borrower will do all things necessary to preserve, renew and keep in full force and effect and in good standing its existence and material qualifications and rights necessary or desirable in the ordinary conduct of its business.

2.2. The Borrower shall retain ownership and possession of the Collateral and keep the Collateral free and clear of all Liens and other property interest of any and every kind whatsoever, except those in favor of the Lender. The Borrower shall promptly notify the Lender of (i) any Lien made or threatened against the Collateral or any part thereof, and (ii) any material change in the Collateral, including without limitation, any material decrease in the value thereof.

2.3. The Borrower shall deliver to the Lender, promptly upon receipt of same, copies of all notices, certificates, documents and instruments received by the Borrower which materially affect the Collateral.

2.4. The Borrower shall pay or cause to be paid promptly when due all taxes, betterments, assessments and other governmental levies, insurance premiums and other charges, to whomever and whenever laid or assessed, whether on this agreement or on any interest therein or on the Secured Obligations, or on the Collateral, which if unpaid might by law become a Lien on the Collateral; provided, however, that any such tax, assessment, charge, levy or claim need not be paid if the validity or amount thereof shall currently be contested in good faith by appropriate proceedings and if the Borrower shall have set aside on its books appropriate reserves with respect thereto in accordance with generally accepted accounting principles; and provided, further, that the Borrower will pay all such taxes, assessments, levies or other governmental charges forthwith upon the commencement of proceedings to foreclose any Lien which may have attached as security therefore.

2.5. The Borrower will keep and maintain each item of Equipment in good operating condition, ordinary wear and tear excepted, and the Borrower will provide all maintenance and service and all repairs necessary for such purpose.

2.6. The Borrower will use the Collateral for lawful purposes only, with all reasonable care and caution in conformity with all applicable laws, rules, regulations and ordinances.

2.7. The Collateral is now and shall remain personal property, and the Borrower will not permit any of the Collateral to become a part of or affixed to real property without written prior consent of the Lender and without first making all arrangements and delivering, or causing to be delivered, to Lender all instruments and documents including, without limitation, waivers and subordination agreements by any party necessary, at the sole discretion of the Lender, to preserve and protect the primary security interest granted herein in the Collateral to the Lender.

2.8. At all times, and at its sole cost and expense, the Borrower shall (i) cooperate with Lender to record and maintain appropriate financing and continuation statements; (ii) pay all recording, filing or other taxes, fees and other charges relating thereto; and (iii) shall comply with all such statutes and regulations, as may be required by law in order to establish, preserve, perfect and protect the first Lien of the Lender in the Collateral (including, without limitation, any interests acquired after the execution hereof) and the rights of the Lender there under. The Lender may record or file as such a financing statement or statements, a carbon, photographic or other reproduction of this agreement. Borrower hereby authorizes the Lender to prepare and file such financing statements (including continuation statements or amendments thereof or supplements thereto) or other instruments as the Lender may from time to time deem necessary or appropriate in order to perfect and maintain the security interest granted hereunder in accordance with the UCC, including without limitation, any financing statement that describes the Collateral.

2.9. If and to the extent from time to time requested by the Lender, the Borrower shall furnish to the Lender written statements, signed and, if so requested, acknowledged, setting forth the amount of the Secured Obligations which the Borrower acknowledges to be due to the Lender, specifying any claims of offset or defense which the Borrower asserts against the Secured Obligations or any obligations to be performed hereunder, the then state of facts relative to the condition of the Collateral, and such other matters as the Lender shall request.

2.10. The Borrower shall notify the Lender at least thirty (30) days prior to any change in the name, structure or identity of the Borrower, or the use by the Borrower of any trade name or trade style not heretofore disclosed to the Lender, or the address of the Borrower's chief executive office or location and the address of any location of Collateral; in each case by an amendment to this Security Agreement.

2.11. The Borrower will promptly notify the Lender (a) of any material adverse change in its financial condition, assets, business or prospects and (b) any litigation, arbitration or administrative proceeding to which the Borrower may hereafter become a party and which may involve any material risk of any judgment or liability which may have a material adverse effect on the Collateral or Borrower's ability to pay and perform the Secured Obligations as and when due.

2.12. The Borrower shall allow the Lender and its representatives access and right of inspection of the Collateral at its location at reasonable times, with reasonable frequency, and in a reasonable manner, and in the event of loss or damage to the Collateral shall send prompt written notice thereof to the Lender.

2.13. The Borrower will maintain with financially sound and reputable companies insurance policies (i) insuring the Equipment against loss by fire, explosion, theft and such other casualties as are usually insured against by companies engaged in the same or similar businesses, and (ii) insuring the Borrower and the Lender against liability for personal injury and property damage relating to the Equipment, such policies to be in such form and in such amounts and coverage as may be reasonably satisfactory to the Lender, with losses payable, in the case of casualty policies, to the Lender as its interests may appear.   All insurance policies with respect to the Equipment shall (i) contain a "Lender's Loss Payable" endorsement which shall provide that in respect of the interests of the Lender in such policy the insurance shall not be invalidated by any action or inaction of the Borrower or any other person and shall insure the interests of the Lender as they appear, regardless of any breach or violation of any warranties, declarations or conditions contained in such policies by the Borrower; (ii) provide that no cancellation, reduction in amount or change in coverage thereof shall be effective until at least thirty (30) days after receipt by the Lender of written notice thereof; (iii) waive any right of subrogation of the insurer against, or any right of set-off, counterclaim or any other deduction in respect of any liability of, the Lender to such insurer; (iv) provide that the Lender shall receive promptly copies of any notices to the Borrower of any default or other act or omission by the Borrower which might invalidate or render unenforceable, in whole or in part, such policy or result in the lapse thereof, in whole or in part; and (v) be otherwise satisfactory in all respects to the Lender. Each liability policy carried in accordance with this Section shall be primary without right of contribution from any other insurance policy which is carried by the Borrower or the Lender to the extent that such other insurance policy provides the Borrower or the Lender with contingent or excess liability insurance with respect to its interest in the insured property and shall expressly provide that all of the provisions thereof, except the limits on liability, shall operate in the same manner as if there were a separate policy covering each insured. The Borrower shall, if so requested by the Lender, deliver to the Lender as often as the Lender may reasonably request, a Certificate of Insurance evidencing such coverage. All such insurance proceeds received by the Lender may be applied by the Lender in its discretion to the satisfaction of the Secured Obligations or to repair or replacement of any property which sustained the casualty, except as otherwise required by applicable law.

2.14. The Borrower shall not permit the Collateral to be relocated to a jurisdiction outside the contiguous United States, and the Borrower shall give the Lender prior written notice if any item of Collateral is to be removed from its current jurisdiction to another within the United States.

2.15. The Borrower will defend the Collateral against the claims and demands of all persons.

## Section 3.   Right of Lender to Perform for Borrower.

3.1. Whether or not an Event of Default exists under this Security Agreement, the Lender shall have the following rights: (a) The Lender is hereby specifically authorized to make, at the Lender's sole option, any or all payments required to be made either hereunder or otherwise in respect of the Collateral by the Borrower. Such payments may include, but are not limited to, payments for taxes, assessments, betterments and other governmental levies, and insurance premiums.  The Lender

**Borrowers initials here** ⟋⟍

shall have the right, but not the duty, to perform any obligations of the Borrower relating to the Collateral, without . . . ing any other rights or releasing the Borrower from any obligation hereunder (b) The Lender shall have the right, but not the duty, to intervene or otherwise participate in any legal or equitable proceeding which, in the Lender's sole judgment, affects the Collateral or any of the rights created or secured by this Security Agreement. Such rights may be exercised by the Lender at any time, but only after notice to the Borrower, and only to the extent permitted by law and necessary to protect the Lender's rights hereunder and in the Collateral.

3.2. Any sums paid, and any costs or expenses, including reasonable attorneys' fees, incurred by the Lender, pursuant to the Lender's exercise of rights specified or referred to herein, shall:  (a) as between the parties hereto and their successors-in-interest, be deemed valid, so that in no event shall the necessity or validity of any such payments, costs or expenses be disputed by the Borrower; and (b) with respect to such sums, costs and expenses, be, until paid, part of the Secured Obligations and, until paid, shall accrue interest at the Default Rate as defined in this Agreement.

### Section 4.  Events of Default.

The occurrence of any one or more of the following events shall constitute an Event of Default hereunder (each an "Event of Default"): (a) the Borrower shall fail to make any payment of the Secured Obligations within five (5) days of when due; (b) the Borrower shall fail to perform or observe any other covenant, condition or agreement to be performed or observed by the Borrower under this Agreement within fifteen (15) days after the date of written notice thereof sent by the Lender; (c) any representation or warranty made by the Borrower herein or in any document or certificate furnished to the Lender in connection herewith shall have been incorrect in any material respect when made; (d) the Borrower shall fail to make any payment of any "material indebtedness" (meaning indebtedness equal to or exceeding ten percent (10%) of the original principal amount of the Loan) (other than indebtedness constituting Secured Obligations) for money borrowed or indebtedness under any capitalized lease or other purchase money obligation or shall fail to perform the terms of any agreement relating to such indebtedness and such breach or default shall continue, without having been duly cured, waived or consented to, beyond the period of grace, if any, therein specified, or any such indebtedness shall be accelerated or declared due and payable prior to the stated maturity thereof; (e) the Borrower or any "affiliate" (meaning, as applied to any person or entity, a person or entity which directly or indirectly controls, is controlled by, or under common control with such person or entity) shall fail to pay, observe or perform any obligation, indebtedness, covenant or agreement to or with the Lender or any of its "affiliates" to be paid, observed or performed on the part of the Borrower or its "affiliates" and such default shall continue without having been duly cured, waived or consented to beyond the period of grace, if any, therein specified; (f) there shall be imposed on the Collateral or any part thereof any Lien other than a Lien in favor of the Lender; (g) there shall occur any loss, theft, fire, substantial damage to or destruction of a material portion of the Collateral, or any seizure of any of the Collateral; (h) there shall occur the entry of any material judgment against the Borrower, which judgment is not satisfied or appealed from (with execution or similar process stayed) within thirty (30) days of its entry; (i) (x) the Borrower shall generally not pay its debts as such debts become due, shall admit in writing its inability to pay its debts generally or shall make a general assignment for the benefit of creditors, (y) any proceeding shall be instituted by or against the Borrower seeking to adjudicate it a bankrupt or insolvent, or seeking liquidation, winding up, reorganization, arrangement, adjustment, protection, relief or composition of it or its debts, under any applicable law relating to bankruptcy, insolvency or reorganization or relief of debtors, or seeking the entry of an order for relief or the appointment of a custodian, receiver, trustee or other similar official for it or for any substantial part of its property; provided, however, that in the case of any such proceedings instituted against the Borrower (but not instituted by the Borrower) either such proceedings shall remain undismissed or unstayed for a period of 45 days or more or any action sought in such proceedings shall occur, or (z) the Borrower shall take any corporate action to authorize any action set forth in clauses (x) and (y) above; (j) any provision of this Agreement after delivery thereof shall for any reason fail or cease to be valid and binding on, or enforceable against, the Borrower, or the Borrower shall so state in writing; (k) this Agreement shall for any reason fail or cease to create valid and enforceable Liens on any Collateral purported to be covered hereby or, such Liens shall fail or cease to constitute the first priority Liens or the Borrower shall so state in writing; (l) all, or a controlling interest of, the capital stock of the Borrower shall be sold, assigned, or otherwise transferred or if a security interest or other encumbrance shall be granted or otherwise acquired

therein or with respect thereto; (m) Lender shall determine, in its sole discretion and in go..   aith that there has been a material adverse change in the financial condition of the Borrower since the date hereof, or that Borrower's ability to make any payment under this Agreement promptly when due or otherwise comply with the terms of the Loan Documents is impaired; or (n) any one or more of the foregoing events shall occur with respect to the Guarantor as if it were the "Borrower" named herein.

### Section 5.   Remedies.

If an Event of Default hereunder shall have occurred, then, or at any time thereafter while such Event of Default is continuing, the Lender may lawfully exercise any of the following remedies (and the Borrower hereby authorizes and empowers the Lender with the aide and assistance of any persons): (a) To enter upon such place as the Collateral may be found and take possession of and carry away the Collateral with or without due process of law at any time or times, and to dispose of the Collateral and apply the proceeds thereof to the Secured Obligations ; and to exercise any or all of the rights and powers and pursue any or all of the remedies that are available to a secured party under the UCC or any other applicable law or in equity in respect to the Collateral. Beyond the safe custody of the Collateral, the Lender shall have no duty as to any of the Collateral in its possession or the possession of its nominee or any income thereon or as to the preservation of rights against prior parties or any other rights pertaining thereto

Upon issuance of a notice of default by Lender, all payments received by the Borrower in connection with the use of any of the Collateral shall be held by the Borrower in trust for the Lender, shall be segregated from other funds of the Borrower and shall forthwith upon receipt by the Borrower be turned over to the Lender, in the same form as received by the Borrower (duly endorsed by the Borrower to the Lender, if required). Any and all such payments so received by the Lender (whether from the Borrower or otherwise) shall be held by the Lender as collateral security for, and then or at any time thereafter, may be applied in whole or in part for the benefit of the Lender against, all or any part of the Obligations in such order as the Lender, in its discretion, may determine.

The Borrower will reimburse the Lender for all fees of attorneys or collection agencies and all expenses, costs and charges paid or payable to third persons or suffered or incurred by the Lender in attempting or affecting protection or preservation of its security interest in the Collateral or the enforcement of any provision of this Security Agreement. Costs of collecting the amounts secured hereby shall be added to the principal amount due hereunder and shall be secured by, and payable out of, the Collateral.

Any sale or other disposition of the Collateral may be at public or private sale upon such terms and in such manner as the Lender deems advisable, having due regard to compliance with any statute or regulation which might affect, limit, or apply to the Lender's disposition of the Collateral. Unless the Collateral is perishable or threatens to decline speedily in value, or is of a type customarily sold on a recognized market (in which event the Lender shall provide the Borrower with such notice as may be practicable under the circumstances), the Lender shall give the Borrower at least the greater of the minimum notice required by law or seven (7) days prior written notice of the date, time, and place of any proposed public sale of, and of the date after which any private sale or other disposition, of the Collateral, or any portion thereof, is to be made.

In connection with the Lender's exercise of the Lender's rights under this Section, the Lender may enter upon, occupy, and use any premises owned or occupied by the Borrower, and may exclude the Borrower from such premises or portion thereof as may have been so entered upon, occupied, or used by the Lender. In no event shall the Lender be liable to the Borrower for use or occupancy by the Lender of any premises pursuant to this Section, nor for any charge (such as wages for the Borrower's employees and utilities) incurred in connection with the Lender's exercise of the Lender's rights and remedies.

The Lender may require the Borrower to assemble the Collateral and make it available to the Lender at the Borrower's sole risk and expense at a place or places which are reasonably convenient to both the Lender and the Borrower (including at the Borrower's premises), or the Lender may render any Collateral unusable to the Borrower.

All rights, remedies and options conferred upon the Lender by the terms of this Agreement or by law shall be cumulative and may be exercised

**Borrowers Initials here**

successively or concurrently and are not alterne‎ ̄ ̈ or exclusive of any other such rights, remedies or options. No expre‎  ̄ r implied waiver by the Lender of any default or event of default hereunder shall in any way be, or be construed to be, a waiver of any future or subsequent Default or Event of Default. The failure or delay of the Lender in exercising any rights granted hereunder shall not constitute a waiver of any such right in the future and any single or partial exercise of any particular right by the Lender shall not exhaust such rights or constitute a waiver of any other right provided herein.

**Section 6.    Miscellaneous.**

6.1. If the Lender is made a party defendant to any litigation concerning this Agreement, any Loan Document or the Collateral or any part thereof, then the Borrower shall indemnify, defend and hold the Lender harmless from and against all claims, liabilities, judgments, costs and expenses by reason of said litigation, including reasonable attorneys' fees and expenses incurred by the Lender in any such litigation, whether or not any such litigation is prosecuted to judgment.

All amounts due to the Lender pursuant to this Section shall bear interest at the Default Rate from time to time in effect until paid. The "Default Rate" shall mean a per annum rate of the lesser of (i) the interest rate of the Loan plus four percent (4%) per annum or (ii) the maximum rate of interest then permitted by law.

6.2.When all Secured Obligations have been indefeasibly paid and performed in full and no further obligation on the part of the Borrower shall exist, this Security Agreement shall cease and terminate, and, at the Borrower's written request, accompanied by such certificates, opinions and proof as the Lender shall reasonably deem necessary, the Collateral furnished hereunder shall revert to the Borrower and the estate, rights, title, and interest of the Lender therein shall cease, and thereupon on the Borrower's written request and at its cost and expense, the Lender shall execute proper instruments, acknowledging satisfaction of and discharging the Security Interest created by this Agreement, and shall redeliver to the Borrower the Collateral furnished hereunder then in its possession; subject, however, to the terms and provisions contained in Section 6.3 hereof.

6.3. All covenants, agreements, representations and warranties made herein or in the Note and in certificates delivered pursuant hereto or thereto shall be deemed to have been material and relied upon by Lender, notwithstanding any investigation made by Lender or on Lender's behalf, and shall survive the execution and delivery to Lender hereof and thereof. Each such covenant, agreement, representation and warranty is hereby confirmed by the Borrower to be true and correct in all respects with the same force and effect on and as of the date of delivery of any Collateral to Lender as though made as of the date of such delivery.

6.4.Borrower agrees to indemnify, defend and save and hold harmless Lender and its officers, directors, employees, agents and advisors and affiliates (each, an "Indemnified Party") from and against, and shall pay on demand, any and all claims, damages, losses, liabilities and expenses (including, without limitation, reasonable fees and expenses of counsel) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or resulting from this Agreement (including, without limitation, enforcement of this Agreement), except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

6.5.This Security Agreement may not be waived, changed or discharged orally but only by an agreement in writing and signed by the Lender, and any

oral waiver, change or  ̄ ‎charge of any provision of this Agreement shall be without authority a. ‎ l no force and effect.

6.6 (a)All notices, demands, requests, consents and other communications provided for in this Agreement shall be given in writing, (including electronic mail), and addressed to the party to be notified at the address for such party set forth below or at such other address as shall be notified in writing to the other parties. (b)All notices, demands, requests, consents and other communications described in clause (a) above shall be effective (i) if delivered by hand, including any overnight courier service, upon personal delivery, or (ii) if delivered by mail, three business days after deposited in the mails, and (iii) if delivered by electronic mail or any other telecommunications device, when transmitted to an electronic mail address (or by another means of electronic delivery) as provided in clause (a) above.

6.7 The covenants, representations, warranties and agreements herein set forth shall be binding upon the Borrower, its successors and assigns and shall inure to the benefit of the Lender, its successors and assigns. Any purchaser, assignee or transferee of any of the Secured Obligations and the Lender's Lien hereunder shall forthwith become vested with and entitled to exercise all the powers and rights given by this Agreement to the Lender, as if said purchaser, assignee, transferee or pledgee were originally named herein.

6.8.This Security Agreement shall be interpreted in accordance with and governed by the laws of the State of Illinois without regard to choice of law principles. Any action or suit in connection with this Agreement or the transactions contemplated herein or therein may be brought in any court of record in the State of New York, the parties hereby irrevocably submitting and consenting to the non-exclusive jurisdiction of each thereof, and each party irrevocably waives, to the fullest extent it may effectively do so under applicable law, any objection it may have or hereafter have to the laying of the venue of any such suit, action or proceeding brought in any such court and claim that the same has been brought in an inconvenient forum. Service of process may be made on the other party by mailing a copy of the summons to such party, by registered mail, at its address to be used for the giving of notices under this Security Agreement and the Note. IN THE EVENT OF ANY LITIGATION IN CONNECTION WITH THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREIN OR THEREIN, THE DEBTOR AND THE LENDER KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE ALL RIGHTS TO A TRIAL BY JURY.

6.9. This Agreement, any Schedules or Exhibits hereto and any riders or other attachments, any application submitted by the Borrow to the Lender and any guaranty or subordination agreement delivered together under this Agreement (the "Loan Documents") constitute the entire agreement between the parties with respect to the subject matter hereof. If at any time one or more provisions of this Agreement or the Loan Documents, any amendment or supplement thereto or any related writing is or becomes invalid, illegal or unenforceable in whole or in part in any jurisdiction, the validity, legality and enforceability of such provision in any other jurisdiction or of the remaining provisions shall not in any way be affected or impaired thereby.

6.10. If more than one Person constitutes the Borrower or the Guarantor, the obligations of such Persons shall be joint and several.

**IN WITNESS WHEREOF**, the parties hereto have executed and delivered this Security Agreement, under seal, on the day and year first below written.

| LENDER | | BORROWER | |
|---|---|---|---|
| **Name** Atlas Copco Construction and Mining USA LLC | **Contact Person** G. Grammerstorf | **Name** Indie Energy Services Company LLC | **Contact Person** Daniel Cheifetz |
| **Address** 3700 E. 68th Avenue | **Telephone** 1.303.600.2330 | **Address** 1020 Church Street | **Telephone** 647.371.1604 |
| **City / State** Commerce City, CO | **Zip Code** 80022 | **City / State** Evanston, IL | **Zip Code** 60201 |
| **Signature (Duly Authorized)** | **Date** 08-31-07 | **Signature (Duly Authorized)** | **Date** 6/20/07 |
| **Name** Jim Levitt | **Title** VP Finance | **Name** Daniel Cheifetz | **Title** CEO |